# EXHIBIT A

Page 1

1          Elizabeth Trenbeath

2     IN THE UNTIED STATES DISTRICT COURT

3        DISTRICT OF SOUTH CAROLINA

4           COLUMBIA DIVISION

5  CAREER COUNSELING, INC, d/b/a     Case No.

6  SNELLING STAFFING SERVICES, a     3:16-cv-3013-JMC

7  South Carolina Corporation,       Class Action

8  individually and as the

9  representative of a class of

10 Similarly situated persons,

11            Plaintiffs,

12      vs.

13 AMERIFACTORS FINANCIAL GROUP,

14 LLC AND JOHN DOES 1-5,

15            Defendants.

16
         Virtual Video Remote Deposition of
17          Elizabeth Trenbeath 30(b)6
              January 12, 2021
18               1:02 p.m.

19

20

21

22

23

24 Reported by LeShaunda Cass-Byrd, CSR, RRP

25 TSG Job No. 188570

1                    Elizabeth Trenbeath

2    you in an office at Career Counseling today?

3        A.      Yes.

4        Q.      And at what address are you at?

5        A.      114 Haygood Avenue, Lexington, South

6    Carolina.

7        Q.      And is any -- is anyone physically present

8    with you today?

9        A.      No, not in my office.  In the front office,

10   I have secretaries up there.

11       Q.      Other than the secretaries, is there anyone

12   else physically present in your office?

13       A.      No.

14       Q.      I heard Mr. Kelly say off screen that he

15   was at your location or somewhere?

16       A.      Oh, yeah.  He is in the break room.  If

17   we're talking my four walls, no one is here.  But then

18   we have my secretary and Mr. Kelly in the break room.

19       Q.      Okay.  Is there anyone else present other

20   than your -- I'm sorry, did you say four secretaries?

21       A.      No, but four of my secretaries.  I have two

22   up front, an intern, a secretary, and Mr. Kelly.

23       Q.      Okay.  Thank you.  And do you have in front

24   of you any documentation or materials related to this

25   case?

```
 1                    Elizabeth Trenbeath
 2   name.  Mr. Kelly can get that for you, but Mr. Watson
 3   was the only name I can remember.
 4       Q.     Okay.  And so after participating in that
 5   settlement that you mentioned that was approximately
 6   eight years ago in which Career Counseling received
 7   $500, did you then come to retain Mr. Kelly and his
 8   firm to represent Career Counseling with respect to
 9   similar type claims regarding the receipt of faxes?
10       A.     Yes.
11       Q.     And what was the first time that you
12   retained Mr. Kelly and his firm for that purpose?
13       A.     I just sent faxes through the years.  So I
14   guess at that time, I got the $500 check.
15              But what was your question again, one more
16   time?
17       Q.     How you came to -- Career Counseling came
18   to retain the ones that were directly?
19       A.     Directly, that would be with -- besides
20   that first $500 payment where we were a member of a
21   class action lawsuit, it would have been with
22   Amsterdam.
23       Q.     And you mentioned you would send faxes over
24   to Mr. Kelly's law firm?
25       A.     Correct.
```

1                   Elizabeth Trenbeath

2      Q.     About how many faxes have you sent over to

3 Mr. Kelly's law firm?

4      A.     I would -- let's see.  Maybe 100 or more

5 would receive quite a few faxes.  So I feel

6 comfortable saying 100.

7      Q.     And were all of those 100 related to the

8 Amsterdam case and this case?

9      A.     A variety.  So no, they were not.

10      Q.     But you testified earlier the only lawsuits

11 that Career Counseling filed were for -- were against

12 Amsterdam Printing and against AmeriFactors; is that

13 correct?

14      A.     Correct.

15      Q.     Were there any other less formal claims

16 asserted with respect to the 100 or so faxes that you

17 sent over to Mr. Kelly?

18      A.     No.

19      Q.     Other than the $500 that you received in

20 connection with that -- excuse me, with that first

21 lawsuit in which Career Counseling was a settlement

22 class member, and putting aside the Amsterdam case for

23 the moment, has Career Counseling been paid any other

24 monies in connection with these types of claims?

25      A.     Through Wanca.

Page 27

1              Elizabeth Trenbeath

2    Q.    Yes.

3    A.    No, I have not spoken to him.

4    Q.    Have you met him in person?

5    A.    No.

6    Q.    Can you describe for me what Career

7  Counseling does?

8    A.    Sure.  We are a staffing agent.  So

9  applicants come in and are looking for employment, and

10  then we have companies looking for candidates to hire.

11  So we are the middle person bringing them together and

12  helping people find work and helping people find great

13  employees.

14    Q.    How do your -- I'll call them the

15  candidates looking for the employment -- how do those

16  folks come to you?  How do you find those people?

17    A.    Sure.  Word of mouth.

18          I'm trying to think.  Word of mouth.  We do

19  e-mails or texts out if they've registered with us.

20  They go to our website, and we have jobs posted there.

21  If we do any printed advertisement, which is few and

22  far between but when we do, that would -- they may see

23  that, a family member may see that and they refer them

24  to us.  We see third generations coming in now.  We

25  have been open since '82.  So that's the general ways.

1                  Elizabeth Trenbeath

2       Q.      And then how do perspective employers find

3  your company?

4       A.      Sure.  By sales calls in-person, over the

5  phone, again, word of mouth, Google searching.  That

6  has been the most common, word-of-mouth referrals.

7       Q.      And you mentioned earlier with respect to

8  the -- I don't know if I am categorizing them right,

9  but the folks who are seeking the employment that seek

10  placement, you mentioned that you reach out to them by

11  phone, and did you say by text?

12      A.      We -- yeah.  Our -- our databases allow to

13  do mass texting.  Of course, you have very limited

14  space that you can text.  But it would be something

15  simple like, we have a position you may be interested

16  in, please give us a call.  And we leave our landline

17  number, or type our landline number in there.

18      Q.      And what type of text platform was used?

19      A.      So we are on a new database now, which goes

20  through Bullhorn, but before that, it was called

21  eEmpACT, E-E-M-P-A-C-T.  And it's just through a

22  database, those -- those system.

23      Q.      Okay.  And is that -- when you said you did

24  mass texting, when you send out a mass text, how many

25  recipients ordinarily would receive a mass text or the

1            Elizabeth Trenbeath

2    typical occasion?

3        A.    We could be texting five to -- up to 100

4    people.  It just depends on who comes in with the key

5    words.  If we're looking for a welder, anyone that

6    pops up with welding, say do you have six years'

7    experience, please give us a call.

8        Q.    Okay.  And when you say you are using key

9    words, is that some queries concerning database or --

10       A.    Correct, queries in the database.

11       Q.    And who is in that database?

12       A.    Oh, we -- people that register with us.

13       Q.    Do you keep for all time, anyone who has

14   ever registered with you, or is it something that you

15   age out over time?

16       A.    Keep all time, as long as the database

17   doesn't have a glitch.  It's --

18       Q.    Sort of like --

19       A.    Yeah.  It's many, many people.

20       Q.    Okay.  And you mentioned that Career

21   Counseling has been in business since -- I don't know.

22   You said 1983, or actually seeing something from 1983.

23   Is that about the time that the business was formed?

24       A.    Correct.

25       Q.    And I understand the business was -- that

1                      Elizabeth Trenbeath

2    bottom line, there are two sentences at the bottom.

3    If you can read that out loud.  Yeah, there we go.

4         A.     AmeriFactors is a wholly-owned subsidiary

5    of Gulf Coast Bank, Member FDIC.  If you would like to

6    be removed from our contact list, just dial

7    888-879-1777 and enter fax number.  Thank you.

8         Q.     Did you ever take any action, as suggested

9    at the bottom of the fax, to be removed from the

10   contact's list that is referred to in that statement?

11        A.     No.

12        Q.     Have you ever on any other faxes, if they

13   have similar language, taken action to be removed from

14   a contact list?

15        A.     No.

16        Q.     And why not?

17        A.     I don't have -- we don't have time for

18   that, and it's taking time for my staff to do so.

19        Q.     Would that require more time than sending

20   it to Ryan Kelly?

21        A.     Yes, I would think so.  But yeah, I would

22   think so.

23        Q.     And was this fax received on the fax number

24   that you identified previously, the one ending in

25   3008?

1                    Elizabeth Trenbeath

2       Q.      Okay.  And does anyone actually work in

3   that Columbia office?

4       A.      Yes.

5       Q.      Who works there?

6       A.      I do on Fridays.

7       Q.      Okay.  And we can take down the fax.

8               And back in mid 2016, I think the

9   allegation is that this fax was received towards the

10  end of June of 2016.  Who had access to the actual fax

11  machine in the office?

12      A.      The staff did.  So that would be me and the

13  staff that was employed at the time.

14      Q.      Do you believe that you were the person to

15  pick up this particular fax off the fax machine?

16      A.      Yes.

17      Q.      And how long did it take you to review this

18  fax?

19      A.      Less than a minute.

20      Q.      And how long did it take you to transmit it

21  to Mr. Kelly?

22      A.      Two minutes.

23      Q.      How did you get it transmitted to

24  Mr. Kelly?

25      A.      I scanned it into my computer and sent it.

1                      Elizabeth Trenbeath

2      A.     Yes.

3      Q.     And what -- what are you seeking in this

4  lawsuit?  Do you have an understanding of the remedies

5  that you are seeking?

6      A.     I know that there is 500 for fax.  There

7  is -- I think there's 1500 for a fax that is not

8  verified and received.  So basic like that, and then

9  just leaving the class action lawsuit so this doesn't

10 continue.

11     Q.     Okay.  I'm sorry, what did you say the 1500

12 was for?

13     A.     Oh, the -- if it's -- it's another 1500 is

14 if -- trying to get my -- remembering it right for --

15 I don't remember the -- I don't recall the full term

16 of it, but not being a legitimate fax.

17     Q.     What does it mean to not be a legitimate

18 fax to you?

19     A.     One that is not having a business

20 relationship with.

21     Q.     Do you know how many faxes would be at

22 issue, or you're -- you're advocating should be at

23 issue on a class-wide basis in this case?

24     A.     In this case, it's 59,000.

25     Q.     And are you seeking $500 for each of those

1              Elizabeth Trenbeath

2    faxes?

3         A.    Whatever the judge decides.

4         Q.    Is that -- what relief are you requesting?

5         A.    What relief am I requesting?  It's -- it's

6    not up to me to -- to make that decision.

7         Q.    If you could turn to page 13 of the

8    complaint, do you see on page 13 of the complaint, it

9    says:  Plaintiff Career Counseling -- I'm going to

10   paraphrase a bit -- demands judgment against

11   AmeriFactors.

12              And then if we look at B:  That the court

13   award a monetary loss for such violations, or the sum

14   of $500 for each violation, whichever is greater.

15              Do you see that?

16        A.    Oh, yes.

17              Are you talking for the class action

18   lawsuit?

19        Q.    Yes.

20        A.    Oh, yes.  500 for each -- for each, 59,000.

21   I was -- yes.

22        Q.    Have you done that math?

23        A.    I can do it really quick, but I know

24   it's -- it's quite a bit.  I believe it's -- I have --

25   it's -- I believe it's up to 27,000.  Between 7

1                    Elizabeth Trenbeath

2      A.       Representing the class to help in the

3  mass -- the mass faxing that was going out and helping

4  put it into that.

5      Q.       I'm sorry.  I -- I am not quite sure I

6  understood.  What do you understand your role to be as

7  the class representative?

8      A.       To represent the 59,000 people that

9  received the fax that -- that would not have wanted to

10 receive the fax, and that is it.

11     Q.       And do you have any obligations as the

12 class representative to make sure that you are

13 adequately representing the interests of those other

14 persons that are not parties?

15     A.       I refer to my legal counsel on that.  I

16 would say yes.

17     Q.       And what do you -- what steps do you think

18 that you must take to make sure that you are

19 adequately representing the interest of these absent

20 class members?

21     A.       What steps am I to be taking to make sure

22 that I am representing them well?

23     Q.       Yes.

24     A.       Is -- you know, the mediation that we tried

25 a month or two ago here in this deposition, steps like

1                    Elizabeth Trenbeath

2    that.

3        Q.      Any others?

4        A.      Not that I can think of right now.

5        Q.      If you could turn to page 6 of this

6    exhibit, please.  Paragraph 23 states:  The plaintiff

7    will fairly and adequately represent and protect the

8    interests of the class.  He is interested in this

9    matter, has no conflicts, and has retained experienced

10   class counsel to represent this -- the class.

11              Do you see that?

12       A.      Yes, ma'am.

13       Q.      I think the "he" is a typo.  The reference

14   is to the plaintiff, which is Career Counseling.  Is

15   that your understanding as well?

16       A.      I would say yes.

17       Q.      Do you think that "he" refers to somebody

18   else?

19       A.      The plaintiff (reading out loud to self).

20   I would think it's a typo.  I'm a she.

21       Q.      And Career Counseling is an it, presumably,

22   correct?

23              COURT REPORTER:  I didn't hear you.

24        I'm sorry, Career Counseling is what?

25              MS. MAZZUCHETTI:  An "it."  Neither

1                    Elizabeth Trenbeath

2      Q.      Okay.  You had mentioned the FCC.  There

3   were proceedings before the FCC, correct?

4      A.      Yes.

5      Q.      Did Career Counseling make any submissions

6   or statements to the FCC?

7      A.      I would refer to my attorney for that.  It

8   would be in the process, but that is all I know.

9      Q.      Do you know one way or the other whether

10  Career Counseling made submissions to the FCC?

11     A.      If it was through Wanca, yes, but I would

12  have to refer to them on how they did the proceedings.

13  I'm not familiar with that.

14     Q.      Did you ever review any documents that were

15  going to be presented to the FCC?

16     A.      I'm not familiar with all the documents and

17  how they're presented in process totally with them.

18     Q.      Do you -- do you have any recollection of

19  reviewing the document that was submitted to the FCC

20  or was to be submitted to the FCC?

21     A.      Not specifically FCC.  I've referred to

22  like lots of documents, and whatever the documents are

23  supposed to go within the process, I refer back to

24  Wanca for that.

25     Q.      Are you aware of any rulings made by FCC?

1                    Elizabeth Trenbeath

2     class of persons or businesses, whatever they may be,

3     that you are seeking to represent?

4          A.     We can agree to that.

5          Q.     Okay.  And I'll re-ask my question to make

6     sure we are on the same page.  Do you know whether the

7     FCC's rejection, as you described it, impact the

8     claims of any absent class members?

9          A.     I would say yes.

10          Q.     How does it impact those claims?

11          A.     The process has to continue through the --

12     the steps for the class action lawsuit, and I would

13     not be able to explain legally any more than that.

14          Q.     You had mentioned earlier and went out of

15     your way to tell us you have a standalone fax machine.

16     Do you remember testifying that you have a standalone

17     fax machine?

18          A.     Yes.

19          Q.     Do you believe that the FCC's ruling

20     eliminates a claim for persons or businesses that

21     don't have a standalone fax machine?

22                    MR. KELLY:  Objection.  Calls for a

23          legal conclusion.

24                    THE WITNESS:  I would have no idea

25          how that would play itself out, as I'm --

1              Elizabeth Trenbeath

2       I'm not familiar with the full process.

3  BY MS. MAZZUCHETTI:

4       Q.    Do you know what if anything the FCC said

5  about eFax solutions or computerized or internet-based

6  fax solutions?

7       A.    I am not familiar --

8            MR. KELLY:  Same objection.

9            Go ahead.

10            THE WITNESS:  I'm not familiar with

11      the full legalities.

12  BY MS. MAZZUCHETTI:

13       Q.    Okay.  Do you have a financial agreement

14  with your attorneys about how they will be compensated

15  for their work on this case?

16       A.    Do I have an agreement?  No.  No, other

17  than standard attorneys, if they settle a case,

18  what -- what they could get.  But I would not know --

19  there is no financial agreement.

20       Q.    Okay.  What is that -- when you refer to

21  that standard agreement if they settle a case, what

22  they will get, what is your understanding in that

23  regard?

24       A.    With Amsterdam, it was 1/3.

25       Q.    Okay.  So if they get a recovery for you

1             Elizabeth Trenbeath

2   and/or the absent class, they would get 1/3 of what

3   they got for you and/or the absent class?

4        A.    I would only assume so.  I don't know what

5   the judge will -- will decide, if the judge decides

6   that.  I don't know who decides that.

7        Q.    And do you think that in your

8   representation of the absent class here, that you

9   would be advocating that the attorneys received 1/3 in

10  compensation of what they get for the class?

11            MR. KELLY:  Objection.  Calls for a

12        legal conclusion.

13            Go ahead.

14            THE WITNESS:  If that is industry,

15        then yes, but I'm not the one to make that

16        judgment.  But I will go with what the

17        industry does.

18  BY MS. MAZZUCHETTI:

19       Q.    Okay.  Your -- you understand that you are

20  the person that has stood up to represent this class

21  of persons, correct?

22       A.    Yes, ma'am.

23       Q.    And you understand that, you know, as -- as

24  part of that role, you represented to the court that

25  you are adequate to be that class representative,

Page 137

1                    Elizabeth Trenbeath

2      A.      No.

3      Q.      Do you know whether any settlement demands

4 have been made in this case?

5      A.      Any settlement demands have been made in

6 this case?

7      Q.      Yes.

8      A.      Any -- that's what we are going through

9 right now, right?

10      Q.      Not this.  And again, I'm not asking -- I

11 don't want you to reveal any positions taken at the

12 mediation.  But I'm just asking you, as the class

13 representative, are you aware of whether settlement

14 demands, which would be demands by your lawyers from

15 AmeriFactors, have been made to resolve the case?

16      A.      I -- I'm unaware.

17      Q.      Are you -- are you aware of any settlement

18 offers that have been made by AmeriFactors at any time

19 to settle the case?

20      A.      To settle the case as they evolved through

21 this process, yes -- no, I'm -- I'm unaware.

22      Q.      You had mentioned earlier the first case

23 that you got the $500 from.  We don't remember that

24 case name.  Then you mentioned a case that you

25 attempted to participate in but missed the claims

1                          Elizabeth Trenbeath

2   subpoenas sent to telephone companies like Spirit or

3   Segra, AT&T together, that information, or -- yeah,

4   I'm assuming that way or AdMax provided that.  I'm not

5   sure.

6        Q.    Okay.  But how are you able to verify that

7   the statement defendant directed a third party to use

8   a list of numbers which AdMax had purchased or

9   acquired, how did you verify so that you were signing

10  previously -- how can you verify the accuracy of that

11  statement?

12       A.    That's what the -- the accuracy of the

13  response, the 55,000?

14       Q.    The whole response about who directed who

15  to do what.

16       A.    Oh, that would be from legal counsel in

17  their investigation, or their -- their process.

18       Q.    Did you do anything else to verify the

19  accuracy of that statement?

20       A.    I would have to refer to them.

21       Q.    In interrogatory number 15, you were asked

22  to list all lawsuits filed by Anderson & Wanca

23  alleging violation of the facsimile provisions of the

24  TCPA including identification of which lawsuits

25  involved B2B or its principal AdMax Marketing or Chad

1                    Elizabeth Trenbeath

2   Komniey, and the question goes on.

3              You state -- and I will just read the last

4   line in the response:  The only other TCPA case filed

5   by plaintiff is versus Amsterdam Printing and Litho,

6   Inc., and Taylor Corporation 3:15-CV-05061.

7              Do you see that?

8     A.    Yes, ma'am.

9     Q.    Do you understand the 3:15-CV-05061 to be

10  the federal or docket number or the court docket

11  number of the lawsuit you filed against Amsterdam

12  Printing?

13    A.    I would recognize that as such.  It's --

14  yes.

15    Q.    Did the verify the accuracy of this

16  statement before you signed the verification page?

17    A.    I read over the questions and answers.  And

18  speaking with my legal counsel, it was understood that

19  this -- this is all true.  And I don't recall going

20  over like numbers like that.  It just is beyond some

21  of my understanding, but I have read everything.

22    Q.    Okay.  And do you verify that you filed one

23  lawsuit, like one -- one single lawsuit that is

24  reflected here, correct?

25    A.    Correct.

1              Elizabeth Trenbeath

2      Q.     And did you understand you had an

3   obligation to make sure the responses that you give

4   are true and correct?

5      A.     Yes.

6      Q.     Okay.  And do you also understand that you

7   filed a second lawsuit against Amsterdam Printing to

8   settle the case?

9      A.     A second lawsuit?  Well, are you talking

10  about -- you mean to say AmeriFactors or Amsterdam?

11  There's two lawsuits with Amsterdam are you saying?

12     Q.     Well, I -- I would be happy to show you,

13  but we did a search and found that there was a second

14  lawsuit filed against Amsterdam by you.

15     A.     That may have come out through the

16  mediation and the processes.  So I refer back to legal

17  counsel on the steps that we went through.  I was

18  there in mediation.  I know they -- it all ended and

19  payment was sent out.  And the steps that were done

20  within that by legal counsel, I'll refer back to them

21  on that.

22     Q.     Okay.  But a lawsuit -- if the lawyers are

23  going to file a lawsuit on your behalf, you know, you

24  review the complaints and make sure the information is

25  accurate, correct?

1                    Elizabeth Trenbeath

2      A.      Correct.

3      Q.      And if somebody filed a lawsuit in your

4  name, you would have done the same, particularly if

5  you were acting as a class representative, correct?

6      A.      Correct.

7      Q.      But here we only have a single lawsuit

8  listed?

9      A.      I refer -- yeah, I refer back to them.

10  It's -- the legalities and all, I just -- I was there

11  to step -- every step of -- say the steps that I was

12  involved in, was there in person and the steps I've

13  been doing here.  What they do in addition to get this

14  going and settled, I'm not familiar with all of that

15  and cannot remember all of that.

16      Q.      Okay.  Sitting here today, do you know

17  whether a second lawsuit was filed in St. Louis,

18  Missouri?

19      A.      If that is what has happened, I will go

20  with that.  But I'm -- I can't answer that question

21  thoroughly.

22      Q.      I'm not asking you to go with it.  I'm

23  asking you --

24      A.      Oh.

25      Q.      -- whether sitting here today, do you know

1                      Elizabeth Trenbeath

2    that to have occurred?

3        A.      I'm unable to answer that.

4        Q.      Because you don't know if it occurred?

5        A.      Because I don't know all the steps that

6    were taken to get to the process of that we got to.

7    I'm just not familiar with it legally.  I -- I know I

8    was there going through this -- the processes.  I read

9    information, responses -- responded and provide what I

10   am able to provide.  And through my small business,

11   I'm filing what I can, but I'm not familiar with every

12   step and all that is done to finish it all.

13       Q.      Okay.  We will come back to your

14   interrogatory responses.

15              MS. MAZZUCHETTI:  Let's put up the

16        Amsterdam complaint, Whitney, if you could

17        show me what exhibit that is.

18              MS. SMITH:  It's what we identified

19        as Tab 5 in the exhibits we provided.

20              (Defendant's Exhibit 9 was marked for

21        identification.)

22   BY MS. MAZZUCHETTI:

23       Q.      Ms. Trenbeath, I will put up what I marked

24   as Exhibit 9.  Do you know what this Exhibit 9 is?

25       A.      Class action complaint.

1                    Elizabeth Trenbeath

2      Q.      And is this the complaint that was filed on

3   behalf of Career Counseling by the Wanca firm against

4   Amsterdam Printing?  It looks like there's a date of

5   December 28th, 2015.

6      A.      If that is what it -- what it says, yes.

7      Q.      Any reason to doubt this was not filed?

8      A.      No.

9      Q.      Sitting here today, you believe this was

10  the complaint that started a lawsuit against Amsterdam

11  Printing?

12     A.      I'm unfamiliar with that.

13     Q.      You are not --

14     A.      I'm not able to verify that.  It's -- I

15  refer to my legal counsel.

16     Q.      Okay.  And you -- do you see where it says

17  United States District Court, District of South

18  Carolina, Columbia Division?

19             Do you see that?

20     A.      Yes, ma'am.

21     Q.      Do you understand that you testified

22  earlier that the Amsterdam Printing case that you

23  filed was filed in the same court which the case

24  against AmeriFactors is pending?

25     A.      Yes.

1                    Elizabeth Trenbeath

2      Q.      Do you believe that that court is the

3  United States District Court for the District of South

4  Carolina, Columbia Division?

5      A.      It reads as such, so yes.

6      Q.      Were you aware that both cases are pending

7  before the district judge?

8      A.      I'm un- -- I'm unfamiliar.  I'm not able to

9  answer.  I know AmeriFactors is and -- this is

10 Amsterdam?

11     Q.      Correct.  And you testified previously, I

12 believe -- and I don't want to put words this your

13 mouth -- but you believe those two cases were pending

14 before the same courts, correct?

15     A.      Pending?  Pending means that it's still

16 going on.

17     Q.      Well, when -- when it was pending.

18     A.      Oh, right.

19     Q.      The same court?

20     A.      Correct.

21     Q.      Okay.  And if we can turn to page 15 of

22 this document -- I'm sorry, 13, 13.  Do you see this

23 that document says:  Respectfully submitted, Career

24 Counseling, Inc., individually and as a representative

25 of a class of similarly-situated persons and is signed

1               Elizabeth Trenbeath

2    by John Felder, Jr.?

3         A.     I see that.

4         Q.     Do you have any doubt that this is the

5    complaint that was filed against Amsterdam Printing by

6    Career Counseling?

7         A.     I do not have a doubt as it reads.

8               MS. MAZZUCHETTI:  Okay.  And if we

9          can go to the next exhibit, I would like,

10         John, if you could put up the federal --

11              MS. SMITH:  If we -- it's what we

12         identified as Tab 6.  John, it's what we

13         sent over.

14   BY MS. MAZZUCHETTI:

15        Q.     Okay.  And Ms. Trenbeath, I have placed

16   before you what I will represent to be a joint

17   stipulation of dismissal of the Amsterdam Printing

18   case.  Have you ever seen this document before?

19        A.     I may have.  I do -- I am familiar with the

20   dismissal and the settlement.

21        Q.     Okay.  But are you aware that the court

22   case that was pending in South Carolina was dismissed

23   on October 23rd, 2018, by way of this document?

24        A.     I'm familiar with the happenings, so yes.

25        Q.     You're familiar with what?

```
 1                    Elizabeth Trenbeath
 2        A.      The -- I guess I'm sounding Southern here.
 3   The familiar of the process of the end result through
 4   my mediation, yes.
 5        Q.      Okay.  And do you know why the South
 6   Carolina case was dismissed?
 7        A.      I believe there was a settlement.
 8        Q.      Okay.
 9        A.      And mediation.  So we decided to settle the
10   mediation.  So I will refer to my legal counsel on
11   what that means in the courts of South Carolina.
12        Q.      Okay.  And this document was signed by John
13   Felder, and he was authorized to sign as counsel for
14   Career Counseling, correct?
15        A.      Correct.
16        Q.      Let's go to the next exhibit.  This is
17   exhibit -- I'm sorry, I'm losing count -- 9 or --
18                COURT REPORTER:  Yes.
19                (Defendant's Exhibit 10 was marked
20          for identification.)
21        Q.      So let's mark Exhibit 10.
22                (Off record.)
23   BY MS. MAZZUCHETTI:
24        Q.      So we will move on to Exhibit 11.
25                MS. SMITH:  And Exhibit 11, John,
```

Page 160

1                      Elizabeth Trenbeath

2          should be what we identified as Tab 7 in

3          the documents, so yeah.

4               (Defendant's Exhibit 11 was marked

5          for identification.)

6    BY MS. MAZZUCHETTI:

7        Q.      Ms. Trenbeath, I have placed before you

8    what is a petition for breach of the Telephone

9    Consumer Protection Act, which initiated a lawsuit in

10   the Circuit Court of the City of St. Louis, State of

11   Missouri, on behalf of Career Counseling, Inc.,

12   against Amsterdam Printing and Litho, Inc., and Taylor

13   Corporation.

14               Have you ever seen this document?

15       A.      Yes, I believe so.  I'm just trying to

16   remember all the documents I've looked at.  It's 31

17   pages so -- I know -- I know after the mediation, it

18   was settled.  And I had my legal representation, so

19   and I know it was settled in Missouri.  But --

20       Q.      I'm sorry, you didn't know it was settled

21   in Missouri?

22       A.      I did.

23       Q.      You did know there was a lawsuit filed in

24   Missouri?

25       A.      Well, the terminology, I'm not quite

1                    Elizabeth Trenbeath

2    following.  I just know I was there in mediation, we

3    settled.  And in the process of that with the -- with

4    the legal counsel was on them.  But I do remember

5    hearing Missouri, yes.

6             Now that I'm following you, what's going on

7    with how it's -- how it's ending, yes.

8        Q.    And --

9        A.    I do know it was Missouri, yes.

10       Q.    Why did you decide to file a lawsuit in

11   Missouri?

12       A.    That's where it was --

13            MR. KELLY:  I will just object --

14       object.  Calls for, you know, legal

15       conclusion and may breach the mediation

16       privilege.

17            But the witness can answer if she

18       knows.

19            THE WITNESS:  I don't -- I don't know

20       all the legalities, and I will refer that

21       to my legal counsel.

22   BY MS. MAZZUCHETTI:

23       Q.    So I will show you the docket sheet in a

24   moment.  There is no date on this complaint that I

25   could find.  But the docket sheet reflects that this

1                    Elizabeth Trenbeath

2    was filed on October 25, 2018, which was two days

3    after the South Carolina suit was dismissed.  Does

4    that sound about right to you, based on your

5    recollection?

6        A.    Yes.  I would say that would go with the

7    process of the mediation.

8        Q.    And then if you can turn to the page 7,

9    please, there is -- there is a signature that says

10   signed for Career Counseling, a Max Margulis.

11            Do you see that?

12       A.    Yes, ma'am.

13       Q.    Do you know who that is?

14       A.    Yeah.  That was the representation in

15   Missouri.

16       Q.    And have you ever met Mr. Margulis?

17       A.    No, but I know the -- the name.

18       Q.    Have you ever talked to Mr. Margulis?

19       A.    No.

20       Q.    And then if you turn to page 8, we see

21   Anderson & Wanca firm, correct?

22       A.    Correct.

23       Q.    Were they also representing you in the St.

24   Louis, Missouri, action?

25       A.    That is my legal counsel, yes.

```
 1                    Elizabeth Trenbeath

 2              MS. MAZZUCHETTI:  So I'd like to pull

 3         up, Whitney, the court docket.

 4              MS. SMITH:  That's Tab 8 in the

 5         exhibits, John.

 6              (Defendant's Exhibit 12 was marked

 7         for identification.)

 8    BY MS. MAZZUCHETTI:

 9         Q.     This will be Exhibit 12.

10              Ms. Trenbeath, I will show you what we

11    marked as Exhibit 12, and this is, I will represent to

12    you, something that my law firm pulled off the

13    Missouri court website where they have docket

14    information about cases filed.  And we pulled this, I

15    think, you can see in the upper left-hand corner, on

16    January 11th, 2021.

17              Have you ever viewed the Missouri court

18    docket for the lawsuit that you filed there?

19         A.     No.

20         Q.     And I see where it says Amsterdam Printing

21    and Litho, Inc., defendant, and there is an address in

22    Minnesota.

23              Do you see that?

24         A.     Yes.

25         Q.     And then is that your understanding of
```

1                    Elizabeth Trenbeath

2  where that company is located?

3       A.      It says that on the screen, so I would say

4  yes.

5       Q.      Okay.  And then scroll down below that,

6  Taylor Company.  Taylor, sorry, Corporation says that

7  it's also in North Mankato, Minnesota.

8               Do you see that?

9       A.      Yes, ma'am.

10       Q.      Is that your understanding of where that

11  company is?

12       A.      Yes, ma'am.

13       Q.      Okay.  And then if you scroll up where your

14  company is referenced, there is an address in

15  Missouri.  Do you know what that address is?

16       A.      It would be my representation.  I would

17  have to go back and look at Max's, but that would be

18  just finalizing the process of our mediation.

19       Q.      So I see on the right-hand side Max's

20  address is listed at the same address.

21       A.      Okay.  Yeah.

22       Q.      But I'm just confused because, you know,

23  Amsterdam Printing's address is in Minnesota, and his

24  counsel's address is in Kansas City, Missouri.  Do you

25  know why your address shows either a company as having

1                        Elizabeth Trenbeath

2    an address in Missouri while the others --

3        A.      I will refer to legal counsel on that, or

4    it was the person entering the information.  I deal

5    with government sites.  There's typos all the time.

6        Q.      Okay.  So you didn't do anything to suggest

7    to the Missouri court that Career Counseling is a

8    Missouri company, right?

9        A.      I refer back to my legal counsel on the

10   process of this.  There may be a reason why in our

11   mediation.  I don't have any more to add to that.

12       Q.      Okay.  So if you can just scroll down to

13   the second page, if you can see on 10/25, it says

14   there is a judge assigned.  There is a petition filed

15   in the circuit court.  And as I said, that was the

16   date that the record reflects that the suit was filed.

17               Do you see that?

18       A.      Yes, ma'am.

19       Q.      And do you know why you see on 10/31/2018

20   there was a motion to change judge?

21       A.      I'm unfamiliar with all of the steps that

22   were needed to take.

23       Q.      Okay.  So if we could go to the next

24   exhibit, we will pull the settlement agreement in the

25   Amsterdam case.

1              Elizabeth Trenbeath

2              MS. MAZZUCHETTI:  So we will mark

3         what has been -- I'll mark it as -- what

4         are on, 12?

5              JOHN:  13.

6              MS. MAZZUCHETTI:  13.

7              (Defendant's Exhibit 13 was marked

8         for identification.)

9    BY MS. MAZZUCHETTI:

10        Q.    Ms. Trenbeath, have you ever seen what has

11   been marked as Exhibit 13 before?

12        A.    I did receive, I want to say, the

13   settlement agreement.  I did -- I did receive this

14   because this is kind of familiar to me, but it

15   settled.  I didn't -- I don't have it memorized or

16   looked -- I don't recall the details of it.

17        Q.    If we can turn to page 14 of this document.

18        A.    Yes.

19        Q.    Is that -- is that your signature?

20        A.    Yes.

21        Q.    And is this the settlement agreement for

22   the settlement that was reached in the Amsterdam

23   Printing case?

24        A.    Yes.  So that would make sense.  So we did

25   the mediation, they settled, and then I was able to

1                    Elizabeth Trenbeath

2    receive payment once it was settled.  Yes.

3        Q.    Okay.  And is this the settlement that you

4    were talking about, the $10 million and, you know,

5    the --

6        A.    15,000, yes, ma'am.

7        Q.    Okay.  And did you actually receive the

8    $15,000?

9        A.    We did.

10        Q.    Did you receive any other monies resulting

11    from the settlement?

12        A.    No.

13        Q.    Did you make a claim for the 500 or $1500

14    that you mentioned was available?

15        A.    Repeat that one more time.  This person

16    keeps calling in.  I'm having to silence it.  My

17    intern just left.

18            What was the question again?

19        Q.    Did you make a claim, or did you -- to

20    receive 500 or $1500, you mentioned earlier that, you

21    know, that there was a 500 and $1500 option available.

22    And I was wondering whether in addition to the 15,000,

23    you received what the class received.

24        A.    Yes.  Let's see here.  So I believe I got a

25    1500 one.  I have my calculator here.  I believe I

1                    Elizabeth Trenbeath

2    got, yeah, two 1500 ones.  So two.

3        Q.    So how much total did you get from this

4    settlement?

5        A.    15,000.

6        Q.    But I'm sorry, where did the 1500 come in?

7        A.    I believe it was 12,000 plus 1500 plus

8    1500.  My recollection.

9        Q.    Okay.  And if we could go back to the first

10   page, if we go to the last line:  Plaintiff has

11   determined -- whereas, plaintiff has determined that

12   the settlement class includes owners of 24,591 unique

13   fax numbers that were successfully sent in excess of

14   252,000 advertising faxes by defendants between June

15   21st, 2015, and December 24th, 2015.

16             Do you see that?

17       A.    Yes, ma'am.

18       Q.    Was it your understanding in that case that

19   there were just shy of 25,000 class members --

20   settlement class members in that context if we're

21   comparing to this case where there is approximately

22   59,000, according to your testimony?

23       A.    I don't recall the details.  But if each

24   one was receiving 27 faxes like I did, that wouldn't

25   make sense of why they were sending me faxes and less

1                      Elizabeth Trenbeath

2    people.

3        Q.      Okay.  But this document that you signed

4    said that the settlement class includes owners of

5    24,591 unique fax numbers.

6        A.      Yes, ma'am, I see it right there.  Yes,

7    ma'am.

8        Q.      Do you think that is correct?

9        A.      Yes.

10       Q.      I also noted, just turning back to the

11   signature page on page 14, this document was signed on

12   November 2nd, 2018.

13               Do you see that?

14       A.      Yes, ma'am.

15       Q.      Did you sign this document after you

16   dismissed the South Carolina suit?

17       A.      I don't know the legalities of all the

18   steps and when -- I know you gave me a date when that

19   was dismissed.  And the mediation, we went through

20   that, and then the legal counsel took it from there.

21   And then we settled.  So I don't know all the dates.

22   You have to recap that with me.

23       Q.      Okay.  Well, the dismissal was on -- if I.

24   My recollection is correct -- was October 23rd, 2018.

25               At the time you dismissed the federal court

1                    Elizabeth Trenbeath

2   suit in South Carolina, had you reached a settlement?

3       A.    Just I would -- I'm unfamiliar with all the

4   steps that was happening.  I was there at the

5   mediation, and then it -- it continued on from there.

6   And I was running my business, and they reached back

7   out to me.  And we would -- I let them do what they do

8   best and continue on the process.

9       Q.    Okay.  So October 23rd, we had the federal

10  court dismissal.  October 25th of 2018, we have the

11  filing of the Missouri state court complaint, which

12  was not disclosed in the interrogatory response.  And

13  then on 11/2, we have the signing of the settlement

14  agreement.

15      A.    Okay.

16      Q.    I would like to look at page 1 of the

17  settlement agreement.  You state -- in this first

18  whereas clause, can you -- can you read that, please,

19  out loud?

20      A.    Whereas, on behalf of itself and a punitive

21  class of similarly-situated persons, Plaintiff filed a

22  civil lawsuit against Defendants that is now pending

23  in the Circuit Court of St Louis City, Missouri,

24  entitled Career Counseling, Inc., Amsterdam Printing,

25  and Litho, Inc., and Taylor Corporation, Case Number

1                    Elizabeth Trenbeath

2    1822-CC11500, Division 20.

3        Q.    Okay.  Is there any reference in these

4    whereas clauses describing the history to the cases

5    you filed in South Carolina?

6        A.    I'm unfamiliar, and I will refer back to my

7    legal counsel.

8        Q.    Okay.  I would like to turn to page 5 of

9    the settlement agreement.

10                Looking at paragraph 8, claim forms, the

11    second sentence states that:  After payments to class

12    counsel and to class representative, each member of

13    the settlement class who submits a timely and valid

14    claim form shall be paid a total of $500 per unique

15    fax number to which the above-referenced faxes were

16    successfully sent as determined by the report of

17    Robert Biggerstaff, B-I-G-G-E-R-S-T-A-F-F, as

18    represented in the fax log supplied during discovery.

19                Do you see that?

20        A.    Yes, ma'am.

21        Q.    So is it your understanding that every

22    class member who submitted a claim form, and you

23    testified earlier about, you know, your having

24    participated in that process, and in one case tried to

25    participate but was late.  They received $500,

1                    Elizabeth Trenbeath

2   correct?

3        A.      Correct.

4        Q.      And what would happen for the folks who did

5   not submit a claim?

6        A.      They would not receive their $500.

7        Q.      Okay.  Do you know about --

8        A.      Potentially.

9        Q.      Do you know how -- if 100 percent of the

10  class filed claims, do you know how much they stood to

11  receive?

12       A.      That was you said 24,491 roughly.

13       Q.      Right.

14       A.      And it would depend if it was 500 or the

15  1500 category.

16       Q.      I looked through this, and you are welcome

17  to, I didn't see anything about a 1500 category.

18       A.      Okay.  Maybe I had one, two -- okay.  So

19  maybe I had -- I just did the subtraction wrong.  So

20  that would be 12,470,000 roughly, if I did it right.

21       Q.      Okay.  But they agreed to settle for, you

22  know, you said $10 million.  I'm sorry.

23       A.      There was -- there was a lot of mediation

24  that day.

25       Q.      Okay.  I understand.

1                    Elizabeth Trenbeath

2              And do you know how many claims were

3    ultimately filed?

4         A.     No, I do not.  I refer that to Wanca to

5    that.

6         Q.     Did anyone ever tell you what they

7    estimated the claim rate would be in a case like this?

8         A.     I just remember mediation.  They just

9    review what we just did.  That is not always 100

10   percent.

11             MR. KELLY:  I wouldn't -- I wouldn't

12        talk specifically about anything that was

13        discussed in mediation.

14             THE WITNESS:  Oh, okay.  Yeah.

15   BY MS. MAZZUCHETTI:

16        Q.     We're entitled to understand as a class

17   representative, you know, you are the one who decided

18   this was a good deal for the class.  So what was your

19   thinking?  Why was this a good deal for the class?

20        A.      It helps with any punitive damages that

21   they felt they needed.  You know, their -- their cost

22   in time, and they chose to also be part of the class

23   action lawsuit.  And that's it.

24        Q.     Okay.  So do you have a calculator around?

25   I saw you were typing --

Page 174

1                    Elizabeth Trenbeath

2        A.      Yeah.  Right here.

3        Q.      Okay.  So let's assume that there were 1850

4    claims filed by the 24,000 or nearly 25,000 that could

5    have filed claims.

6        A.      1,850.

7        Q.      1,850.

8        A.      Okay.

9        Q.      How much was achieved for the class, the

10   absent class who claimed?

11       A.      So times 500 was 925,000.

12       Q.      And if you got 15,000, you said, I think,

13   that you looked at -- if you scroll down on this page

14   5 -- paragraph -- I'm sorry, Exhibit 13, it says:

15   Class counsel will reply to the court for plaintiff to

16   be awarded $15,000 from the settlement fund for

17   representing the settlement class.

18               Do you see that?

19       A.      Yes, ma'am.

20       Q.      And does that refresh your recollection as

21   to what you received under the settlement?

22       A.      Yes.  I was aware I got the 15,000.

23       Q.      Did you also receive the 500 that was

24   contemplated in paragraph 8?

25       A.      I can't remember if it was within that 15

1                    Elizabeth Trenbeath

2    or -- I want to say it was all in it, but I don't

3    remember.

4        Q.    Okay.  So let's just assume that it was the

5    15,000.  It was (Audio Glitch) 925,000 claims for that

6    absent class, and $15,000 for you.  What does that

7    total?

8        A.    You said 900,000 plus --

9        Q.    You said -- I think you said 925,000?

10       A.    Yes.

11       Q.    Plus the 15,000.  Sorry.

12       A.    That is 940,000.  Yeah, 940,000, yes.

13       Q.    Okay.  And what was the Wanca firm?

14   What -- what did you as the class representative --

15   you are involved in this process -- what was decided

16   that they would earn for their work on this case?

17       A.    I -- what was decided at the end?  They got

18   10 million.

19             I'm sorry, 1/3, 1/3.  1/3 of 10 million.

20   So I should know that.  Whatever 1/3 of 10 million is.

21       Q.    So let's just say 3.3 million-ish.  So what

22   was achieved for the class and yourself was $940,000,

23   and you thought it was fair and appropriate for the

24   law firm to receive three times that amount?

25       A.    Well, just like this has carried on for

1                    Elizabeth Trenbeath

2    four years, and a lot of time, a lot of the expenses,

3    it would -- they would have to supply those details of

4    how much -- how much time they spent on it.  I mean,

5    we're four years into this one.  It adds up.

6        Q.    Do you have an analysis of how much they

7    had spent to determine whether that amount was fair in

8    your view as compared to what was achieved for the

9    class that you were representing?

10       A.     Whatever was decided by the legalities

11   of -- the legal people, the judges or whoever in this,

12   is what was settled.  And -- and people were

13   compensated legally and professionally as -- as

14   businesses.

15       Q.     And did you file this case in Missouri

16   state court because no judge sitting in federal court

17   in South Carolina would approve a deal that would

18   award the lawyers three times what they achieve for

19   the class?

20       A.     I have no idea about this industry to go

21   and to say that is true or not.

22       Q.     If that were true, if you were to accept as

23   true that the judge you were before and litigating

24   before for three years in South Carolina wouldn't have

25   approved this deal, finding it unfair, did -- did

1                    Elizabeth Trenbeath

2    anyone explain that to you?

3              MR. KELLY:  Objection.  Calls for

4         attorney/client privilege.  You know,

5         Lauri, you are talking about the legal

6         process of settling a class action case

7         with a class representative and asking

8         these questions to the class

9         representative.

10             MS. MAZZUCHETTI:  Who is now seeking

11        to represent a new class of additional

12        folks.  And I would like to understand from

13        the class representative's perspective, of

14        why a case was filed in St. Louis,

15        Missouri, with her company as a

16        representative where no defendant and no

17        plaintiff was in Missouri.

18             MR. KELLY:  Well, Lauri, class

19        numbers were in Missouri, so we get every

20        right to file the case in state court of

21        Missouri.  For you to ask -- for you to ask

22        the witness regarding, assume a judge in

23        South Carolina would or would not approve a

24        class-wide settlement is just patently

25        unfair to ask her about that, when she is

1                    Elizabeth Trenbeath

2        not a lawyer, and she is just seeking to

3        represent a class.

4              MS. MAZZUCHETTI:  I'm asking when you

5        take on the role of class representative,

6        you have a duty to protect the class and

7        understand --

8              MR. KELLY:  You are right, but she

9        doesn't have a duty to answer hypotheticals

10       about what a judge in South Carolina would

11       or wouldn't do.

12   BY MS. MAZZUCHETTI:

13       Q.    Okay.  So then I will ask this:  Why did

14   you decide not to -- you had a litigation pending in

15   South Carolina and a judge that worked on this case

16   for three years.  Why did you dismiss that suit, never

17   mention it in your settlement to the St. Louis court,

18   never mentioned the prior case, and get a settlement

19   approved in St. Louis rather than the court that you

20   were in.  What was wrong with the federal court?

21       A.    That is what the legal counsel chose to do

22   in the mediation.  We were all there, and we all

23   decided that's the -- that's -- through the mediation

24   process.  And the lawyers that were representing it,

25   they took it from there, and the decisions were made.

Page 179

1                    Elizabeth Trenbeath

2   It was all parties in agreement, I would think.

3        Q.     Why did you decide -- why did you believe

4   it was in the best interest of the class to do that?

5        A.     My legal advice that I received from Wanca,

6   and I let them do what they do best.  And they handled

7   it.

8        Q.     Okay.  Let's go back to the

9   interrogatories.  I believe it was the supplemental

10  set.  I believe it is Exhibit 9, if I am not mistaken.

11            MS. SMITH:  I think that has been

12       marked as Exhibit 8, the supplemental

13       interrogatory responses.

14  BY MS. MAZZUCHETTI:

15       Q.     So I would like to turn to page 15 and

16  interrogatory number 15.  Sitting here now, Ms.

17  Trenbeath, is the statement that the only other TCPA

18  case filed by plaintiff is versus Amsterdam Printing

19  and Litho, Inc., and Taylor Corporation,

20  3:15-CV-05061, which I will represent to you is the

21  South Carolina Federal Court docket number?  Is that a

22  true statement that that is the only TCPA case that

23  you filed?

24       A.     I will refer back to my legal counsel this,

25  going through the process of how you're in one court,

1                    Elizabeth Trenbeath

2  you do mediation for eight or nine hours, you know,

3  decide on whatever you all decide on to then go

4  another direction to settle.  I don't understand all

5  the processes with it.

6      Q.    But you did understand, as you testified

7  earlier, you understood that you initiated a legal

8  suit?

9      A.    Yes.

10      Q.    Right?

11      A.    Yes.

12      Q.    So sitting here today, is the statement

13  that you made in this interrogatory response true or

14  false?

15      A.    Repeat that question one more time.

16      Q.    Is your interrogatory response number 15,

17  the last sentence, is that -- is that a true statement

18  today?

19      A.    I would say yes.  Yes.

20      Q.    So you did not file a suit in St. Louis,

21  Missouri?

22      A.    Again, I refer back to, I was in mediation.

23  The parties -- the lawyer was going back and forth

24  between the two rooms.  They decided on what they

25  wanted to decide on, and we settled in Missouri.

1                    Elizabeth Trenbeath

2      Q.    Okay.  But that is not my question, and I

3   don't intend to be argumentative here.  But I just

4   want to get an answer to my question.

5      A.    Sure.

6      Q.    The interrogatory responses state -- and I

7   can pull the federal court complaint in South Carolina

8   that you filed if you want to compare the docket

9   number.  But this is the only TCPA case that you

10   filed, was the South Carolina case.

11      A.    So South Carolina -- go ahead.  Go ahead.

12      Q.    Is that true?

13      A.    Oh, in South Carolina, and then we went to

14   Missouri.  So we filed the cases as we needed to, to

15   settle, which we agreed to a mediation.

16            I don't know how to answer it because

17   I'm -- if we --

18            MR. KELLY:  I think you've

19         answered -- I think you've answered the

20         question now three or four times.

21            MS. MAZZUCHETTI:  I haven't gotten an

22         answer.  It's yes or no, is that statement

23         true, is the only other case you filed.

24            MR. KELLY:  She -- I'm just going to

25         object.  It's been asked and answered.

```
 1              Elizabeth Trenbeath

 2        MS. MAZZUCHETTI:  It's not been

 3   answered.  It's been asked.

 4        MR. KELLY:  We will amend the

 5   interrogatory answer to include the

 6   Missouri case.  We produced to you the

 7   settlement agreement.  You were aware that

 8   there was a settlement agreement in

 9   Missouri.  For -- for you to now think that

10   somehow you discovered the settlement is

11   just -- it's just --

12        MS. MAZZUCHETTI:  Ryan, that's

13   about -- what I discover on my own is not

14   the inquiry.  What I'm asking is whether

15   the state -- what I'm asking your client is

16   whether the statement is true or false

17   today.  If it was a mistake, it was a

18   mistake, but it's clearly false.  And why

19   are we fighting about something that is

20   clearly false to try to say that it's true?

21        MR. KELLY:  I'm not sure because we

22   have been talking about the Missouri case

23   for 30 minutes now.  We went through the

24   docket sheet.  If you want, we can amend

25   the interrogatory and we can move on.
```

1                   Elizabeth Trenbeath

2              MS. MAZZUCHETTI:  We certainly did,

3        but -- but the witness has testified that

4        interrogatory 15 response remains true.  Do

5        you want to -- do you want to stipulate

6        that it's false, and you would need to

7        amend to make it true?

8              THE WITNESS:  I turned to legal

9        counsel -- oh, are you asking Ryan?

10             MR. KELLY:  Yes.  So we will amend

11        interrogatory 15 to include the Missouri

12        case.

13   BY MS. MAZZUCHETTI:

14        Q.    Okay.  So I just need an answer to my

15   question.  Is the answer to interrogatory number 15

16   true or false?  Does it remain true today with

17   everything we just discussed?

18        A.    We will amend that.  So I guess it's --

19   needs to be corrected.  So it would be false and needs

20   to be corrected.

21        Q.    Okay.  That was -- that was all I was

22   asking for, to get a simple answer.  I'm not sure why

23   it took so long to get.

24             MS. MAZZUCHETTI:  All right.  Let's

25        take a 5-minute break.  I don't have too

1                    Elizabeth Trenbeath

2              (Defendant's Exhibit 14 was marked

3        for identification.)

4    BY MS. MAZZUCHETTI:

5        Q.    I would like to mark as the next exhibit,

6    the responses to doc request.  I think this will be

7    Exhibit 14.

8              MS. SMITH:  It should be Tab 13,

9        John, in the documents we identified.

10   BY MS. MAZZUCHETTI:

11       Q.    Ms. Trenbeath, I placed before you what has

12   been marked as Exhibit 14.  Have you ever seen this

13   document before?

14       A.    Yes.

15       Q.    And what is this document?

16       A.    It's the plaintiff's responses to the

17   defendant's first set of document requests.

18       Q.    And did you provide information that went

19   into these responses?

20       A.    I would refer to my legal counsel, but I

21   would say yes, in the processes, the steps that we

22   went through, and they represented the details.

23       Q.    Did you search for documents and records to

24   be provided in response to this request?

25       A.    Repeat that question, please.

Page 198

Elizabeth Trenbeath

1

2     Q.     Did you search for documents and records

3  that may be responsive to these requests?

4     A.     I would leave that to my legal -- legal

5  counsel to help me with this process.

6     Q.     I'm sorry, did -- but did you ever conduct

7  any search of your own records to locate potentially

8  responsive documents?

9     A.     I don't recall in -- in all my steps that I

10  did.

11     Q.     Is there any document that your -- that you

12  believe is responsive that you are withholding or

13  hasn't otherwise been produced?

14     A.     Well, you are referring to documents that I

15  helped research and provide.  I -- I provided my DP

16  maintenance pro -- maintenance plan, my phone bills,

17  you know, things like that that I would have to send

18  documents to provide.  Yes, I did do that.

19          I don't know what other documents you are

20  referring to.

21     Q.     Just the ones that are requested in this

22  document.  Did you review this document, the requests

23  that were made, and then search to determine if you

24  had any documents responsive to the request?

25     A.     Well, for 12 pages, so I would have zoomed

1                      Elizabeth Trenbeath

2      Q.      Would you rely on the telephone company

3 to -- to provide that information relating to the

4 fax -- fax line?

5      A.      I -- I can, yes.

6      Q.      Okay.  In other words, you believe that

7 your telephone carrier would have better knowledge

8 than you regarding whether or not your fax line was

9 VoIP or some other line?

10      A.      Yes.

11      Q.      Okay.  Counsel asked you about settlement

12 demands and offers in this case, and I believe you had

13 said you were unfamiliar or you didn't recall.  Do you

14 recall that testimony?

15      A.      Repeat that one more time.

16      Q.      Yeah.  Counsel had asked you about

17 settlement offers and settle -- settlement demands in

18 this case.  And I think you provided an answer such as

19 I don't recall or I'm unfamiliar with any offers or

20 demands.

21      A.      Yes.

22      Q.      Do you recall generally, those -- those

23 series of questions?

24      A.      I do recall the series of questions.

25      Q.      Okay.  You attended a mediation via Zoom in

1                    Elizabeth Trenbeath

2     this case, correct?

3         A.     I did.

4         Q.     And that occurred approximately three

5     months ago or so?

6         A.     Yes.

7         Q.     All right.  And you attended and

8     participated in mediation?

9         A.     I did.

10        Q.     And during that mediation, settlement

11    demands were made and settlement offers were also

12    made, correct?

13        A.     Yes.  At the --

14        Q.     Okay.  Wait, we don't need to talk about

15    the specifics, just that's what you recall, correct?

16        A.     Yes.  Yes.

17        Q.     All right.  And early on in the case, were

18    you made aware of an individual demand that was made

19    to you personally to settle the case?

20        A.     Yes.

21        Q.     Was that done via a letter from defendant's

22    counsel?

23        A.     Yes.

24        Q.     Did my office provide you with the letter?

25        A.     Received -- I can't remember the -- how I

```
 1                    Elizabeth Trenbeath
 2   received.  Yes, I did receive it.
 3        Q.     Okay.  And did you review the letter?
 4        A.     Yes, I reviewed the letter.  Yes.
 5        Q.     Did you discuss the individual demand with
 6   your counsel?
 7        A.     I did.
 8        Q.     And did you -- and can you -- can you tell
 9   me what the individual demand -- or strike that.
10              Can you tell me how much the individual
11   demand was?
12        A.     35,000.
13        Q.     Right.  And so was it your understanding
14   that defendant's counsel was offering you $35,000 to
15   build a case individually?
16        A.     Yes.
17        Q.     Okay.  And did you respond through your
18   attorneys regarding that individual demand?
19        A.     I did.
20        Q.     And how did you respond to that individual
21   demand?
22        A.     I don't recall.  I believe in writing.
23   I -- I don't --
24        Q.     Well, you responded through your attorneys,
25   correct?
```

```
 1                    Elizabeth Trenbeath

 2      A.      Correct.  Yes, I did.  Yeah.

 3      Q.      And did you -- did you reject the $35,000?

 4      A.      That is correct.

 5              MR. KELLY:  All right.  Those are all

 6       the questions I have.

 7              MS. MAZZUCHETTI:  Okay.  I just have

 8       a few follow-up to that.

 9                      EXAMINATION

10   BY MS. MAZZUCHETTI:

11      Q.      Ms. Trenbeath, I had asked you earlier

12   about whether any settlement demands or settlement

13   offers have been made.  And I even explained what

14   those were, and you said you were unaware.

15              Did you have conversations with anyone

16   during the breaks that led you to revise the

17   testimony?

18      A.      No.  I misunderstood the question there was

19   a settlement.  Like early on, I didn't think that was

20   something that was to be what it is now.  But -- so

21   I'm sorry, but no, I was aware of the 35.

22      Q.      Did you have a conversation with Mr. Kelly

23   during the break related to the testimony that you had

24   given?

25      A.      No.
```

# EXHIBIT B

```
                                              Page 1

 1         IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
 2                 COLUMBIA DIVISION
 3
     CAREER COUNSELING, INC., d/b/a
 4   SNELLING STAFFING, a SOUTH
     CAROLINA CORPORATION, Individually
 5   and as the Representative of a
     Class of Similarly Situated Persons,
 6
                    Plaintiffs,    CASE NO.:  3:16-cv-3013-JMC
 7         vs.
 8   AMERIFACTORS FINANCIAL GROUP, LLC,
     and JOHN DOES 1-5,
 9
                    Defendants.
10
11
12   DEPOSITION OF:  JEFFREY SPEISER (VIA VTC)
13   DATE:            December 22, 2020
14   TIME:            1:02 PM
15   LOCATION:        200 Celebration Place
                      Celebration, Fl
16
     TAKEN BY:        Counsel for the Plaintiff
17
     REPORTED BY:    LINDA MAHONEY RAMIREZ, Court Reporter
18   _____
19
20
21
22
23
24
25
```

```
                                              Page 6
 1        A     I did.
 2        Q     And you worked full-time from February of
 3   2016 to November of 2016?
 4        A     Correct.
 5        Q     What was your email address at
 6   AmeriFactors?
 7        A     I don't recall offhand.  Probably some
 8   combination of initials and last name
 9   @AmeriFactors.com.
10        Q     What were your job duties and
11   responsibilities as VP of marketing?
12        A     Getting the brand name out there, trying
13   to get business coming in for the factoring.
14        Q     When you say the factoring, what are you
15   referring to?
16        A     The factoring services that AmeriFactors
17   offered.
18        Q     What is factoring?
19        A     It's a financial model where businesses
20   will sell their invoices to another company, they
21   get an advance on those invoices.  So instead of
22   waiting that 30, 60, 90 days for an invoice to get
23   paid, they'll get paid earlier for a discount.
24        Q     How does AmeriFactors make money?
25        A     Because of the discount.  So AmeriFactors
```

Page 7

1    is buying the full value of the invoice.  They're

2    paying the company whose factoring the invoice a

3    reduced rate and then they're collecting the full

4    value of that invoice at a later date.

5         Q    All right.  In June of 2016, were you

6    investigating marketing by fax?

7              MS. SMITH:  Objection to form.  You may

8    answer, Jeff.

9              THE WITNESS:  Yes, we were.

10   BY MR. KELLY:

11        Q    And when you say we, was there anybody

12   else at AmeriFactors that was responsible for

13   marketing by fax?

14        A    Not directly for marketing by fax, but

15   just for marketing in general.

16        Q    Did you find a company called AdMax as a

17   result of your search?

18        A    I did.

19        Q    How did you find AdMax?

20        A    Through a Google search.

21        Q    What was your Google search?

22        A    I do not recall.

23        Q    Had you ever considered marketing by fax

24   prior to June of 2016?

25        A    No.

Page 11

1   visually recorded?

2        A    No.

3        Q    Did you ever discuss with Kevin the

4   legality of sending advertisement by fax?

5        A    No.

6        Q    Did Kevin approve fax marketing?

7             MS. SMITH:  Objection to form.

8             THE WITNESS:  Not as a specific tactic,

9   no.  We were just investigating it at the time.

10  BY MR. KELLY:

11       Q    Okay.  But at some point you did order a

12  broadcast through AdMax, correct?

13       A    Correct.

14       Q    Did Kevin authorize the ordering of the

15  broadcast through AdMax?

16            MS. SMITH:  Objection to form.

17            THE WITNESS:  Correct.  Sorry.

18            MS. SMITH:  That's okay.

19  BY MR. KELLY:

20       Q    What was your answer, that's correct?

21       A    Yes.

22       Q    How did Kevin approve the broadcast

23  through AdMax?

24       A    Verbal approval.

25       Q    Was anybody else present at the meeting

Page 33

1    SVC.  Do you see that?

2         A    I do.

3         Q    So with respect to Exhibit 16, your

4    request to merge the information was done, correct?

5         A    It appears to.

6         Q    And so at the bottom there's language, and

7    I'll just read it into the record.  It says:  If you

8    would like to be removed from our contact list, just

9    dial (888) 879-1777 and enter fax number.  Thank

10   you.

11             Do you see that?

12        A    I do.

13        Q    And so that language is not on Exhibit 5,

14   correct?

15        A    Correct.

16        Q    And so did you have discussions with

17   Mr. Komniey regarding putting that language at the

18   bottom of the fax for people to opt-out.

19             MS. SMITH:  Objection to form.

20             THE WITNESS:  I believe he informed me

21   that he would be inserting that.

22   BY MR. KELLY:

23        Q    And did you approve that language?

24        A    Not that language specifically.  Again, he

25   was the expert in fax blasting.  I've never done fax

Page 34

1    blasting before and relied on him to be compliant.
2        Q    So you relied on him to create the opt-out
3    language, correct?
4        A    Correct.
5        Q    And the (888)879-1777 number is a number
6    that he provided, correct?
7        A    Correct.
8        Q    And so was it your understanding that he
9    would handle any opt-outs?
10       A    Either that he would or by dialing that
11   number, somebody could opt-out.
12       Q    And did you have a discussion with
13   Mr. Komniey regarding why opt-out language was
14   needed?
15       A    No.  It's typical on unsubscribe language
16   in an email.  I'm equating it to that.
17       Q    Did you discuss with Mr. Komniey the
18   legality of sending advertisements by fax?
19       A    No.
20       Q    Did you review Mr. Komniey's deposition
21   transcript in this case?
22       A    I have not.
23       Q    Are you aware of how Mr. Komniey testified
24   in this case?
25       A    I've been told a few things but nothing

Page 35

1    specific.

2         Q    Were you told by -- let me get the

3    question out.

4              Were you told by your attorneys?

5         A    Yes.

6              MS. SMITH:   Objection.  Caution the

7    witness not to reveal the substance of any of those

8    communications.

9              THE WITNESS:   Yes.

10   BY MR. KELLY:

11        Q    All right.  If I told you that Mr. Komniey

12   had a conversation with you regarding the legality

13   of sending advertisements by fax, that you discussed

14   that a violation would only be $500 and class

15   actions wouldn't be available, would you disagree

16   with that testimony?

17        A    I would.

18        Q    Did you discuss with him how much a

19   violation would be under the 2CPA?

20        A    No.  Because it was not my understanding

21   that it was a violation of anything.

22        Q    Okay.  Did you discuss there was a law

23   that prohibited the sending of advertisements by fax

24   with Mr. Komniey?

25        A    No.  Again, he was the expert we were

Page 36

1   relying on.  It's not our understanding that there

2   was anything illegal about it.

3        Q    Just so I'm clear, you've never had any

4   discussions with Mr. Komniey about the legality of

5   sending advertisements by fax?

6        A    Correct.

7        Q    You did have a conversation with him

8   regarding the opt-out language, correct?

9        A    We did.

10            MS. SMITH:  Objection to form.

11            THE WITNESS:  We did.

12  BY MR. KELLY:

13       Q    Did he discuss with you that he needed to

14  put the opt-out language at the bottom of the fax in

15  order for the advertisement to be legal?

16            MS. SMITH:  Objection to form.

17            THE WITNESS:  I can't recall if it was a

18  legal or just a courtesy.

19  BY MR. KELLY:

20       Q    Were you aware at the time that there was

21  a statute that prohibited the sending of

22  advertisements by fax unless certain conditions are

23  met?

24       A    No.

25       Q    Did Mr. Komniey ever tell you that there

Page 37

1   was a statute --

2        A    No.

3        Q    -- regarding the sending of advertisements

4   by fax?

5        A    No.

6        Q    Did you ever review the website from AdMax

7   marketing?

8        A    I believe that I did when I did the Google

9   search.

10       Q    Did you ever review the frequently asked

11  questions section of the website?

12       A    I don't know.

13            MS. SMITH:  Objection to form.

14            THE WITNESS:  Sorry.  I don't recall.

15  BY MR. KELLY:

16       Q    How many conversations did you have with

17  Mr. Komniey?

18       A    Probably less than ten.

19       Q    Okay.  Were any of those conversations

20  recorded?

21       A    Not to my knowledge.

22       Q    Did you feel that Mr. Komniey was

23  knowledgeable regarding fax broadcasting?

24       A    He represented himself as much.

25       Q    Did you believe him?

Page 38

1      A     I did.

2      Q     Did he tell you that he was going to use a

3  third-party fax broadcaster to send the faxes or did

4  he tell you --

5      A     Sorry.  Go ahead.

6      Q     Let me ask the same question.

7            Did he tell you that he was going to use a

8  third party broadcaster to send the faxes?

9      A     I can't recall.

10     Q     What was discussed with Mr. Komniey

11  regarding the less than ten conversations?

12           MS. SMITH:  Objection to form.  You can

13  answer if you understand.

14           THE WITNESS:  The services that he would

15  provide and the cost for those services.

16  BY MR. KELLY:

17     Q     What did he tell you about the services

18  that he would provide?

19     A     That he was able to provide a fax list and

20  have the fax sent to those numbers.

21     Q     Did he tell you where he would obtain the

22  fax list?

23     A     Not specifically.

24     Q     Was it your understanding that the fax

25  numbers -- strike that.

Page 43

1    correct?

2            MS. SMITH:  Objection to form.

3            THE WITNESS:  Not Exhibit 5.  Exhibit 5

4    with the remove language.

5    BY MR. KELLY:

6        Q    Okay.

7        A    And our intent -- I believe that with any

8    email list, address list, probably fax as well, that

9    a certain number of them are not going to got

10   through so you sent out more to get to the number

11   you're targeting.

12       Q    So the list was 96,963, correct?

13       A    I believe so.

14       Q    And so you approved Exhibit 5 with the

15   opt-out language to be sent to those fax numbers,

16   correct?

17           MS. SMITH:  Objection to form.

18           THE WITNESS:  Correct.

19   BY MR. KELLY:

20       Q    He said he owed you a credit.  Did you

21   ever ask for money back or did you ever order

22   another broadcast?

23       A    It don't believe we asked for a credit and

24   we did not ask for another broadcast.

25       Q    Is there a reason why AmeriFactors did not

Page 44

1    order another fax broadcast?

2        A    The response rate on this one didn't prove

3    successful.

4        Q    Okay.  Is there a reason why Mr. Komniey

5    was asking you for removals?

6            MS. SMITH:  Objection to form.

7            THE WITNESS:  Because I believe that some

8    removals could have come directly to us as opposed

9    to utilizing the opt-out language.

10   BY MR. KELLY:

11       Q    If you look at AmeriFactors 25 and 24, you

12   provided a list of the removals to Mr. Komniey,

13   correct?

14       A    That's what it appears to be.

15       Q    How did you obtain those removal numbers?

16       A    I don't recall specifically, but it could

17   have been by email, phone, or fax.

18            (Off-the-record conference.)

19   BY MR. KELLY:

20       Q    Go to Bates number 10.

21       A    Okay.

22       Q    This is an email from you dated June 16th.

23   You write:  Here's the proof of the fax.  And that's

24   Exhibit 5, correct?

25       A    I believe so.

# EXHIBIT C

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
2                COLUMBIA DIVISION
3

    CAREER COUNSELING, INC., d/b/a
4   SNELLING STAFFING, a SOUTH
    CAROLINA CORPORATION, Individually
5   and as the Representative of a
    Class of Similarly Situated Persons,
6

                   Plaintiffs,    CASE NO.: 3:16-cv-3013-JMC
7          vs.
8   AMERIFACTORS FINANCIAL GROUP, LLC,
    and JOHN DOES 1-5,
9

                   Defendants.
10
11
12  DEPOSITION OF:  KEVIN GOWEN (VIA VTC)
13  DATE:           December 22, 2020
14  TIME:           10:16 AM
15  LOCATION:       AmeriFactors Financial Group, LLC
                    1070 Celebration Boulevard
16                  Celebration, Florida
17  TAKEN BY:       Counsel for the Plaintiff
18  REPORTED BY:    LINDA MAHONEY RAMIREZ, Court Reporter
19  _____
20
21
22
23
24
25

Page 2

1  APPEARANCES OF COUNSEL:
2      ATTORNEYS FOR THE PLAINTIFF
       CAREER COUNSELING, INC., d/b/a
3      SNELLING STAFFING:
4      ANDERSON WANCA
       BY:  RYAN M. KELLY (VIA VTC)
5      3701 Algonquin Road, Suite 500
       Rolling Meadows, IL 60008
6      (855)827-2329
       rkelly@andersonwanca.com
7
8      ATTORNEYS FOR THE DEFENDANT
       AMERIFACTORS FINANCIAL GROUP, LLC:
9
       KELLEY DRYE & WARREN, LLP
10     BY:  LAURI A. MAZZUCHETTI (VIA VTC)
       WHITNEY M. SMITH (VIA VTC_
11     1 Jefferson Road, 2nd Floor
       Parsippany, NJ  07054
12     (973)503-5910
       lmazzuchetti@kelleydrye.com
13     wsmith@kelleydrye.com
14
15
16     (INDEX AT REAR OF TRANSCRIPT)
17
18
19
20
21
22
23
24
25

Page 3

1            KEITH GOWEN,
2  being first duly sworn, testified as follows:
3            EXAMINATION
4  BY MR. KELLY:
5      Q    Mr. Gowen, my name is Ryan Kelly.  I
6  represent the plaintiff in this case.  I'm going to
7  be asking you some questions this morning.
8            Since we are doing this by video
9  conference, please keep your answers out loud.
10 Allow me to finish asking the question before you
11 start giving an answer.
12           If you don't understand a question, let me
13 rephrase or restate the question.  If you do give an
14 answer to a question that I did ask, I'm going to
15 assume that you understood the question.  Is that
16 fair?
17     A    Correct.
18     Q    Are you currently employed?
19     A    Yes.
20     Q    By whom?
21     A    AmeriFactors Financial Group, LLC.
22     Q    What is your job title?
23     A    I'm president and CEO.
24     Q    How long been you have been president and
25 CEO of AmeriFactors?

Page 4

1      A    30 years.
2      Q    Where is AmeriFactors currently located?
3      A    1070 Celebration Boulevard, Celebration,
4  Florida with a zip of 34747.
5      Q    How long has it been at the Celebration
6  location?
7      A    Since of June of '20.
8      Q    June of 2020?
9      A    2020, yes, sir.
10     Q    And where did AmeriFactors operate prior
11 to June of 2020?
12     A    215 Celebration Place, Suite 347,
13 Celebration, Florida.
14     Q    How long did AmeriFactors operate out of
15 that location?
16     A    19 years.
17     Q    What does AmeriFactors do?
18     A    We are an accounts receivable financing
19 firm, primarily we do factoring.
20     Q    Can you tell me what factoring is?
21     A    Sure.  Factoring is when we take an
22 invoice from a business and we discount backwards
23 and buy the receivable and we wait to get paid.
24     Q    Who are your typical customers?
25     A    It ranges from doctors to construction

Page 5

1  companies to warehouse distributors.  Anybody in
2  business, we can find a way to finance them.
3      Q    What are your day-to-day activities as
4  president and CEO?
5            MS. MAZZUCHETTI:  Object to the form.  You
6  can answer, Kevin, if you understand the question.
7            THE WITNESS:  It's running the company, I
8  deal with many issues on a daily base.
9  BY MR. KELLY:
10     Q    Currently how many employees are at
11 AmeriFactors?
12     A    34.
13     Q    And in June of 2016 approximately how many
14 employees?
15     A    I can't say.  I can't say.
16     Q    More or less or about the same?
17     A    I would say it could range from five
18 employees less.
19     Q    Did AmeriFactors have an employee by the
20 name of Jeff Speiser?
21     A    Yes.
22     Q    Does he still work at AmeriFactors?
23     A    No.
24     Q    When did he leave?
25     A    I don't recall.

2 (Pages 2 - 5)

# EXHIBIT D

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2                          for the

3                 District of South Carolina

4                    _____

5

6     CAREER COUNSELING, INC.,        )
                                       )
7              Plaintiff,            )Case No. 3:16-cv-03013
                                       )
8     vs.                             )
                                       )
9     AMERIFACTORS FINANCIAL GROUP,)
                                       )
10             Defendant.             )
      _____)

11

12

13

14

15               VIDEOCONFERENCE DEPOSITION

16                         OF

17                    CHAD KOMNIEY

18               (Confidential Testimony)

19            Tuesday, September 22, 2020

20               San Diego, California

21

22

23

24

25        Reported by: Veronica J. Fabela, CSR No. 14106

CONFIDENTIAL

Page 14

1      Q.   Are these the types of documents that you

2  used -- you use in the ordinary course of business?

3      A.   Yes.

4      Q.   Before producing these documents, did you

5  change, modify or alter any of the information on these

6  documents?

7      A.   No.

8      Q.   Are these true and correct copies of business

9  records of AdMax?

10          MS. MAZZUCHETTI:  Objection to form.

11          THE WITNESS:  Yeah.  I mean, I've got them

12  right here still.

13  BY MR. KELLY:

14      Q.   Okay.  So let's go to Exhibit 3.

15          (Plaintiff's Exhibit 3

16          marked for identification.)

17  BY MR. KELLY:

18      Q.   Okay.  Showing you what's been marked as

19  Exhibit 3.  It's entitled, AmeriFactors.6.28.16.success.

20  Do you see that?

21      A.   Yes.

22      Q.   Is this the attachment that you've produced

23  with that title?

24      A.   Yes.

25      Q.   Can you describe what Exhibit 3 purports to

CONFIDENTIAL

Page 15

1   be?

2       A.   Those would be the report from WestFax of the

3   faxes that connected that day.

4       Q.   Okay.  In other words, are these the faxed

5   transmissions that were recorded as successful or

6   completed?

7       A.   Yes.

8       Q.   And are you familiar with WestFax logs?

9       A.   Well, yeah.  It's just an Excel file.

10      Q.   Okay.  Is this a log that was generated by

11  WestFax?

12      A.   Yes.

13      Q.   And can you tell me how you came into

14  possession of Exhibit 3?

15      A.   Not precisely.  As I said, I've acquired lists

16  from all kind of sources, so I think these would -- they

17  were from another customer of mine, along with some that

18  I went out and purchased.

19      Q.   Well, you understand that -- you understand

20  that this is a fax log for WestFax.  Correct?

21      A.   Yes.

22      Q.   Okay.  Is it your understanding that WestFax

23  provided Exhibit 3 to you following the broadcast?

24      A.   Yes.

25      Q.   And this WestFax log shows successful

CONFIDENTIAL

Page 16

1    transmissions.  Correct?

2        A.   That one does, yes.

3        Q.   And does Exhibit 3 relate to the fax

4    broadcasts done on behalf of AmeriFactors?

5             MS. MAZZUCHETTI:  Objection to form.

6             THE WITNESS:  Yes.

7    BY MR. KELLY:

8        Q.   All right.

9             MS. MAZZUCHETTI:  Ryan, before you move on

10   from this exhibit, I just want to note, the view that we

11   have is slightly different.  Your file is as Exhibit 3

12   AmeriFactors --

13            MR. KELLY:  Say that again, Lauri.

14            MS. MAZZUCHETTI:  The title of your document

15   is edited.  That wasn't the view we had, and I want to

16   see the view you're looking at.  We opened it in a

17   different view.  I just want to make sure this is the

18   same exhibit.

19            MR. KELLY:  Yeah, I'll represent to you

20   Exhibit 3 is the attachment that -- that is identified

21   in Exhibit 2.

22            MS. MAZZUCHETTI:  Okay.

23            MR. KELLY:  I'm sorry.  You're breaking up,

24   Lauri.

25            MS. MAZZUCHETTI:  Is this the CSV version or

CONFIDENTIAL

Page 86

1          A.    I'm not sure who I was using during this time

2     period, but I use FAXAGE right now.

3          Q.    What is FAXAGE?

4          A.    They provide fax numbers for people.

5          Q.    And how do you receive the fax -- if someone

6     were to send you a fax on the fax page number, how would

7     you receive it?

8          A.    That's up to you to set up your own system.

9     You could have them emailed to you, or you can just go

10    FAXAGE.com and read them.

11         Q.    Well, you don't have a fax machine sitting in

12    your house where the paper comes out like we did in the

13    old days?

14         A.    Most people don't have that anymore.

15         Q.    What's the basis for your statement that most

16    people don't have that anymore?

17         A.    Because everybody I talk to has an online fax

18    service.  They get a fax to email.

19         Q.    That's been true for a fairly -- for a number

20    of years now.  Is that correct?

21         A.    Yeah, I believe so, yeah.

22         Q.    When is the last time you used a fax machine,

23    a traditional fax machine?  If I say a traditional fax

24    machine, can we agree that I mean the type of fax

25    machine that uses ink and toner and will print out a

# EXHIBIT E

Page 1

1              UNITED STATES DISTRICT COURT
                       FOR THE
2              DISTRICT OF SOUTH CAROLINA
3
4   CAREER COUNSELING, INC.
    d/b/a SNELLING STAFFING
5   SERVICES, A SOUTH CAROLINA
    CORPORATION, INDIVIDUALLY
6   AND AS THE REPRESENTATIVE
    OF A CLASS OF SIMILARLY
7   SITUATED PERSONS,
8              Plaintiff,
9        vs.           CASE NO. 3:16cv03013
10  AMERIFACTORS FINANCIAL
    GROUP, LLC, AND
11  JOHN DOES 1-5,
12             Defendants.
13
14
15
16  DEPOSITION OF:  BARRY W. CLARK
                    (Appearing by VTC)
17  DATE:           January 26, 2021
18  TIME:           12:11 p.m.
19  LOCATION:       34179 Golden Lantern St.
                    Dana Point, CA
20
    TAKEN BY:        Counsel for the Plantiff
21
    REPORTED BY:    Renee H. Tollison, CVR
22                  (Appearing by VTC)
    _____
23
24
25

Page 35

1    don't know whether there is a record, you're not

2    aware of any record reflecting that what has been

3    marked as Exhibit 5 was downloaded from WestFax's

4    portal.  Is that correct?

5         A.    I do know that there is not currently a

6    record of exhibit, what's displayed as Exhibit 1 on

7    the screen now, had been accessed by AdMax.

8         Q.    There's not a record of whether this

9    Exhibit 5 on the screen was accessed by AdMax?

10        A.    There's no record.

11        Q.    There's no record?

12        A.    There's no record.  Correct.

13        Q.    And looking at -- are you familiar with

14   the concept of an online fax, Mr. Clark?

15        A.    I am familiar with the concept, yes.  I

16   think the definition of that could be interpreted a

17   number of ways.

18        Q.    Are you able to tell looking at

19   Exhibit 5 whether any of the phone numbers listed

20   in column D received the fax at issue using an

21   online fax?

22        A.    No.

23        Q.    Do you have any knowledge as to how the

24   document that has been marked as Exhibit 5 on the

25   screen, how that record was stored?

Page 36

```
 1          A.    I'm sorry.  Can you ask the question
 2     again?
 3          Q.    Do you have any knowledge of how the
 4     document that's been marked as Exhibit 5 was
 5     stored?
 6          A.    How it was stored where?
 7          Q.    By the entity that was maintaining this
 8     record.
 9          A.    I guess I don't understand your
10     question, Ms. Smith.
11          Q.    Sorry.  I'll try it again.  I believe
12     plaintiff's counsel represented that this document
13     was produced by AdMax in this litigation.  And my
14     question to you is whether you have any knowledge
15     of how AdMax maintains its records.
16          A.    I do not.
17          Q.    And do you have any knowledge as to
18     whether AdMax could have altered this record that's
19     being displayed as Exhibit 5 in any way?
20          A.    I have no knowledge of that.
21          Q.    Is there anything to prevent someone
22     who has downloaded a fax log such as the one that's
23     being displayed as Exhibit 5 on the screen from
24     WestFax's portal at the time that -- at the time
25     such technology was being used from altering the
```

Page 37

1    results of a fax broadcast in any way?

2            A.    I think you're asking me if I have any

3    knowledge as to whether or not -- well, maybe you

4    can just ask me the question again.

5            Q.    Let me ask a question.  After a

6    customer accessed the WestFax portal and downloaded

7    the results of a fax broadcast, was there anything

8    to prevent the individual who downloaded those

9    records from altering them in any way?

10           A.    No.

11           Q.    Are you aware of how AdMax bills its

12   customers?

13           A.    No.

14           Q.    Does WestFax offer any services other

15   than fax broadcasting?

16           A.    Yes.

17           Q.    What are those?

18           A.    They are services related to fax,

19   general production fax, which would enable users or

20   other mechanisms to send fax using the WestFax

21   platform.

22           Q.    Does WestFax offer any services related

23   to receiving faxes?

24           A.    Yes.

25           Q.    What are those?

Page 43

1    of the first page of Exhibit 6, can you take a look

2    at those for me, please?

3          A.    Okay.

4          Q.    And the second bullet says that there

5    is unlimited storage.  Never lose a fax again.

6    Does that mean that a customer who's using this

7    solution will not have -- that there's no limit on

8    the number of faxes that they can receive while

9    they're using this product?

10          A.    That's correct.

11          Q.    And do you have an estimate of how many

12    fax recipients today are using online fax

13    solutions, or fax-to-email solutions, similar to

14    the one that is being described in Exhibit 6?

15          A.    This is Exhibit 6 we're looking at now?

16    I'm sorry.

17          Q.    Yes.

18          A.    Okay.  Are you asking me to make an

19    estimate industrywide what percentage of people

20    receive fax via email?

21          Q.    Yes.

22          A.    I would estimate greater than

23    50 percent.

24          Q.    And what is the basis for that

25    estimate?

Page 44

1              A.    General industry knowledge.

2              Q.    This document, if we scroll up to the

3    top of Exhibit 6, talks about porting existing

4    numbers.  What does that mean?

5              A.    It means that a customer could take

6    their existing fax number which is typically

7    connected to a paper fax machine, but not always,

8    and port that to WestFax so that they could use

9    that number to send and receive faxes and eliminate

10   their paper fax machine.

11             Q.    Would you -- if a customer is using

12   this service, are you identified as their telecom

13   provider in that instance?

14             A.    I wouldn't use that description, no.

15             Q.    How would you describe it?

16             A.    We're the service provider.

17             Q.    The service provider?  Okay.

18             MS. SMITH:  I think I am done with my

19   examination.  Could we just go off the record for

20   one minute so I can checked my notes?

21             MR. KELLY:  Sure.

22             (A recess transpired.)

23             MS. SMITH:  I have no further questions

24   for you, Mr. Clark.

25             MR. KELLY:  I just have a couple of

# EXHIBIT F

Confidential – Robert Biggerstaff

```
 1            IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH CAROLINA
 2                   COLUMBIA DIVISION
 3
 4   CAREER COUNSELING, INC., d/b/a    )
     SNELLING STAFFING SERVICES, a     )
 5   South Carolina corporation,       )
     individually and as the           )
 6   representative of a class of      )
     similarly-situated persons,       )
 7                                      ) Civil Action No.
            Plaintiff,                  ) 3:16-cv-03013-JMC
 8                                      )
     v.                                 ) Class Action
 9                                      )
     AMERIFACTORS FINANCIAL GROUP, LLC )
10   and JOHN DOES 1-5,                 )
                                        )
11          Defendants.                 )
     _____ )
12
13                   CONFIDENTIAL
14
15        DEPOSITION OF ROBERT BIGGERSTAFF
16          Friday, September 18, 2019
17               Given Remotely
18                  9:04 a.m.
19
20
21      REPORTED BY:  KAREN K. KIDWELL, RMR, CRR
22
23           GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24               deps@golkow.com
25
```

Confidential - Robert Biggerstaff

1              Now I don't think it does a great deal of

2    harm other than -- in this specific situation, other

3    than the fax number with the standard column width

4    that comes with Excel was displaying the 10-digit fax

5    numbers in scientific notation so you can't see the

6    entire 10-digit fax number.  You can work around

7    that.  But there could be other problems.  And I did

8    not use Excel to process it so I don't want to use

9    Excel to look at it because there may be other issues

10   that Excel doesn't handle this file properly.  That's

11   why I don't use it for processing files like this.

12        Q.   When you indicated that Westfax uses the

13   customer key to perform certain functions, what is

14   the basis of your knowledge of how Westfax uses that

15   particular column?

16        A.   Other cases that I've worked on.

17        Q.   And looking at this file now that has been

18   marked as Exhibit 3 in this deposition, are there

19   other similarities that you can identify with this

20   fax log as compared to other fax logs you've seen

21   produced by Westfax?

22        A.   Yes.

23        Q.   What are they?

24        A.   The first column is titled Job Sequence.

25   That's a column title that is unique to Westfax.  The

Confidential - Robert Biggerstaff

1    rows of data that show up in that column begin with

2    BFX, and then a broadcast fax identifier.  The second

3    column has the title Job Name, which is common in

4    Westfax logs.  Then the Date in column C, Date.  And

5    then in parentheses UTC, standing for Universal Time

6    Coordinates.  That's generally unique to Westfax.

7    Then we have Fax Number, which is a common field to

8    all fax logs.  Pages Sent.  That is common to several

9    different fax broadcast providers.  Customer Key 1 is

10   another column that's uniquely used by Westfax.  I

11   haven't seen it used by anybody else.  And then

12   Result meaning the results of the transmission is

13   another common piece of metadata and a common column

14   title.

15           However, the result Sent, with a capital

16   S, is maybe not unique, but very common to or --

17   that's not a commonly used notation.  They often use

18   success or failure versus the term "Sent."

19           The real -- the real strong ones are the

20   Job Sequence and BFX number, the Date (UTC), the

21   Customer Key 1, those are all unique in my experience

22   to identifying the log as having been sourced by

23   Westfax.

24       Q.   And, sorry.  Did you say "sent" is

25   consistent with the -- using the word "sent" is

Confidential - Robert Biggerstaff

 1   consistent with using Westfax or it's --

 2          A.   It is.  It is consistent, but not

 3   exclusively consistent.

 4          Q.   Okay.  And looking at this exhibit, can

 5   you tell which fax numbers received the materials on

 6   a stand-alone fax machine?

 7          A.   Not solely looking at this log.

 8          Q.   What other --

 9          A.   But what do you mean by "a stand-alone fax

10   machine"?

11          Q.   I'm sorry.  A desktop fax machine?

12          A.   Not from -- solely from looking at this

13   log.

14          Q.   What other information would you need?

15          A.   There -- in order to identify the desktop

16   fax machines, the one procedure is to identify, if

17   you were going to be distinguishing between a desktop

18   fax machine and a fax server, such as j2 or eFax,

19   there are various techniques you can use to identify

20   the fax server operators like eFax and j2.  And by

21   eliminating those, the ones that remain were the ones

22   that were not received by a cloud-based fax receiving

23   system.

24          Q.   And have you done that analysis here?

25          A.   No, I haven't.

Confidential - Robert Biggerstaff

1        Q.    Are you able to tell by looking at this

2    file which numbers received information through an

3    online fax service?

4        A.    Well, I thought that's what we were just

5    talking about, the other side of that coin.  You have

6    online fax services -- the bifurcation is -- most

7    people make I think is between the online fax

8    services, like eFax, versus a desktop or stand-alone

9    fax machine that sits on a desktop.

10       Q.    And looking at Exhibit 3, can you tell

11   which numbers received the materials using an online

12   fax service?

13       A.    Not solely from looking at this log.

14       Q.    If we look at Exhibit 15 of -- or sorry,

15   sorry.  If we return to your report which is

16   Exhibit 2.

17       A.    Okay.

18       Q.    And turn to paragraph 15 on page 6.

19       A.    Okay.  Okay.

20       Q.    If you take a minute to read your opinion

21   that you offer here.

22       A.    Yes.

23       Q.    You indicate a certain number of these

24   records documented a fully received error-free fax

25   transmission.  And what is a fully received

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES, individually and as the representative of a class of similarly-situated persons,<br><br>       Plaintiff,<br><br>v.<br><br>AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5,<br><br>       Defendants. | Case No. 3:16-cv-03013-JMC<br><br><br><br><br><br><br><br><br><br>Original Complaint Filed September 2, 2016 |

## DEFENDANT'S EXPERT REBUTTAL REPORT OF KEN SPONSLER

1.      I am Ken Sponsler.  I am the Senior Vice President of CompliancePoint, Inc. Litigation Services ("CompliancePoint") with offices in Duluth, Georgia.  CompliancePoint is a wholly-owned subsidiary of PossibleNOW, Inc.

2.      I reserve the right to provide additional information in this matter.  I also reserve the right to supplement this report as new information becomes available.

**Assignment**

3.      I was asked to assess the expert report of Robert Biggerstaff[1] pertaining to the alleged facsimile ("fax") transmissions by defendant AmeriFactors Financial Group, LLC ("AmeriFactors") and to provide my own opinion regarding some of the opinions expressed by him relevant to this case.

**Summary of Opinions**

4.      I have reached the conclusions set forth below based on my review of the Biggerstaff Report and the materials cited by Mr. Biggerstaff, as well as other case materials made available to me, listed in **Exhibit A**, in addition to my expertise and experience in the telecommunications industry.  The opinions expressed by Mr. Biggerstaff are largely based on documents identified as fax logs in CSV format titled "amerifactor.6.28.16.failed.csv" and "amerifactor.6.28.16.success.csv" in addition to the invoice titled "INVOICE_ADMAX AmeriFactors.6.28.16.pdf," and other materials listed in ¶¶ 9 – 11 of his Expert Report including Exhibit 1 to his Report.

**Opinion One:** A very significant percentage of the ultimate fax image recipients likely used an online, Internet or "commercial" fax service, which converted the fax to an image and

---

[1] Expert Report of Robert Biggerstaff, July 20, 2020, hereafter referred to as the "Biggerstaff Report."  The cover page of Mr. Biggerstaff's report bears the title "Expert Report of Robert Biggerstaff," however, the footers of the same report say, "Revised Expert Report of Robert Biggerstaff."

notified their customers of the receipt; it is not possible to determine which recipients received the fax through such means by reviewing fax transmission logs. These customers did not receive a fax with a facsimile machine over a regular telephone line or use printer paper or toner in receiving such fax transmissions.

**Opinion Two:** The names and addresses of businesses and/or individuals who allegedly received the faxes at issue in this case cannot reliably be identified **through** objective or administratively feasible means.

**Qualifications**

**Overview**

5.      I have over 20 years operational experience in business-to-business and business-to-consumer global direct marketing compliance matters, and have (a) personally conducted dozens of onsite compliance assessments, gap analyses,[2] and risk assessment studies, (b) assessed numerous call center operations in connection with clients contracting for such services, and (c) analyzed multiple facsimile campaigns. My company has also performed fax-specific data analyses and historical subscriber/user research.

6.      During my compliance consulting engagements, I have routinely evaluated and opined upon matters related to faxing, including third-party fax service providers. Due to this consultative work, I am familiar with the TCPA's fax-related regulations, as well as modern day faxing technology. To date, I have been retained and disclosed as an expert witness in the following fax-related cases.

---

[2] The identification of gaps between the requirements according to the law and the actual practices of a company.

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                              - 2 -

- *Physicians Healthsource, Inc. v. Stryker Sales Corp.,* 1:12-cv-00729 (W.D. Mich.);

- *True Health Chiropractic v. McKesson Corp.*, 3:13-cv-002219 (N.D. Cal.);

- *Daisy, Inc. v. Pollo Operations,* 2:14-cv-00564 (M.D. Fla.);

- *Pinchem v. Regal Medical Group,* 2:15-cv-06518 (C.D. Cal.);

- *America's Health & Resource Center and Affiliated Health Group v. Alcon Laboratories, Inc.,* 1:16-cv-04539 (N.D. Ill.);

- *Gorss Motels v. Otis Elevator Co.*, 3:16-cv-017871 (D. Conn.);

- *Etter v. Allstate Insurance*, 3:17-cv-00184 (N.D. Cal.);

- *Scoma Chiropractic v. Mastercard International, Inc.,* 2:16-cv-00041 (M.D. Fla.);

- *Gorss Motels v. Sprint Solutions, Inc.,* 3:17-cv-00546 (D. Conn.);

- *Gorss Motels v. AT&T Mobility & AT&T Mobility National Accounts*, 3:17-cv-00403 (D. Conn.);

- *Meda Pharmaceuticals, Inc. v. Odyssey Services, Inc.,* SOM-L-406-14 (Superior Court of Somerset County, New Jersey);

- *Gorss Motels v. Lands' End*, 3:17-cv-00010 (D. Conn.);

- *E&G, Inc. v. Mt. Vernon Mills*, 6:17-cv-00318 (D. S.C.);

- *Kawa Orthodontics LLP v. Laboratory Corporation of America Holdings*, 9:19-cv-80521 (S.D. Fla.);

- *Davis Neurology, P.A. v. DoctorDirectory.com, L.L.C.*, 4:19-cv-00499 (E.D. Ark.).

## A.    **CompliancePoint**

7.      I founded CompliancePoint's consulting practice, which, among other things, provides historical call data compliance analysis, wireless identification services, call data audits, and compliance monitoring for corporate clients.  CompliancePoint can do this because it has

access to the historical data resources of its parent company, PossibleNOW, Inc. ("PossibleNOW"). PossibleNOW maintains licensing agreements that allow PossibleNOW and CompliancePoint use of both the Interactive Marketing Solutions' Wireless Block Identifier™ list and the Wireless Number Portability List. PossibleNOW obtains and uploads the Interactive Marketing Solutions' Wireless Block Identifier™ twice monthly, on the first day of the month and on or about the 15th of the month (which is every day the list is published on the IMS website). PossibleNOW has maintained the history of these downloads since June 13, 2003. PossibleNOW downloads the iconectiv (previously: Neustar) Wireless Number Portability List daily. This list consists of two files daily—wireline-to-wireless and wireless-to-wireline. PossibleNOW has maintained the history of these downloads since May 2004. These combined download transactions are archived in a proprietary data warehouse. This provides PossibleNOW with a unique history of each of these lists since their inception. PossibleNOW expends great effort on the maintenance of this data set. PossibleNOW's standard process of download, upload, and verification of its data sources is the primary focus of the PossibleNOW operations team. Queries to this data warehouse allow the determination of the wireless status of any telephone number on the date it was dialed PossibleNOW's and CompliancePoint's status reflects the status of the source data providers on the date identified for analysis. None of PossibleNOW's wireless historical data is obtained from compiled data sources such as lead generators or data aggregators.

       8.     CompliancePoint's initial output files indicate the counts of telephone numbers that were on the Wireless Block or Wireless Number Portability List at the time of call and on the list

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC        - 4 -

>15 days at the time of call.  Later outputs can identify the number of calls to unique telephone numbers that were on one of the wireless lists >15 days[3] at the time of dial.

9.      This combination of historical, primary source, wireless data and our suite of data analysis tools and analysts provides an accurate picture or the wireless status of records in any data file that contains the 10-digit telephone number dialed and the date of dial.

10.      In my position at CompliancePoint, I have served as a court-appointed monitor as well as an expert witness on such topics, including specifically to monitor or opine on compliance with the TCPA.  As a result, I am intimately familiar with the methodologies that must be used to perform accurate and reliable call record analysis, whether in the context of analyzing calls to wireless numbers, calls to numbers that may be registered on the National Do Not Call Registry ("NDNCR"), calls to numbers on a company's entity-specific do not call list, or to determine whether evidence exists of a successful facsimile transmission.

11.      Prior to taking on my role at CompliancePoint, I served in a critical role at PossibleNOW, CompliancePoint's parent company.  PossibleNOW is an industry leader in telemarketing and telephone communications compliance services.  It not only performs compliance suppression and analysis services for companies engaged in telephone communications, it is also the federal government's contractor responsible for purging numbers from the NDNCR if it finds that they have been disconnected and reassigned to a new name and a new address.

---

[3] For TCPA compliance, callers have a 15-day grace period to detect if a number has been ported and remove from their calling list(s). FCC Order 04-204, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, adopted August 25, 2004, released September 21, 2004. https://docs.fcc.gov/public/attachments/FCC-04-204A1.doc – accessed August 4, 2020.

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                                    - 5 -

12.     PossibleNOW is a provider of, among other things, mobile, as well as residential and business, telephone auditing and identity services, and other solutions for Do Not Call Compliance.  In my role at PossibleNOW, I wrote the functional specifications for PossibleNOW's "DNCSolution," which, along with other things, provides a suppression platform to scrub for wireless numbers and numbers registered on the NDNCR, state DNC lists, and entity-specific DNC lists while accounting for numbers associated with federal and/or state established business relationship ("EBR") (inquiry or transaction EBR) exemptions as well as consent.

13.     Finally, as a member and previous Vice Chairman and member of the Executive Committee of the National Board of Directors for the Professional Association of Customer Engagement ("PACE"), formerly the American Teleservices Association, I interact with hundreds of corporate compliance professionals and companies/providers involved in consumer contact operations.

14.     I underwent specialized training at the U.S. Army Command Sergeant Major Course (graduated with Honors) and the Advanced Non-Commissioned Officers' Course (Distinguished Graduate).  I served primarily in Airborne Infantry and Mechanized Infantry units. After 27 years' service, I retired from the U.S. Military after achieving the highest enlisted rank of U.S. Army, Command Sergeants Major, of the 3rd Infantry Division, a 23,400-man elite combat team.  My awards and decorations include the Legion of Merit, Expert Infantry Badge, Master Parachutist Badge, Pathfinder Badge, Canadian and German Parachutist Badges, and the French Commando Badge (#10 Berlin).  A copy of my CV is attached hereto as **Exhibit B**.

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                              - 6 -

**Recent Relevant Expert Experience**

15.     In the last four years I have been retained to provide deposition testimony as an expert in the following matters:

- *Bridge v. Credit One Bank*, 2:14-cv-01512 (D. Nev.);

- *Raffin v. Medicredit*, 2:15-cv-04912 (C.D. Cal.);

- *Keim v. ADF Midatlantic*, 9:12-cv-80577 (S.D. Fla.);

- *Marcus v. CVS Pharmacy*, 3:15-cv-00259 (D. N.J.);

- *Tomeo v. Citigroup and CitiMortgage*, 1-13-cv-04046 (N.D. Ill.);

- *Tillman v. Ally Financial*, 2:16-cv-00313 (M.D. Fla.);

- *Slovin v. Sunrun*, 4:15-cv-05340 (N.D. Cal.);

- *Gorss Motels v. Brigadoon Fitness*, 1:16-cv-00330 (N.D. Ind.);

- *Larson v. Harman-Management Corp. et al.*, 1:16-cv-00219 (E.D. Cal.);

- *Glasser v. Hilton Grand Vacations Co.*, 8:16-cv-00952 (M.D. Fla.);

- *Gorss Motels v. Otis Elevator Co.*, 3:16-cv-01781 (D. Conn.);

- *Bakov v. CWT,* 1:15-cv-02980 consolidated with 1:17-cv-00973 (N.D. Ill.);

- *Gorss Motels v. AT&T*, 3:17-cv-00403 (D. Conn.);

- *Knapper v. Cox Communications*, 2:17-cv-00913 (D. Ariz.);

- *Bennett v. GoDaddy.com*, 16-cv-03908 (D. Ariz.);

- *Sliwa v. Bright House Networks*, 2:16-cv-00235 (M.D. Fla.);

- *Gorss Motels v. Sprint*, 3:17-cv-00546 (D. Conn.);

- *Gorss Motels v. Lands' End*, 3:17-cv-00010 (D. Conn.);

- *E&G, Inc. v. Mt. Vernon Mills*, 6:17-cv-00318 (D. S.C.);

- *America's Health & Resource Ctr. & Affiliated Health Grp. v. Alcon*, 1:16-cv-04539 (N.D. Ill.);

- *Hunter, Villa, Mejia v. Time Warner Cable*, 1:15-cv-06445 (S.D.N.Y.);

- *Morgan v. Orlando Health, Inc. et al*., 6:17-cv-01972 (M.D. Fla.);

- *San Pedro-Salcedo v. The Häagen-Dazs Shoppe Co.,* 5:17-cv-03504 (N.D. Cal.);

- *Grigorian v. FCA US*, 1:18-cv-24364 (S.D. Fla.);

- *Morgan v. Adventist Health System/Sunbelt, Inc*., 6:18-cv-01342 (M.D. Fla.);

- *Kawa Orthodontics v. LabCorp*, 9:19-cv-80521 (S.D. Fla.);

- *Clark v. FDS Bank et al*., 6:17-cv-00692 (M.D. Fla.);

- *Chinitz v. Intero Real Estate Services*, 5:18-cv-05623 (N.D. Cal.); and

- *Jenkins et al. v. National Grid USA Service Company, Inc*., 2:15-cv-001219 (E.D.N.Y.).

16.     I have qualified as an expert in Federal District Court in the following matters (pre-trial):

- *Manno v. Healthcare Revenue Recovery Group, LLC*, 11-cv-61357 (S.D. Fla.);

- *Trilegiant Corporation v. Sitel Corporation*, 1:09-cv-06492 (S.D. N.Y.);

- *Horton v. Cavalry Portfolio Services*, LLC, 3:13-cv-00307 (S.D. Cal.);

- *Molnar v. NCO Financial Systems*, 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.);

- *Abante Rooter & Plumbing v. Birch Communications*, 1:15-cv-03562 (N.D. Ga.);

- *True Health Chiropractic, Inc. v. McKesson Corp.,* 3:13-cv-002219 (N.D. Cal.);

- *Abante Rooter & Plumbing v. Alarm.com*, 4:15-cv-06314 (N.D. Cal.);

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                        - 8 -

- *Paoletti v. Everglades College*, 0:16-cv-61777 (S.D. Fla.);

- *Pinchem v. Regal Medical Group*, 2:15-cv-06518 (C.D. Cal.);

- *Flores v. Adir International*, 2:15-cv-00076 (C.D. Cal.);

- *Meyer v. Bebe Stores*, 4:14-cv-00267 (N.D. Cal.);

- *CS Wang v. Wells Fargo*, 1:16-cv-11223 (N.D. Ill.)

- *Dipuglia v. US Coachways*, 1:17-cv-23006 (S.D. Fla.);

- *Toney v. Quality Resources*, 1:13-cv-00042 (N.D. Ill.);

- *Fitzgerald v. Universal Pictures*, 6:16-cv-01193 (M.D. Fla.);

- *Eisenband v. Starion Energy*, 9:17-cv-80195 (S.D. Fla.);

- *Aparicio v. Jade Holdings Grp*, 0:18-cv-60202 (S.D. Fla.);

- *Fabricant v. United Card Solutions*, 2-18-cv-01429 (C.D. Cal.);

- *Powell v. YouFit Health Clubs*, 0:17-cv-62328 (S.D. Fla.);

- *Poirier v. CubaMax Travel*, 1:18-cv-23240 (S.D. Fla.);

- *Warren v. Ross Medical Education Center*, 1-18-cv-00341 (W.D. Mich.);

- *Washington v. Ross Medical Education Center*, 3-18-cv-00139 (N.D. Ind.);

- *Lisa Drayton and Daniel Drayton v. Toyota Motor Credit Corp.*, 3:16-cv-00046 (M.D. Fla.);

- *Lennartson v. Papa Murphy's Holdings*, 3:15-cv-05307 (W.D. Wash.);

- *Burke v. Credit One Bank*, 8:18-cv-00728 (M.D. Fla.);

- *Frank v. South Aiken Fitness*, 1:18-cv-02454 (D.S.C.);

- *Davila-Lynch v. HOSOPO Corporation d/b/a Horizon Solar Power, et al.*, 1:18-cv-10072 (D. Mass.);

- *Williams v. PillPack LLC*, 3:19-cv-05282 (W.D. Wash.);

- *Fischer v TriVita, Inc.*, 6:19-cv-02333 (M.D. Fla.);

- *Davis Neurology, P.A. v. DoctorDirectory.com, et al.*, 4:19-cv-00499 (E.D. Ark.);

- *Austin and Marrero v. Public Reputation Management Services d/b/a PR.Business*, 9:20-cv-80161 (S.D. Fla.); and

- *Hicks v. Houston Baptist University*, 5:17-cv-00629 (E.D. N.C.).

17.    I have qualified as an expert and provided trial testimony in the matters *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D. Ill.) and *ADT Security Services Inc. v. Security One International*, No. 11-cv-05149 (N.D. Cal.).

**Materials Reviewed and Relied Upon**

18.    In preparing this report and rendering my opinions in this case, I, and others on my team under my direction, reviewed various documents made available to me by AmeriFactors' counsel that were produced in this matter, as well as the materials considered by Mr. Biggerstaff. My opinions and conclusions are relevant to the proposed class period: from September 2, 2012 to September 2, 2016.[4]  A list of all the documents and policies I relied upon for this report is attached as **Exhibit A**.

19.    In preparing this report, I also relied upon my knowledge of fax transmission systems, fax related records (and their limitations), as well as operational matters related to the TCPA, as amended by the Junk Fax Prevention Act ("JFPA").  Fax related operational matters include an evaluation of the compliance related policies, procedures, training, monitoring and enforcement procedures, contracts and so on.  In addition, where appropriate and as noted, I performed research on various fax delivery and receipt mechanisms in common use as well as the

---

[4] First Amended Complaint ("FAC"), ¶ 19.

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                        - 10 -

evolution of the technology.

20.    My opinions are also informed by my experience with historical telephone number compliance audits and reviews of consumer contact operations including fax campaigns. These reviews have included third-party providers of fax services as a component of corporate compliance assessments.

21.    I stay current with industry developments – both in terms of technology and compliance – and this knowledge has also informed my opinions.

## I.    PROPOSED CLASS AT ISSUE

22.    Plaintiff seeks to represent a class it defined as follows:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability or quality of any property, goods, or services by or on behalf of Defendants, and (3) from which Defendants did not have prior express invitation or permission, or (4) which did not display a proper opt-out notice.

Plaintiff's First Amended Complaint, ¶ 19.

## Background

23.    I understand that AmeriFactors provides funding and financial services to businesses, and is located in Celebration, Florida.[5]

24.    It is my understanding that plaintiff Career Counseling, Inc. d/b/a Snelling Staffing Services ("Snelling Staffing Services" or "Plaintiff") is a staffing and recruiting firm with its corporate office in Richardson, Texas.[6]

---

[5] https://amerifactors.com/ - accessed August 24, 2020.

[6] https://www.snelling.com/ - accessed August 24, 2020.

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                                                  - 11 -

25.    I understand that AmeriFactors engaged a company called Admax to send the fax, and Admax engaged a company called WestFax to transmit the fax.[7]  It is also my understanding that WestFax operates a web-based fax broadcasting platform.

## II.    STATEMENT OF OPINIONS

**Opinion One:**  The proliferation of Internet-based facsimile technology presents major user identification issues in this case that are not addressed by Plaintiff.  A very significant percentage of the ultimate fax image recipients likely used an online, Internet or "commercial" fax service that converted the fax to an image and notified their customers of the receipt or emailed designated recipients an image of the fax as an attachment.  There is no way to determine from the transmission log how any particular recipient listed received a transmission.

### A.    Background on the TCPA and Rulings by the Federal Communications Commission ("FCC")

26.    The TCPA provides, among other things, that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless certain conditions apply.[8]

27.    A "telephone facsimile machine" is defined in the statute as "equipment which has the capacity (A) to transcribe text or images, both, from paper into an electronic signal and to

---

[7] Deposition of Chad Komniey, *Career Counseling, Inc. v. AmeriFactors Fin. Grp. LLC*, No. 3:16-cv-03013 (D.S.C. Sept. 22, 2020) ("Komniey Dep."), at 21:1-15, 34:15-35:21.

[8] 47 U.S.C. § 227(b)(1)(C).

---

transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."[9]

28.    On July 13, 2017, AmeriFactors filed a Petition For Expedited Declaratory Ruling with the FCC seeking a clarification that the TCPA does not apply to fax transmissions that the recipient receives through online fax services or on a device other than a telephone facsimile machine.  On December 9, 2019, the FCC issued a Declaratory Ruling on AmeriFactors' Petition ("FCC Ruling" or "Ruling") holding, in pertinent part, that online fax services are not within the scope of the TCPA.  *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, CG Docket Nos. 02-278, 05-338, Declaratory Ruling, 2019 WL 6712128 (Dec. 9, 2019).  The FCC Ruling determined that faxes received via an online fax service as electronic messages are effectively email and therefore **are not faxes received on a "telephone facsimile machine."**[10]

29.    On September 4, 2020, the FCC's Bureau on Consumer and Governmental Affairs issued a Declaratory Ruling in *In the Matter of Joseph T. Ryerson & Son, Inc. Petition for Declaratory Ruling*, concluding that modern faxing technologies are not within the scope of the TCPA,[11] and finding **"Ryerson's technology is similar to the technology" it had addressed in *AmeriFactors***, and "an online service cannot itself print a fax and thus is plainly not 'equipment which has the capacity . . . to transcribe text or images (or both) from electronic signal received

---

[9] 47 U.S.C. § 227(a)(3).

[10] https://docs.fcc.gov/public/attachments/DA-19-1247A1.pdf – accessed August 26, 2020.

[11] Excerpt: Commenter Biggerstaff argues that all faxes are sent digitally, and can be received or sent using a computer, but the message in question should be considered a fax and not an email because "[w]hen someone uploads a list of 10-digit telephone numbers and a fax image to a fax broadcaster's web site, they are undoubtedly sending faxes as a result of their actions even though they used a web browser to start the process."  (Biggerstaff Comments at 3.) https://docs.fcc.gov/public/attachments/DA-20-1038A1.pdf – accessed September 29, 2020.

over a regular telephone line onto paper' and thus does not meet the statutory definition of a 'telephone facsimile machine,'" thus granting the Ryerson request.  (emphasis added.)

### B.    Modern Fax Technology

30.    As the FCC acknowledged with its recent rulings, modern faxing technology operates in a much different manner from the technology in 1991, when the TCPA was enacted, and today's technology is also much different than the technology that existed in 2003, when the FCC analyzed fax technologies.[12]  By 2010, faxing had largely disappeared, having fallen victim to the same technological and economic processes that had created it.[13]  There are many variations of equipment and software.  Companies, including companies whose fax numbers are identified in the fax logs produced in this case, use cloud-based fax services that host all of the equipment and software and require no phone-system integration.  There also are hybrid services that still utilize on-site servers but that do away with phone-system integration.  There are online services marketed to consumers and small businesses and require **only an Internet connection**.  Users can even send and receive faxes using their smartphones (a technology that did not exist in 2003).  In short, the online faxing industry, the technology it utilizes, and the customer experience continue to evolve.

---

[12] *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14133 (2003), CG Docket No. 02-278, released July 3, 2003, ("2003 Report and Order").  In relevant part, ¶ 200 of the 2003 Report and Order states: "We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes.  However, we clarify that **the prohibition does not extend to facsimile messages sent as email over the Internet.**  The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways.  Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes.  'Fax servers' enable multiple desktops to send and receive faxes from the same or shared telephony lines."  *See also* n.736 ("Commenters also note that some commercial facsimile services transmit faxes to the recipients as email attachments. **We emphasize that any rules the Commission adopts with respect to unsolicited facsimile advertisements would not extend to facsimile messages transmitted as email over the Internet.**") (emphasis added) (citing 47 U.S.C. § 227(a)(2).

[13] Faxed, The Rise and Fall of the Facsimile Machine, Jonathan Coopersmith (2015) (John Hopkins' University Press).

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                                    - 14 -

31.    An **online fax** is a web-based or Internet fax service.  It functions like a webmail (Gmail, Hotmail) service for faxes.  The system can integrate with email and other software systems.  **Internet-based faxing** is the latest evolution of fax.  The term "online fax" is often used interchangeably with "Internet fax" and a number of other terms.  Online fax refers to a hosted system, while Internet fax refers to any system of faxing where faxes travel over the Internet, including regular fax machines communicating with the T.38 fax standard.

32.    It is possible now to send and receive "faxes" online, from a computer, PC, or Mac.  Mobile phones or other mobile devices can also send/receive faxes over the Internet or carrier network.  Faxing is also possible with a modem USB dongle.  Faxes may also be sent and received via email account, be it Outlook, Gmail, Hotmail, etc.  Voice over Internet Protocol ("VoIP"), a methodology and group of technologies for the delivery of voice communications and multimedia sessions over Internet Protocol (IP) networks such as the Internet, also supports fax.

33.    Online faxing is also referred to as Internet fax, virtual fax, fax to email, digital fax, electronic fax, vfax, commercial facsimile services, and by many more terms.  Simply, there are numerous variations of this popular technology service.  Online fax services convert traditional facsimile transmissions into a digital file (typically PDF or TIFF files), allowing faxes to be received and sent via email or accessed via an online portal maintained by the service provider.

34.    In order to receive a fax with email, an email is sent to a designated email address whenever a fax is received.  The **"from" section is the service provider**, the "subject" section is the fax sender's fax number and other data, and the fax as it was transmitted is attached to the email.  Web interfaces, desktop software, or smartphone apps can be logged into for checking

faxes to receive faxes through a webpage, computer, or smartphone.  Just like email, messages can be viewed and forwarded or replied to.

35.     In the context of an online fax service, the recipient of the fax does not receive the transmission "over a regular telephone line."  The service stores the faxes online and either allows the recipient to view the file from a web portal or to receive the file via email.  The user of an online fax system does not need to have a premise-based analog telephone line dedicated to incoming faxes because there is no transmission over a regular telephone line to a fax machine owned/operated by the ultimate intended recipient.  Instead, the transmission in such instances engages the telephone lines that belong to the online services, which are in business to receive/send fax transmissions over a regular telephone line on behalf of their customers.

36.     The development away from the traditional fax machine has resulted in many businesses in the marketplace offering non-traditional faxing solutions, including, for example, Vonage, eFax, Mitel, Retarus, RingCentral, Metrofax, and Fax.com.  These businesses use a variety of platforms accessible from a host of devices and generally are marketed as offering faxing solutions that obviate the need for a traditional fax machine.

37.     Many Internet-based faxing solutions include access to their "fax portal." Typically, users of the fax services can specify whom within the organization should receive a notification email that a fax has been received and/or whom to automatically email the fax as an attachment.  The portal facilitates the user's ability to view/or delete received faxes by clicking on the PDF or TIFF file.  This "opens" the image and presents to the user the actual fax image.  From that point users can delete/email/save/print the image as desired.  These images or files may also

be forwarded to others inside or outside the organization further complicating the identity of the person or persons who actually received the file.

38.    While Internet-based fax services could theoretically receive/send a facsimile over a regular telephone line, the ultimate recipient does not.  Internet fax service providers are in the business of receiving faxes on behalf of their clients and are therefore not negatively impacted by doing so.

39.    Internet-based fax services do not transcribe fax images onto paper.  No Internet fax provider I am aware of provides an option of providing "printed" faxes.  Instead, a fax is converted to common image formats such as PDF or TIFF and either stored on the fax service provider's servers or, depending upon the user's preferences, included as an attachment to an email sent to the user.

40.    While a user may choose to implement a hybrid solution by connecting a traditional or stand-alone fax machine to the online fax service, this is an option that the user would specifically choose to implement and is not a default option of such services.

41.    According to a recently released paper publishing research from International Data Group ("IDC"), **90 percent of fax users** have already integrated or are evaluating integrating fax with other technologies or applications like email, or Enterprise Resource Planning ("ERP"), Customer Relationship ("CRM") and Electronic Health Record ("EHR") systems.  IDC's research predicts that during the next two years, all fax usage will shift to cloud services.[14]  Another market research report on computer-based faxing predicted the market would grow from $385 million in

---

[14] https://enterprise.efax.com/blog/the-top-10-reasons-companies-continue-to-fax-in-2017 - last accessed September 19, 2019.

---

2011 to $700 million in 2016, a 12.1% Compound Annual Grown Rate. [15]   One more researcher stated that the market for virtual fax services was anticipated to grow at an estimated 15.2 percent Compound Annual Grown Rate.[16]

### C.    Benefits of Online Fax Solutions

42.    Compared with a traditional fax machine, an online fax does not require maintenance of equipment, ink/toner, paper, or a landline phone line.  It does, however, require a way to access the Internet (such as a computer or smartphone).

43.    Some of the primary selling points for online fax systems is that users need not have a dedicated telephone line to receive faxes, will not use paper or toner, and will not tie up their telephone lines or fax machines.

44.    Setting up an online fax service account is quite easy to do – most of the technology is straightforward.  In most cases, all that is needed is an Internet connection, email address, and credit card.[17]  If customers are transitioning from a premise based fax machine to an online fax service, they may transfer their existing fax number to their online fax provider or obtain an entirely new fax number.

45.    Today's cloud-based or online fax technology is a technological advancement that has completely changed faxing.  Well in advance of 2016, individuals, businesses, and other organizations have been able to choose from a wide selection of Software-as-a-Service ("SaaS"), Integration-as-a-Service ("IaaS"), Platform-as-a-Service ("PaaS"), and numerous other options

---

[15]        https://www.businesswire.com/news/home/20121120005651/en/Research-Markets-Computer-Based-Fax-Markets---Forecasts#.Us6_zGRDsxg - accessed August 24, 2020.

[16] https://bebusinessed.com/online-fax/impressive-stats-of-online-fax/ - accessed August 24, 2020.

[17] https://faxauthority.com/online-fax/ - accessed August 24, 2020.

---

that have rapidly been displacing traditional fax machines and the dial-up modem technologies of yesteryear.

46.    Online fax services are always on – there is no need to keep a computer running to maintain an Internet connection.  When a fax arrives, it is automatically received by the service, no busy signals are caused using Internet faxes, virtual faxes, e-faxes (in other words any form of online faxing) causing a busy signal.  To double check, we called one of the major cloud-based web-fax service providers, Mitel, to inquire if, when using Mitel Cloud Services WebFax service, senders would ever receive a busy signal, even when multiple faxes are received simultaneously. The Mitel agent replied no, one would basically never get a busy signal.  I also called eFax, another premier fax provider, and was told by the eFax representative that there are NO busy signals at eFax, an eFax subscriber would receive ALL incoming faxes even if they were to arrive concurrently.  This is also supported by eFax literature, which states "eFaxing uses a broadband connection instead of a phone line.  This means a virtual fax number will effectively never have a busy signal as it can handle numerous faxes simultaneously."  "Online faxing makes busy signals a problem of the past.  Your fax number is always available – even if your computer is turned off." "You should never get a busy signal, it's usually a line issue."

47.    Online faxing is not only a safer and more secure process of transmitting documents, it is also faster.  The fax transmission rate for online faxing can be affected by several factors.

(a)    Document length and complexity - The more black and white variations on a fax page, the longer it will take to send the fax.  If a fax contains multiple pages and/or large amounts of text and/or complex graphics, it will take longer to send than a simple document.  This

also applies to faxes containing gray-scale shading or backgrounds. Gray-scale consists of thousands of tiny black/white variations, each of which is transmitted by fax as separate pieces of data. The more data to be transmitted with gray-scale increases the time needed to send the fax.

(b)     Phone line quality - A poor connection or noise on the telephone line will slow down a traditional fax transmission.

(c)     Modem speed - Most online faxing systems are configured to send at the fastest possible transmission speed. However, if the receiving fax machine is an older Group 3 fax machine or is experiencing other problems, transmission speeds may drop to 9600bps or less. In other words, the fax transmission speed will drop to match the receiving machine's capabilities. Documents that contain graphics may take longer and documents that contain a lot of white space may go faster. Research shows the average transmission speed for non-current-generation faxes is approximately 30 - 60 seconds per page, depending on the aforementioned factors.

48.     There are many online fax service or commercial facsimile providers that offer reliable faxing service at cheap prices. Nearly every online fax provider will provide users with a fax phone number when they join as customers. The fax "phone number" assigned will convert incoming and outgoing faxes to an electronic document that can be managed online via email or through the control panel provided by the online fax service provider. In other words, no traditional fax machine is needed by the customers of online fax services in order to receive faxes; therefore, no paper or toner is used at all, unless the recipient freely decides to print rather than delete or save fax images on a computer hard drive, thumb drive or on cloud-based storage. Faxes can be archived electronically and searched using keywords.

49.     Virtual faxes, e-faxes or cloud-based faxes, *i.e.*, commercial facsimile services, are essentially received like an email and, therefore, do not impact a business's telephone lines, do not keep a traditional fax machine busy, and do not use paper or toner unless the recipient decides to print the message.

50.     Users of online fax services need not own or use the equipment that sends and receives the initial fax transmission.  If the sending fax machine is "point A and the receiving fax machine is "point B,"  users of online fax services may receive images or files either as an email attachment or through an online portal, which is "point C."  "Point C" users of online fax services receive an email containing an image or link to their webportal provided by the "point B" Internet fax service provider.

51.     In addition to the already mentioned advantages over a traditional fax machine, the privacy implications of Internet-based faxes are much improved and therefore appealing to companies large and small.   Confidential information, such as social security numbers, salary/wages, HIPAA, HR-related matters, accounting, medical, legal, and business-proprietary information will not be printed out on a paper fax that will sit on a tray with open access to anyone who happens to view or even take possession of the content.

52.     Reviewing the advantages of all these cloud-based, online, Internet, electronic and other non-traditional fax technologies, *i.e.*, technology not involving a fax machine in a centralized location where employees have to get in line to send outgoing faxes, or stand by when expecting an incoming fax (particularly one that might contain confidential or sensitive information that the user might prefer to shield from another's view), it is plain to see the reasons for their proliferation.

---

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                                    - 21 -

### D.     Identification of Users of Online Fax Solutions

53.     The Fax Detail Records ("FDRs")[18] produced in this case do not and cannot show which faxes were sent to an online or email-based facsimile service versus which faxes were sent to a traditional fax machine.  Indeed, as Barry Clark, owner of WestFax, has acknowledged, there is no way to know whether the facsimile was received by a fax service that converts the transmission into an image and sends the image as an email to a recipient associated with the fax number.[19]

54.     Mr. Biggerstaff testified that simply looking at the FDRs in this case makes it impossible to determine which fax numbers received the materials on a stand-alone/desktop fax machine without performing a specific analysis, which he has not done in this matter.[20]

55.     In fact, it is nearly impossible for a web-based fax platform, such as WestFax, to determine if faxes were received by an online, Internet/cloud or commercial fax service versus a traditional premise-based analog fax machine recipient, or how any such faxes might have been received.  There exists no possible way to determine "IF" a fax was received or even viewed at all by the intended or any other recipients.

56.     The FDRs,[21] produced in this case, do not show which faxes were "sent" to a commercial or online facsimile service.

---

[18] AMERIF-000002152_Confidential, referred to in the Biggerstaff Report and the remainder of this report as "amerifactor.6.28.16.failed.csv" and AMERIF-000002153_Confidential, referred to in the Biggerstaff Report and the remainder of this report as "amerifactor.6.28.16.success.csv."

[19] Deposition of Barry Clark , *Etter v. Allstate*, No. 3:17-cv-00184-WHA (N.D. Cal.), p. 34 ("Clark *Etter* Deposition").

[20] Deposition of Robert Biggerstaff, *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, No. 3:16-cv-03013 (D.S.C. Sept. 18, 2020) ("Biggerstaff Dep."), at 40:18-42:25; 43:10-13.

[21] Fax detail records in CSV format "amerifactor.6.28.16.failed.csv" and "amerifactor.6.28.16.success.csv."

---

57.     This opinion is very much in line with the knowledge and experience I have acquired during my many years of working with fax providers, including WestFax.  For example, in *Etter v. Allstate*, Barry Clark, Owner of WestFax,[22] testified in relevant part:

> Question: How do you know those are successful?  How do you know that number?  Where did that come from?
>
> Answer: It came from the tone from the recipient's fax machine that says that the fax was received there; however, there's a significant question now as to what constitutes a received fax.  Many - - and I previously testified that **60 percent**, even **as many as 60 percent**, is my estimation, of faxes are now received via e-mail.  So, I certainly couldn't testify that these 17,000 pages were actually received by the intended recipient.
>
> Question: Or at least by a fax machine?
>
> Answer: That's true.  They may not have been received, I mean, I'm not aware of any other way for a fax to be received.  It just **may not have been received by the intended recipient**.

(emphasis added).[23]

58.     Further, in my opinion, identifying these "users" or the "recipients" of commercial or online fax images is not reliably possible.  Any number of employees could be designated to receive fax images via email from the online fax service provider.  Any one of them or none of them could have viewed, deleted, printed, forwarded or stored the image. Employees designated to receive these images can change due to migration in and out of or around the organization.

**Opinion Two:  There is no administratively feasible way to identify historical fax subscribers or intended recipients.**

---

[22] Clark *Etter* Deposition, p. 5, 4:5.

[23] *Id.*, p. 33, 24:25 and p. 34, 1:9; *see also* Komniey Dep. at 86:11-21 (". . . everybody I talk to has an online fax service.  They get a fax to email.").

---

59.    Mr. Biggerstaff's report does not address how or whether it is possible to determine who actually received the faxes and would be class members in this case, even if his analysis could accurately identify the fax numbers that were sent faxes that were "fully received without error."[24] In his deposition, Mr. Biggerstaff testified that the results of the SQL analysis he performed for this case do not indicate a fax was printed.[25]

60.    The information on the CSV spreadsheets referred to as "amerifactor.6.28.16.failed.csv" and "amerifactor.6.28.16.success.csv" in no way identifies current or historical subscribers (the account holders) or intended recipients associated with those numbers. Simply put, the Biggerstaff Report contains no information regarding the identities of the subscribers or intended recipients of the allegedly "sent" faxes.

61.    The FDRs reflect 41,434 rows of unsuccessful transmissions because (i) 836 numbers were "busy," (ii) 197 rows indicate "ConnectionInterrupt," (iii) 69 rows show "InvalidNumber," (iv) 4,004 rows specify "NoAnswer," (v) 1,914 showed "NoFaxDevice," (vi) 472 returned a status of "OperatorIntercept," (vii) 29,787 came back with "RemovalList," and (viii) 4,155 as "TierBlocked." Whoever originally provided the numbers to the fax broadcaster in June 2016, had eight (8) error indicators resulting in 41,434 failed transmissions.

62.    I added the total number of phone numbers reflected on the FDRs to identify 100,378 unique numbers to whom the fax broadcaster attempted to send faxes in June 2016. The

---

[24] Mr. Biggerstaff asserts that he found "58,945 fully received error-free transmissions of one page received by 58,944 unique fax numbers on dates ranging from 06/24/2016 to 06/28/2016." Biggerstaff Report ¶ 15. In footnote 1 of his report, he states that one fax number (█████████) received two successful fax transmissions. An Internet search identified that fax number as the "main fax number" of "AmeriFactors Financial Group, LLC" at "215 Celebration Pl., Ste. 340, Celebration, FL 34747-5410."

[25] Biggerstaff Dep., at 45:14-21.

---

FDRs reflect only 58,945 successful transmissions,[26] which means that over forty (40) percent of the attempted transmissions failed. Given this high failure rate, the remaining fax numbers that allegedly received "error free" faxes cannot be relied upon to accurately identify the recipients or intended recipients. While a fax may have been "sent," the spreadsheet referred to as "amerifactor.6.28.16.success.csv" cannot be relied upon to identify the intended or actual recipients. In my opinion, which is based upon my experience, just because a fax allegedly was "sent," the identity of the intended recipients at the time the fax was allegedly received is unknown. Reliance on the fax number to identify these entities is very problematic given the magnitude of known inaccuracies on the list.[27]

63.    This is clear evidence that the source file at issue in this case had NOT been updated. If fax numbers themselves are incorrect, it only makes sense to assume that other information is inaccurate as well. Mr. Biggerstaff's testimony offers no explanation why so many fax numbers on this list are inaccurate. Simply put, the Biggerstaff Report contains *no* information regarding the identities of the subscribers or intended recipients of the 58,944 fax numbers, with the one exception of the fax number associated with AmeriFactors.

64.    I also understand that a source list of the fax numbers has been produced in this case, which is identified as "AMERIF-000002154_Confidential.csv". While there are names of companies associated with the fax numbers included in the source list, as noted above, given the high error rate of the attempted transmissions in this case, these names cannot be relied upon to

---

[26] Biggerstaff Report, ¶ 1.

[27] *See also* Komniey Dep., at p. 115:4-18 (discussing "glitches" occurring "half of the time" with on-line fax solution websites).

---

accurately identify the recipients of the fax at issue. In fact, I am aware that Mr. Komniey of Admax, who provided the source list in this case, testified that the list came "from all kind[s] of sources" and that he did not "keep track of that."[28] Mr. Komniey also testified that his own records may be unreliable because the original computer on which the files were kept "quit working" and he otherwise has almost nonexistent data security.[29]

65.    Further, other than manually and individually researching each business identified in the source list, I am not aware of any method to determine whether a business entity remains active or otherwise is continuing to operate.

---

[28] Komniey Dep., at 15:13-18; 110:14-19.

[29] Komniey Dep., at 143: 16-21; pp. 146-149.

---

III.    **CONCLUSION**

66.    A very substantial portion of the alleged fax recipients likely received the fax at issue via one of the many varieties of Internet or online fax services and it is impossible to identify how an alleged recipient received the fax by reviewing FDRs.  Any assertion that such an Internet fax message should be treated similarly to a traditional fax because a recipient might decide to print the message received would necessarily mean that every message received on any electronic device that can be connected to a printer could qualify as a fax.  There is also no quantifiable, conclusive evidence in this case that proves that "sent" faxes in this context are the same as "successfully received" faxes.  The names and addresses of businesses and/or persons, who received the faxes cannot be dependably identified by reliance upon the very same list that contains nearly 2,000 fax number errors.

**Compensation**

67.    The rates CompliancePoint receives for my services provided in this engagement are attached as Exhibit C.  My compensation is not dependent upon the outcome of this matter or the content of my opinions.

**Reservation of Right to Amend**

68.    I reserve the right to amend this report based on information received after issuance of the same.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.  Executed in Beverly Hills, Florida on this 16th day of October, 2020.


By: _____
                Ken Sponsler

_____

EXPERT REBUTTAL REPORT OF KEN SPONSLER
CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v.
AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, INC.
CASE NO. 3-16-CV-03013-JMC                                              - 27 -

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES, a South Carolina corporation, individually and as representative of a class of similarly-situated persons | Case No. 3:16-cv-3013-JMC |
| Plaintiffs, | |
| v. | |
| AMERIFACTORS FINANCIAL GROUP, LLC and JOHN DOES 1-5, | |
| Defendants. | Original Complaint Filed: September 2, 2016 |

## SUPPLEMENTAL REPORT OF KEN SPONSLER

## SUPPLEMENTAL REPORT OF KEN SPONSLER

### I.     INTRODUCTION

1.     I am Ken Sponsler.  I am over the age of twenty-one years, of sound mind, and competent to testify.  I am currently the Senior Vice President of CompliancePoint Litigation Services.  CompliancePoint, Inc. ("CompliancePoint") is a global professional services firm specializing in consumer contact compliance consulting and audit services, located in Duluth, Georgia.  CompliancePoint is a wholly-owned subsidiary of PossibleNOW, Inc.

2.     I previously submitted an Expert Report ("Report") in the above referenced action ("Action") dated October 16, 2020, which is incorporated by reference into this Supplemental Report.  My curriculum vitae has not changed materially since I provided my prior Report.

3.     I have been asked by counsel for the Defendant in this Action to supplement the opinions that I previously offered in my Report, based upon my review of responses that Plaintiff's counsel has received in response to third-party subpoenas ("Subpoenas") that they served in this case.  I understand that Plaintiff asserts that these Subpoenas will allow it to identify "whether the subscriber of each phone number was utilizing 'online fax services' on the date of the fax[]" at issue in

1

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

this Action.[1]  I have reviewed the Subpoenas, along with the responses received to date, and, in my opinion, this discovery will not allow Plaintiff to identify subscribers who were utilizing online fax services on the date of the fax at issue.

## II.     BACKGROUND ON PLAINTIFF'S SUBPOENA PROCESS

4.     Plaintiff claims that 58,994 successfully received faxes are at issue in this Action.[2]  In an initial step to attempt to identify which of these faxes were received through an online or internet fax service, Plaintiff issued a subpoena to Telcordia.  Telcordia identified the telephone carrier names that were purportedly associated with each of the 58,944 numbers on June 28, 2016, the date Plaintiff alleges it received the fax at issue.  Telcordia produced a results file containing the numbers at issue and the carrier that, according to its records, is associated with servicing that number as of June 28, 2016 ("Telcordia Response").[3]

5.     Next, Plaintiff issued separate Subpoenas to each of the identified carriers as well as to online fax service provider J2 Global Inc. ("J2").  In total, approximately 330 Subpoenas were issued, with the vast majority served between 9/16/2020 through 11/25/2020, and at least three additional Subpoenas

---

[1] Plaintiff's Motion for Reconsideration, Case No. 3:16-cv-JMC, Dkt. No. 178-1, at 2.
[2] Biggerstaff Report, ¶ 1.
[3] Telcordia Response.xlsx.

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

issued later in December and early January.[4]  Each Subpoena generally provided a

three week deadline for carriers to produce responses, although I understand that

deadline may be subject to change.

       6.     Each Subpoena asks two questions of the recipient:

       (1) For each telephone number on the attached list for the date(s) listed,

       identify whether or not you provided online fax service to the subscriber

       of that telephone number.

       (2) For each telephone number on the attached list for the date(s) listed,

       provide the name and address of the subscriber.[5]

Each Subpoena to a carrier identifies the telephone numbers that the Telcordia

Response associated with that carrier.

       7.     Subpoena responses ("Subpoena Responses") from carriers, as

of January 26, 2021, have been low.  As noted, Plaintiff has served or provided notice

of approximately 330 Subpoenas on the carriers that were identified for the 58,944

numbers in the Telcordia Response.  As of January 26, 2021, approximately 98

substantive Subpoena Responses have been received that provide subscriber data for

---

[4] Plaintiff's Motion and Incorporated Memorandum for Entry of Court Order to Pursue Immediate Discovery Compliance from Third-Party Phone Carriers, Dkt. No. 172, Ex. A.

[5] *See*, *e.g.*, TCSR000032.

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

at least one phone number.  In total, as of January 26, 2021, carriers have provided subscriber data for approximately 874 unique phone numbers.  (*See* Exhibit A.) **Thus, as of January 26, 2021, subscriber data has been received for only approximately 1.5% of the phone numbers identified by the Telcordia Response.**

## III.  OPINIONS

8.     Based on the evidence described in this Supplemental Report, the analyses performed under my direction, as well as my expertise and knowledge related to the telecommunications and fax industries, I reached the conclusions set forth below.

### A.     Opinion One: Subpoena Response Rates Are Low and Unreliable.

9.     While I understand that Plaintiff is currently engaged in motion practice concerning the Subpoenas, and Subpoena Responses are still being produced on a rolling basis, the low rate of response since September 16, 2020 suggests that Plaintiff's proposed methodology will not be effective.  Even if carriers were to provide complete responses, however, for the reasons I describe below, the Subpoena Responses still will not identify subscribers who were using an online fax service.

4

10.     This is because, in the first instance, even the responses received are unreliable.  As of January 26, 2021, several carriers that provided subscriber information with respect   to certain numbers identified in the Subpoenas also objected that certain numbers that the Telcordia Response associated with the carrier were not, in fact, serviced by the carrier on June 28, 2016.     For the Subpoena Responses that provided subscriber data for at least one phone number, no subscriber data was provided for approximately 134 phone numbers associated with those carriers (according to the Telcordia Response).  (*See* Exhibit A.)  This means that, for approximately 13.4% of the total phone numbers associated with those Subpoena Responses as of January 26, 2021, no subscriber information was provided.  For example, Pineland Communications, Inc. despite providing subscriber data for certain numbers, responded that 75% of the numbers were "not our number" or "not a working number on the requested date."[6]  In other instances, a carrier's response included some, but not all, of the subpoenaed phone numbers.  For example,

---

[6] TCSR000509-510.  Further complicating matters, the native format of the file containing the subpoena responses produced by Plaintiff appears to include errors. For example, Pathwayz Communications (TCSR000508) appears to be a duplicate of the Pineland Communications response, which is identified as TCSR000510. Additionally, it appears that Plaintiff also incorrectly bates stamped the native format subpoena response file (TCSR000474) as a response from Heart of Iowa Communications Cooperative; however that file appears to be associated with Alliance Connect LLC (and appears to be the same file as TCSR000555). These are examples only and are not exhaustive nor intended to represent all instances of similar issues.   These errors further complicate any analysis performed by AmeriFactors to test the validity of the alleged subpoena results.

5

AmaTechtel was subpoenaed regarding 18 numbers.  However, its response only included 12 numbers, two of which were not active on June 28, 2016 according to the response.[7]  Yet another example is 123.Net who was subpoenaed regarding 45 numbers; however its response only included 43 numbers, one of which the response simply stated "UNASSIGNED."[8]

       11.    The mismatch between the Telcordia Response and the Subpoena Responses further underscores the unreliable nature of attempting to reconstruct this data nearly five years after the fact.

### B.    Opinion Two: Carriers Cannot Provide the Requested Information Because They Largely Do Not Provide Online Fax Services.

       12.    As seen in many of the Subpoena Responses, most of the subpoenaed entities do not provide online fax services.  In fact, only a fraction of carriers provide an online fax service to their customers, while the vast majority do not.[9]  The carriers that do provide an online fax service can be categorically classified as very small, localized carriers.[10]  This is because smaller, localized carriers often

---

[7] TCSR000381.

[8] TCSR000367.

[9] Heart of Iowa Comm. (TCSR000473 ("Heart of Iowa does not provide online fax service.")); DTC (TCSR000431 ("DTC does not offer 'online fax service.'")).

[10] *See, e.g.,* Xchange Telecom LLC (TCSR000587-588); Everstream (TCSR000449).

---

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

provide more basic online fax services at a cheaper price.  More well-known online fax services may charge more for these same services.

13.    The fact that a carrier does not provide a subscriber with online fax services, however, does not mean that the subscriber does not otherwise obtain online fax services for the number.  For example, the Subpoena Response by Long Lines Metro, LLC notes that "We are unable to identify whether these telephone numbers are tied to an online fax service."[11]  Likewise, Verizon stated that "Verizon does not have information available to allow it to determine whether the customer associated with the telephone numbers used the number with a fax or online service. Verizon therefore has no information responsive to this request."[12]

14.    Therefore, the answer to the first question in the Subpoenas, as drafted, is almost certainly "no," irrespective of whether the subscriber did, in fact, use an online fax service.

C.    **Opinion Three:  Carriers Cannot Reliably Identify Whether Phone Numbers Are Used For Online Fax Service.**

15.    A "no" in response to Subpoena Question 1 does not establish that the phone subscriber did not use an online fax service.  Several online fax service

---

[11] TCSR000205.
[12] Verizon Subpoena Objection (Sept. 24, 2020) [no Bates No.].

SUPPLEMENTAL REPORT OF KEN SPONSLER    CASE NO. 3:16-CV-03013-JMC

providers permit their customers to use their carrier's call forwarding feature to forward incoming "calls" to the online fax service. In that case, the telephone carrier would reflect that the customer is a regular subscriber of telephone services, and would have no record that the telephone number is actually used for online fax services.[13] Thus, this information would not generally be reflected in the Subpoena Responses.

16.     Carriers provide telecommunication services to their customers but have no information regarding whether the number is associated with an online fax service or is even connected to a fax capable device. Indeed, even if a subscriber is not using an online fax provider, it is still possible that they have set their device to receive faxes via the internet.[14] Fax recipients can also connect their computer to a fax line, which would not be reflected in the Subpoena Responses. Thus, this inquiry would require extensive research: first, to identify each entity that subscribes to each number; then, perform research to determine if that entity is a provider of online fax services; then, determine if the number was used as an actual fax number or was used by the entity as a sales, customer support, technical support, or other

---

[13] *See, e.g.*, Ohio Telecom, Inc. (TCSR000241-242 (providing only that a number was call forwarded to another)).

[14] Kyocera Operation Guide, at Career Counseling 000010 ("Fax without using the telephone line (Internet Fax (i-Fax)"); *id.* at 533 ("Installing the Internet FAX Kit (A) sends and receives faxes via the Internet without using a phone line.").

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

business purpose line. Even if it were somehow determined that the number was, in fact, used as a fax line, it would still be necessary to inquire as to the type of technology the subscriber was using, and whether any internet fax technology was implemented.

17.    As Verizon pointed out in its objections to its Subpoena, it does not have the information needed to determine whether a telephone number is used with a fax or online fax service. The reason for this is simple. Carriers often cannot determine if a particular number is associated with any type of fax capability. Customers can plug any analog phone line they have available into a fax machine. Carriers are unaware of whether subscriber lines are using voice or fax. Several of the smaller carrier responses also included this caveat.[15]

18.    Of the small number of carriers that did identify numbers associated with their online fax service, they did not identify if other numbers were associated with an online fax service other than their own. This is not surprising because carriers are often unable to identify if numbers are used for third-party

---

[15] Chickasaw Telephone Company (TCSR000417-418 ("We can only verify that one of the listed customers had a fax line. The other phone numbers do not show whether they're fax lines or not. The customer doesn't have to inform our company what they're using the telephone lines for.")); SRT Communications (TCSR000551-552 ("We would not be able to distinguish if the dial tone service was used for fax or phone use.")).

9

---

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

online fax services because of the availability of call forwarding and other third-party internet-based fax technology providers.

> ### D. Opinion Four: Plaintiff's Subpoena to Online Fax Provider J2 Global Inc. Will Not Conclusively Identify Which Fax Recipients Received Online Fax Services.

19.     Plaintiff issued a subpoena to online fax provider J2 Global Inc. ("J2 Subpoena") for the 58,944 numbers it claims successfully received the fax at issue.  The J2 Subpoena posed the same questions, including whether J2 Global provided online fax services to the subscribers of the listed phone numbers.  This is an apparent attempt to find a back end solution to address situations where the phone subscribers receive fax service from a third–party online fax provider, rather than the phone carrier.  This subpoena, however, also fails to reliably identify whether a specific number was using an online fax service.

20.     First, Plaintiff's subpoena to just one online fax provider fails to capture the various other online fax providers whose services could have been used by the subscribers.  For example, Mitel, Westfax, Snappyfax, RingCentral, Hellofax, Clickfax, Faxaway, Faxitfast, Faxbetter, Aircomusa, Genifax, Nextiva, and Faxage are also significant providers of online fax services.

21.     Second, this subpoena to an online fax provider likely would not capture a call forwarding scenario.  For example, if a subscriber were having any

10

faxes received forwarded to an online service provider, this information would not be reflected in any response to the J2 Subpoena.   Further, if a consumer wanted to maintain their historical fax number for instance (215 233-███), they could forward incoming faxes to an online fax service provided number such as (657 226-███). In this case, the online fax provider would have no information regarding faxes sent to the original 215 233-███ number.

22.     The J2 Subpoena would also not identify instances in which a recipient of the fax at issue was using its own or other fax technology to receive faxes over the internet.

**E.     Opinion Five:  Plaintiff's Subpoenas Confirm the Difficulty of Identifying Subscriber Information on a Historical Basis.**

23.     I also note that Plaintiff's Subpoenas seek subscriber information on a historical basis, nearly five years ago, which is extremely difficult to obtain. The Subpoena Responses confirm this.

24.     For example, in this Action, Defendant produced the fax list that contains the fax numbers used to transmit the fax at issue ("Fax List").   This Fax List also provided name, address and other identifying information.[16]  On a sample basis, I compared the subscriber information provided by the carriers in the

---

[16] AMERIF-00002154.

---

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

Subpoena Responses and found instances in which the subscriber information did not match the fax list. For example, the Fax List identifies ███████████████ █████████ as the contact for fax number 563-556-████. The Subpoena Response from CS Technologies, however, identifies ████████████ as the subscriber to that number on the date the fax was sent.[17] These types of mismatches only further underscore the unreliability of any attempt to identify fax recipients in this Action. I identified further challenges associated with identification of fax recipients or historical fax subscribers in my initial Report in this Action.

## IV.   CONCLUSIONS

It is therefore my opinion that the subpoena process undertaken by the Plaintiff in this case will not produce reliable, accurate or meaningful information regarding which recipients of the fax at issue were using an online fax service. Simply put, carriers do not have the information Plaintiff seeks to acquire because, even if a carrier did not provide online fax services to the subscriber, it does not have information as to whether a subscriber is obtaining these services from another provider, or otherwise employing technology that would allow the subscriber to receive faxes online.

---

[17] TCSR000442-443.

SUPPLEMENTAL REPORT OF KEN SPONSLER     CASE NO. 3:16-CV-03013-JMC

## V.    STATEMENT OF COMPENSATION

My hourly rates are attached as Exhibit C to my original Report and have not changed.  The compensation CompliancePoint Litigation Services receives for my services in this engagement is not dependent upon the outcome of this matter or the content of my opinions.

## VI.    RESERVATION OF RIGHT TO AMEND

I reserve the right to offer additional opinions and/or amend this Declaration subject to additional information received after issuance of the same.

## VII.    DECLARATION

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed in Beverly Hills, Florida on this 28th day of January, 2021.

_____
Ken Sponsler

13

SUPPLEMENTAL REPORT OF KEN SPONSLER    CASE NO. 3:16-CV-03013-JMC

Documents Reviewed and Relied Upon:

1) Telcordia Response, Excel spreadsheet
2) Telcordia and Carrier Subpoenas
3) Subpoena responses (TCSR000001-TCSR000611)
4) Fax List (AMERIF-00002154)
5) Kyocera Operation Guide (Career Counseling 000001)
6) Plaintiff's Motion for Reconsideration, Case No. 3:16-cv-JMC, Dkt. No. 178-1
7) Report of Robert Biggerstaff (July 20, 2020)
8) Plaintiff's Motion and Incorporated Memorandum for Entry of Court Order to Pursue Immediate Discovery Compliance from Third-Party Phone Carriers, Dkt. No. 172, Ex. A

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES, individually and as the representative of a class of similarly-situated persons, | Case No. 3:16-cv-03013-JMC |
| Plaintiff, | |
| v. | |
| AMERIFACTORS FINANCIAL GROUP, LLC, and JOHN DOES 1-5, | |
| Defendants. | |

**EXPERT REPORT OF ADAM HART**

1.  Through my employment with Charles River Associates ("CRA"), I have been retained by Kelley Drye & Warren, LLP. ("Counsel"), in the matter of *CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES v. AMERIFACTORS FINANCIAL GROUP, LLC and JOHN DOES 1-5,* (the "Litigation"), as a computer forensic expert witness. My qualifications include more than fourteen years of information security and digital forensic analysis, including over twelve years of law enforcement related experience. My compensation is not based on the findings or outcome of this matter.

## EXPERT QUALIFICATIONS

2.  Since December 2018, I have been employed as an associate principal in CRA's Forensic Services group based in Boston, Massachusetts. Currently, I lead high-profile cybercrime and data breach investigations and provide digital forensics and incidence response services. Specifically, I manage teams that provide services and solutions for clients in preparation and in response to matters involving a wide range of information security services, privacy assessments, and investigations. I conduct computer forensic and data breach investigations and assist in the assessment and analysis of client data for evidence related to an incident or dispute. Analyses I have conducted include searches for evidence of fraud, theft of trade secrets, etc., on computer media from desktops, laptops servers, virtual machines, email platforms; searches for evidence of reformatting, dates of reformatting, and utilities to wipe or copy data from electronic media; and locating evidence of improper removal, duplication, destruction or transmission of email messages or files. I also have extensive experience conducting malware analysis, ransomware investigations, business email compromise investigations and online social media investigations.

3.  Prior to joining CRA, from 2017 to 2018 I was employed as a Senior Associate in RSM US LLP (RSM)'s Security and Privacy Services group based in Boston, Massachusetts where I managed data breach, digital forensics and incident response services.

4.  Prior to joining RSM, I was employed as Detective with the Montgomery County Police in Maryland from 2006 to 2017, where I served as a criminal investigator, digital forensic examiner and member of the United States Secret Service Electronic Crimes Task Force (ECTF). As part of my duties I conducted multiple complex criminal investigations involving computers, servers, email accounts, network devices, mobile devices, GPS devices, vehicle infotainment systems, cloud storage, social media accounts and malware. In this role I had extensive experience testifying as both a fact witness and an expert witness in the area of digital forensics in both state and federal court.

5.  I hold a Bachelor of Arts in Political Science from the College of the Holy Cross from and a Master of Forensic Science from the George Washington University. I hold several industry recognized certifications in the area of digital forensics including the Certified Forensic Computer Examiner (CFCE), from the International Association of Computer Investigative Specialists (IACIS), the GIAC Reverse Engineering Malware (GREM), the Certified Digital Forensic Examiner (CDFE) from the Department of Defense Cyber Investigation Training Academy (DCITA) and the Cellebrite Certified Mobile Examiner (CCME).

6.  Attached hereto as Exhibit A is a copy of my Curriculum Vitae.

## SUPPORTING EVIDENCE

7.  For the purposes of this report, my conclusions are based on the following evidence:
    - ChadKomniey_PDFTran.pdf-Transcript of the deposition of Chad Komniey September 22, 2020.
    - Files "amerifactor.6.28316.success.csv" and "amerifactor.6.28.16.failed.csv"

8.  I reserve the right to provide additional opinions or update my opinion if additional information/documents are provided.

## EXPERT CONCLUSIONS

9.  Komniey produced the files "amerifactor.6.28316.success.csv" and "amerifactor.6.28.16.failed.csv" to the court as his own alleged business records. These files are plain text comma separated value (CSV) files. A CSV file does not contain embedded metadata about the creation of the file and there is no way to tell if it has been edited from the original.

10. At the request of Counsel, I have reviewed the transcript of the deposition of Chad Komniey dated September 22, 2020. During his testimony Komniey provided details about his business process and the technical infrastructure of his small business, Admax.

11. Mr. Komniey described his systems as a home office setup with a laptop he uses for business. He indicated that he does not have a firewall protecting his computer from

EXPERT REPORT OF Adam J. Hart.     PAGE 3

external access and he uses an AOL email account for business communication. He also indicated that he does not have an outsourced information technology (IT) resource that assists him with information security.

12. Unlike large companies with dedicated information security teams, small businesses often have limited resource to commit to information security. Small businesses are regularly the targets of phishing attacks, network intrusions, data theft, ransomware attacks, website compromises and data loss due to system failures and corruption. Small businesses should have basic security protections in place to protect their customers' data and business records.

13. A firewall is a network security device, either hardware or software-based, which is designed to review incoming and outgoing traffic and either allow or block traffic. A misconfigured firewall is a common contributor to network intrusions. Small business networks should have a firewall in place to prevent unauthorized external access. At a minimum, a properly configured router should contain the necessary firewall to protect a home network. Mr. Komniey indicated that did not have a firewall on his network.

14. All businesses must have data retention and data backup mechanisms in place to protect from data loss. Proper backups allow a business to recover from hardware failure, ransomware attacks and data corruption. Multiple cloud based, software based, and hardware solutions can make this process automated. During his testimony, Mr. Komniey indicated that he would backup data to a hard drive, however, the documents related to his fax records were not backed up. He also stated that the original business records, including the original copies of the fax records produced, had been downloaded to a laptop that "quit working" and that he no longer had this computer. The lack of data retention and backup policies led to a loss of business records that calls into question the completeness of the provided fax records.

15. Email compromises continue to be the leading cause of data breaches. Businesses must utilize an email platform with security features including multifactor authentication

(MFA), spam filtering and audit logging, to identify and prevent potential unauthorized access. Mr. Komniey indicated that he uses the email address admaxmarketing@aol.com for business. America Online (AOL) email is a personal email service which lacks many of the modern security protections of paid business email platforms. Komniey also acknowledged that he does not maintain email logs to confirm no one has accessed his email – the same email address from which the records in this case were produced.[1]  He also acknowledged that he frequently deletes his emails.[2]

16. All business computer systems must have up to date endpoint protection or antivirus software to defend from malware threats. Malware is designed to cause damage to data and systems or to gain unauthorized access to a network. Mr. Komniey indicated that he had three different endpoint protection tools, including "McAfee" and "Super Anti-Spyware Professional". When asked if he has experienced any malware infections or intrusions Komniey indicated that he had, but he believed his antivirus software had detected them. Often times malware has the opportunity to successfully execute on a system prior to the antivirus tools. Proper logging and documentation of malware alerts are important to assess the threat posed to the computer and network. However, Komniey indicated that his software merely removed them but did not indicate that he did anything further.[3]

Komniey also acknowledged that his computer systems are not protected by any disk encryption or physical security to prevent theft or manipulation.[4] In fact, other than his current password protected "cheap" laptop, which was acquired after the facsimile at issue in this case was sent, he has no other security systems in place.[5] An operating system password alone, without disk encryption, can be easily circumvented and allow files to be accessed or manipulated.

Dated:  October 16, 2020

_Adam J. Hart_ _(signature)_
_____
Adam J. Hart

---

[1] Kominey Dep. at 148: 18-20.
[2] Kominey Dep. at 149: 16-24.
[3] Kominey Dep. at 148: 5-20.
[4] Kominey Dep. at 148: 17-20; 149:1-3.
[5] Kominey Dep. at 148: 20; 149:1-20.

EXPERT REPORT OF Adam J. Hart.    PAGE 5
4816-6634-7727v.1

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

CAREER COUNSELING, INC. d/b/a           )
SNELLING STAFFING SERVICES, a           )
South Carolina corporation, individually )
And as the representative of a class of  )
Similarly situated persons,              )
                                         )
            Plaintiffs,                  )        CASE NO.:  3:16-cv-3013-JMC
                                         )
v.                                       )
                                         )
AMERIFACTORS FINANCIAL GROUP,            )
LLC and JOHN DOES 1-5                    )
_____/

## PLAINTIFF'S SUPPLEMENTAL ANSWERS TO FIRST SET OF INTERROGATORIES

Plaintiff Career Counseling, Inc., by and through its attorneys, and pursuant the Federal Rules

of Civil Procedure 26(e) and 33, hereby supplements its answers to Defendant Amerifactors Financial

Group, LLC's ("Defendant" or "Amerifactors") First Set of Interrogatories. Plaintiff incorporates by

reference as if full stated herein its "General Objections" contained in its original Answers to

Defendant Amerifactors Financial Group, LLC's First Set of Interrogatories.

### SUPPLEMENTAL/AMENDED INTERROGATORY ANSWERS

#### INTERROGATORY NO. 1:

Describe Plaintiff's theory as to how it intends to prove the method by which each putative
class member received Exhibit A to the Amended Complaint, including the cost per putative class
member to determine actual receipt.

**RESPONSE:** Plaintiff objects to the request because it seeks to discover the thoughts, mental
processes, and strategy of Plaintiff's counsel which are privileged and confidential and protected by
the attorney client and work product privileges. Without waiving and subject to said objections,
discovery is ongoing and Plaintiff's litigation strategy based on discovery Plaintiff has yet to receive
is constantly evolving.

**AMENDED RESPONSE**:  Plaintiff objects to Interrogatory No. 1 as to its request that

Plaintiff calculate the "cost per class member to determine actual receipt" as irrelevant and not likely

**INTERROGATORY NO. 14:**

Describe the process Plaintiff uses to identify potential facsimile messages to consider as a basis for a potential lawsuit under the Telephone Consumer Protection Act.

**RESPONSE:** Plaintiff objects to the request because it seeks to discover the thoughts, mental impressions, and trial strategy of Plaintiff's counsel which are privileged and confidential and protected by the attorney client and work product privileges.

**INTERROGATORY NO. 15:**

Please list all lawsuits filed by Anderson + Wanca alleging violations of the facsimile provisions of the Telephone Consumer Protection Act, including an identification of which lawsuits involved B2B or its principal, AdMax Marketing, or Chad Komniey, and an identification of those lawsuits where the plaintiff sought to enjoin or obtain a judgment against a fax marketing firm.

**RESPONSE:** Plaintiff objects to the request because it seeks to discover the thoughts mental impressions and trial strategy of Plaintiff's counsel which are privileged and confidential and protected by the attorney client and work product privileges. Plaintiff further objects to providing information which is easily accessible to Defendant as TCPA cases filed by Plaintiff's counsel are on Pacer and state court files.  Plaintiff further objects to being asked to review all of those cases to identify criteria which Defendant has listed because time and expense incurred, if it is possible to do so, grossly outweighs the probative value if any, of the requested information.  Without waiving and subject to said objections, the only other TCPA case filed by Plaintiff is vs. Amsterdam Printing & Litho, Inc. and Taylor Corporation, 3:15-cv-05061.

**INTERROGATORY NO. 16:**

Describe the basis for your allegation in the Amended Complaint that Defendant sent other unsolicited facsimile advertisements other than the communication attached as Exhibit A to the Amended Complaint.

**RESPONSE:** Defendant's discovery responses and the information from AdMax showing AdMax acquired or purchased a list and sent over 55,000 fax advertisements for Defendant.

**INTERROGATORY NO. 17:**

Please describe every way that a communication that originated as a conventional facsimile message could be received by a computer — regardless of whether you consider a computer a telephone facsimile machine.

**RESPONSE**: Plaintiff does not have sufficient information or knowledge to formulate an answer because Plaintiff does not have an efax or computer operated facsimile system.

**AMENDED RESPONSE:** Plaintiff objects as the information sought in this Interrogatory is

equally available to Defendant. Subject to that objection, Plaintiff's general objections, and the

## VERIFICATION BY CERTIFICATION

Elizabeth Trenbeath, president of or on behalf of Career Counseling, Inc., d/b/a Snelling Staffing Services, under the penalties of perjury pursuant to 28 U.S.C. § 1746(2), certifies that statements set forth in the attached Plaintiff's Supplemental Answers to Defendant Ameirfactors Financial Group, LLC's Interrogatories are true and correct, except as to such matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he believes the same to be true; he has read the foregoing Answers and knows the contents thereof; that said Answers were prepared with the assistance and advice of counsel; that the Answers set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information assembled by his attorneys and still in existence, presently recollected and thus far discovered in the course of the preparation of this Plaintiff's Supplemental Answers to Defendant Ameirfactors Financial Group, LLC's Interrogatories, that she, consequently reserves the right to make any changes to Plaintiff's Supplemental Answers to Defendant Ameirfactors Financial Group, LLC's Interrogatories if it appears at any time that omissions or errors have been made therein or that more accurate information is available; that subject to the limitations set forth herein, said Plaintiff's Supplemental Answers to Defendant Ameirfactors Financial Group, LLC's Interrogatories is true to the best of her knowledge, information and belief.

Date: 1/7/2021

ELIZABETH TRENBEATH

11

# EXHIBIT K

CLOSED

# U.S. District Court
## District of South Carolina (Columbia)
## CIVIL DOCKET FOR CASE #: 3:15-cv-05061-JMC

| | |
|---|---|
| Career Counseling, Inc. v. Amsterdam Printing & Litho, Inc. et al | Date Filed: 12/28/2015 |
| Assigned to: Honorable J Michelle Childs | Date Terminated: 10/23/2018 |
| related Case: 3:16-cv-03013-JMC | Jury Demand: None |
| Cause: 47:227 Restrictions of Use of Telephone Equipment | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Career Counseling, Inc.**
*a South Carolina corporation, individually
and as the representative of a class of
similarly-situated persons
doing business as*
Snelling Staffing Services

represented by **John Gressette Felder , Jr**
McGowan Hood and Felder
1517 Hampton Street
Columbia, SC 29201
803-779-0100
Email: jfelder@mcgowanhood.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian J Wanca**
Anderson and Wanca
3701 Algonquin Road
Suite 500
Rolling Meadows, IL 60008
847-368-1500
Fax: 847-368-1501
Email: bwanca@andersonwanca.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ross M Good**
Anderson and Wanca
3701 Algonquin Road
Suite 500
Rolling Meadows, IL 60008
847-368-1500
Email: rgood@andersonwanca.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Michael Kelly**
Anderson and Wanca
3701 Algonquin Road
Suite 500
Rolling Meadows, IL 60008
847-368-1500
Email: rkelly@andersonwanca.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wallace C Solberg**
Anderson and Wanca
3701 Algonquin Road
Suite 500
Rolling Meadows, IL 60008
847-368-1501
Email: wsolberg@andersonwanca.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Amsterdam Printing & Litho, Inc.**          represented by          **Jonathan Matthew Harvey**
Jonathan Harvey Law Office
1701 Richland Street
Columbia, SC 29201
803-779-3363
Fax: 803-779-3364
Email: harveylawfirm@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W Allen Nickles , III**
Nickles Law Firm
4430 Ivy Hall Drive
Columbia, SC 29206
803-466-0372
Email: wanickles@nickleslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellie Mitchell Bubeck**
Copilevitz and Canter
310 West 20th Street
Suite 300
Kansas City, MO 64108
816-472-9000
Fax: 816-472-5000
Email: kmitchell@cckc-law.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E Raney**
Copilevitz and Canter
310 West 20th Street
Suite 300
Kansas City, MO 64108
816-472-9000
Fax: 816-472-5000
Email: braney@cckc-law.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Taylor Corporation**                    represented by   **Jonathan Matthew Harvey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W Allen Nickles , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellie Mitchell Bubeck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E Raney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Does 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/28/2015 | 1 | COMPLAINT against Amsterdam Printing & Litho, Inc., John Does 1-10, Taylor Corporation (Filing fee $400 receipt number 0420-6323664) filed by Career Counseling, Inc. Service due by 3/31/2016 (Attachments: # 1 Exhibit A - two faxes)(cbru, ) Modified to correct filing date on 12/29/2015 (cbru, ). (Entered: 12/29/2015) |
| 12/28/2015 | 3 | Local Rule 26.01 Answers to Interrogatories by Career Counseling, Inc.(cbru, ) (Entered: 12/29/2015) |
| 12/28/2015 | 4 | Summons Issued as to Amsterdam Printing & Litho, Inc. (cbru, ) (Entered: 12/29/2015) |
| 12/28/2015 | 5 | Summons Issued as to Taylor Corporation. (cbru, ) (Entered: 12/29/2015) |
| 01/04/2016 | 6 | MOTION to Certify Class by Career Counseling, Inc.. Response to Motion due by 1/22/2016. No proposed order.(Felder, John) (Entered: 01/04/2016) |
| 01/04/2016 | 7 | **TEXT ORDER: Plaintiff has filed an early motion for class certification through which it purports to reserve its own briefing time until after the completion of discovery. The court reserves ruling on whether such an extension will be allowed. The parties are directed to contact chambers within seven days after the first Defendant appears to set a scheduling conference. All briefing on Plaintiff's motion for class certification is stayed pending that conference. Signed by Honorable Cameron McGowan Currie on 1/4/2016. (cbru, )** (Entered: 01/04/2016) |
| 03/04/2016 | 9 | SUMMONS Returned Executed by Career Counseling, Inc.. Amsterdam Printing & Litho, Inc. served on 2/5/2016, answer due 2/26/2016. (Felder, John) (Main Document 9 |

| | | |
|---|---|---|
| | | replaced on 3/4/2016) (cbru, ). (Additional attachment(s) added on 3/4/2016: # 1 Proof of Service) (cbru, ). (Entered: 03/04/2016) |
| 03/04/2016 | 10 | SUMMONS Returned Executed by Career Counseling, Inc.. Taylor Corporation served on 2/5/2016, answer due 2/26/2016. (Felder, John) (Main Document 10 replaced on 3/4/2016) (cbru, ). (Additional attachment(s) added on 3/4/2016: # 1 Proof of Service) (cbru, ). (Entered: 03/04/2016) |
| 03/04/2016 | 11 | MOTION to Preserve Evidence from WestFax, Inc. by Career Counseling, Inc.. Response to Motion due by 3/21/2016. (Attachments: # 1 Exhibit A-Preservation letter, # 2 Exhibit B-Hicklin v Natl Pen, # 3 Exhibit C-Scoma v Celtic, # 4 Exhibit D-Arkin v Innocutis)No proposed order.(Felder, John) Modified to edit exit on 3/4/2016 (cbru, ). (Entered: 03/04/2016) |
| 03/17/2016 | 13 | ANSWER to 1 Complaint, by Taylor Corporation. (Attachments: # 1 Certificate of Service)(Nickles, W) (Entered: 03/17/2016) |
| 03/17/2016 | 14 | ANSWER to 1 Complaint, by Amsterdam Printing & Litho, Inc.. (Attachments: # 1 Certificate of Service)(Nickles, W) (Entered: 03/17/2016) |
| 03/17/2016 | 15 | MOTION to Appear Pro Hac Vice by Kellie J. Mitchell ( Filing fee $ 250 receipt number 0420-6453417) by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 4/4/2016. (Attachments: # 1 Affidavit)No proposed order.(Nickles, W) (Attachment 1 replaced on 3/17/2016) (cbru, ). (Additional attachment(s) added on 3/17/2016: # 2 Certificate of Good Standing - USDC, District of Kansas, # 3 Certificate of Good Standing - Supreme Court of Kansas, # 4 Certificate of Good Standing - Supreme Court of Missouri, # 5 Certificate of Good Standing - USDC, Western District of Missouri) (cbru, ). Additional attachment filed as entry 16 on 3/17/2016 (cbru, ). (Entered: 03/17/2016) |
| 03/17/2016 | 16 | Additional Attachments to Main Document 15 MOTION to Appear Pro Hac Vice by Kellie J. Mitchell ( Filing fee $ 250 receipt number 0420-6453417). First attachment description: certificate of service . (Nickles, W) (Entered: 03/17/2016) |
| 03/17/2016 | 17 | MOTION to Appear Pro Hac Vice by William E. Raney ( Filing fee $ 250 receipt number 0420-6453487) by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 4/4/2016. (Attachments: # 1 Affidavit, # 2 Certificate of Service)No proposed order.(Nickles, W) (Attachment 1 replaced on 3/17/2016) (cbru, ). (Additional attachment(s) added on 3/17/2016: # 3 Certificate of Good Standing - USDC, District of Kansas, # 4 Certificate of Good Standing - Supreme Court of Kansas, # 5 Certificate of Good Standing - USDC, Western District of Missouri, # 6 Certificate of Good Standing - Supreme Court of Missouri) (cbru, ). (Entered: 03/17/2016) |
| 03/17/2016 | 19 | CLERK'S NOTICE: Defendants are reminded that Answers to Local Rule 26.01 Interrogatories are to be filed at the time a party first appears. Please file these answers to interrogatories no later than March 31, 2016.(cbru, ) (Entered: 03/17/2016) |
| 03/17/2016 | 21 | RESPONSE in Opposition re 6 MOTION to Certify Class. Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation.Reply to Response due by 3/28/2016. (Attachments: # 1 Unpublished opinion Boyce v. Wachovia, # 2 Unpublished opinion Dickerson v. Lab Corp, # 3 Unpublished opinion Ealy v Pinkerton, # 4 Unpublished opinion Haight v. Bluestern Brands, # 5 Unpublished opinion Krakauer v. Dish Network, # 6 Unpublished opinion Physicians's Healthsource v. Purdue, # 7 Certificate of Service)(Nickles, W) Modified to edit text on 3/17/2016 (cbru, ). (Entered: 03/17/2016) |
| 03/18/2016 | 22 | **TEXT ORDER granting 15 Motion to Appear Pro Hac Vice; granting 17 Motion to Appear Pro Hac Vice. Signed by Honorable Cameron McGowan Currie on** |

| | | 3/18/2016.(cbru, ) (Entered: 03/18/2016) |
|---|---|---|
| 03/23/2016 | 23 | Case Reassigned to Judge Honorable J Michelle Childs. Judge Honorable Cameron McGowan Currie no longer assigned to the case. (glev, ) (Entered: 03/23/2016) |
| 03/31/2016 | 26 | Local Rule 26.01 Answers to Interrogatories by Amsterdam Printing & Litho, Inc.. (Attachments: # 1 Certificate of Service)(Nickles, W) (Entered: 03/31/2016) |
| 03/31/2016 | 27 | Local Rule 26.01 Answers to Interrogatories by Taylor Corporation. (Attachments: # 1 Certificate of Service)(Nickles, W) (Entered: 03/31/2016) |
| 04/04/2016 | 28 | MOTION to Appear Pro Hac Vice by Brian J. Wanca ( Filing fee $ 250 receipt number 0420-6481499) by Career Counseling, Inc.. Response to Motion due by 4/21/2016. (Attachments: # 1 Exhibit A-application and certificate of good standing)No proposed order.(Felder, John) (Additional attachment(s) added on 4/4/2016: # 2 Certificate of Good Standing) (asni, ). (Entered: 04/04/2016) |
| 04/04/2016 | 29 | MOTION to Appear Pro Hac Vice by Ryan M. Kelly ( Filing fee $ 250 receipt number 0420-6481530) by Career Counseling, Inc.. Response to Motion due by 4/21/2016. (Attachments: # 1 Exhibit A-application and certificate of good standing)No proposed order.(Felder, John) (Entered: 04/04/2016) |
| 04/04/2016 | 30 | **TEXT ORDER granting 28 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 4/4/2016.(asni, )** (Entered: 04/04/2016) |
| 04/04/2016 | 31 | **TEXT ORDER granting 29 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 4/4/2016.(asni, )** (Entered: 04/04/2016) |
| 04/04/2016 | 32 | NOTICE of Hearing on Motion 6 MOTION to Certify Class, 11 MOTION to Preserve Evidence : Motion Hearing set for 5/2/2016 02:00 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 04/04/2016) |
| 04/05/2016 | 34 | MOTION to Appear Pro Hac Vice by Ross M. Good ( Filing fee $ 250 receipt number 0420-6483763) by Career Counseling, Inc.. Response to Motion due by 4/22/2016. (Attachments: # 1 Exhibit 1-application, # 2 Exhibit 2-certificate of good standing)No proposed order.(Felder, John) (Entered: 04/05/2016) |
| 04/05/2016 | 35 | **TEXT ORDER granting 34 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 4/5/2016.(asni, )** (Entered: 04/05/2016) |
| 04/06/2016 | 36 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 5/2/2016 02:00 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs cancelled and rescheduled to: Scheduling Conference set for 5/2/2016 02:00 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 04/06/2016) |
| 04/25/2016 | 38 | Joint Rule 26(f) Report by Career Counseling, Inc.. (Attachments: # 1 Exhibit Joint Conference and Scheduling Order)(Felder, John) (Entered: 04/25/2016) |
| 04/26/2016 | 39 | **JOINT CONFERENCE AND SCHEDULING ORDER Motions to Amend Pleadings due by 8/26/2016, Plaintiffs ID of Expert Witness due by 1/27/2017, Defendants ID of Expert Witnesses Due by 2/24/2017, Non-expert Discovery due by 1/27/2017, Motion for class certification due by 4/28/2017, Pretrial Briefs due by 11/27/2017, Jury Selection Deadline 12/4/2017, Mediation Due by 9/8/2017, and all other deadlines as set out in this order. Signed by Honorable J Michelle Childs on 4/26/2016. (asni, )** (Entered: 04/26/2016) |
| 04/26/2016 | 40 | NOTICE of Cancellation of Hearing: Scheduling Conference set for 5/2/2016 02:00 PM |

| | | |
|---|---|---|
| | | in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 04/26/2016) |
| 05/06/2016 | 41 | NOTICE of Hearing on Motion 6 MOTION to Certify Class, 11 MOTION to Preserve Evidence from WestFax, Inc. : Motion Hearing set for 6/10/2016 02:30 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) Modified to edit text on 5/6/2016 (asni, ). (Entered: 05/06/2016) |
| 05/06/2016 | 42 | DELETION OF DOCKET ENTRY NUMBER 42 Reason: document filed in the wrong case. (asni, ) (Entered: 05/06/2016) |
| 05/12/2016 | 43 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 6/10/2016 02:30 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 6/29/2016 02:00 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 05/12/2016) |
| 05/12/2016 | 44 | Local Rule 26.03 Answers to Interrogatories by Amsterdam Printing & Litho, Inc., Taylor Corporation.(Nickles, W) (Entered: 05/12/2016) |
| 05/13/2016 | 45 | **ORDER granting 11 Motion to Preserve Evidence. Signed by Honorable J Michelle Childs on 5/13/2016.(asni, )** (Entered: 05/13/2016) |
| 05/20/2016 | 46 | NOTICE of Request for Protection from Court Appearance by Jonathan Matthew Harvey for June 3-6, 2016 (Harvey, Jonathan) (Entered: 05/20/2016) |
| 06/29/2016 | 47 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: taking under advisement 6 Motion to Certify Class. Motion Hearing held on 6/29/2016. Written order forthcoming. Court Reporter Kathleen Richardson. (mbro, )** (Entered: 06/29/2016) |
| 07/12/2016 | 48 | **ORDER AND OPINION denying 6 Motion to Certify Class. Signed by Honorable J Michelle Childs on 7/12/2016.(asni, )** (Entered: 07/12/2016) |
| 12/08/2016 | 50 | MOTION to Compel by Career Counseling, Inc.. Response to Motion due by 12/22/2016. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit Ex 1-Amsterdams Responses to Plaintiffs Requests for Production, # 3 Exhibit Ex 2-Depo Barry Clark, # 4 Exhibit Ex 3-Westfax Summary/Exemption Notice pages 1-25, # 5 Exhibit Ex 3-Westfax Summary/Exemption Notice pages 26-57, # 6 Exhibit Ex 4-Depo of Jason Moreau, # 7 Exhibit Ex 5-Email Kelly to Ramey, # 8 Exhibit Ex 6-Email Ramey to Kelly)No proposed order.(Felder, John) (Entered: 12/08/2016) |
| 12/22/2016 | 51 | RESPONSE in Opposition re 50 MOTION to Compel Response filed by Amsterdam Printing & Litho, Inc..Reply to Response to Motion due by 12/29/2016 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Screenshots of purchase order, # 2 Exhibit Declaration of Jason Moreau, # 3 Exhibit Unpublished opinion Anselmo v. WEst Paces Hotel Group, # 4 Exhibit Unpublished opinion Crane v. Int'l Paper Co, # 5 Exhibit Unpublished opinion Hartsock v. Goodyear Dunlop Tires N. Am. Ltd., # 6 Exhibit Unpublished opinion Knutson v. Schwan's home Serv., # 7 Exhibit Unpublished opinion Nix v. Holbrook, # 8 Exhibit Unpublished opinion Palmer v. Stassinos, # 9 Exhibit Unpublished opinion Piotrowski v. Wells Fargo Bank, NA, # 10 Exhibit Unpublished opinion Romig v. Pella Corp, # 11 Exhibit Unpublished opinion Solo v. Bausch & Lomb, Inc., # 12 Exhibit Unpublished opinion Springs v. Ally Fin., # 13 Exhibit Unpublished opinion Ulig, LLC v. Shirley, # 14 Exhibit Unpublished opinion Welch v. Eli Lilly & Co)(Nickles, W) (Entered: 12/22/2016) |
| 12/27/2016 | 52 | MOTION for Extension of Time to File Response/Reply as to 50 Motion to Compel by |

| | | |
|---|---|---|
| | | Career Counseling, Inc.. Response to Motion due by 1/10/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Felder, John) (Entered: 12/27/2016) |
| 12/27/2016 | 53 | **TEXT ORDER granting 52 Motion for Extension of Time to File Response/Reply re 50 MOTION to Compel, Replies due by 1/12/2017. Signed by Honorable J Michelle Childs on 12/27/2016.(asni, )** (Entered: 12/27/2016) |
| 01/12/2017 | 56 | REPLY to Response to Motion re 50 MOTION to Compel Response filed by Career Counseling, Inc.. (Attachments: # 1 Exhibit 7-Fcc Waiver petition, # 2 Exhibit 8-Comments on FCC petition, # 3 Exhibit 9-FCC order)(Felder, John) (Entered: 01/12/2017) |
| 01/17/2017 | 58 | Consent MOTION for Extension of Time by Career Counseling, Inc.. Response to Motion due by 1/31/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Felder, John) (Main Document 58 replaced on 1/17/2017) (asni, ). Modified to replace document with corrected document as provided by filing user on 1/17/2017 (asni, ). (Entered: 01/17/2017) |
| 01/17/2017 | 59 | **TEXT ORDER granting 58 Consent MOTION for Extension of Time ( Fact Discovery due by 3/27/2017, Plaintiff's Rule 26(a)(2) Disclosures due by 3/27/2017). Signed by Honorable J Michelle Childs on 1/17/2017. (asni, )** (Entered: 01/17/2017) |
| 01/23/2017 | 61 | **ORDER AND OPINION denying 50 Motion to Compel. Signed by Honorable J Michelle Childs on 1/23/2017.(asni, )** (Entered: 01/23/2017) |
| 04/20/2017 | 65 | Consent MOTION for Extension of Time *to Amend Scheduling Order* by Career Counseling, Inc.. Response to Motion due by 5/4/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Felder, John) (Entered: 04/20/2017) |
| 04/20/2017 | 66 | **TEXT ORDER granting 65 Motion for Extension of Time to File Motion (plaintiff's motion for class certification due by May 12, 2017; Defendants' oppositions to class certification due by June 10, 2017; plaintiff's reply in support of class certification (if any) due by June 30, 2017) Signed by Honorable J Michelle Childs on 4/20/2017. (asni, )** (Entered: 04/20/2017) |
| 05/12/2017 | 68 | MOTION to Certify Class by Career Counseling, Inc.. Response to Motion due by 5/26/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Appendix, # 3 Exhibit 1-Group Ex 1-1 to 1-21, # 4 Exhibit 2-Group Ex 2-1 to 2-21, # 5 Exhibit 3-Depo Wachowiak 1 of 4, # 6 Exhibit 3-Depo Wachowiak 2 of 4, # 7 Exhibit 3-Depo Wachowiak 3 of 4, # 8 Exhibit 3-Depo Wachowiak 4 of 4, # 9 Exhibit 4-Depo Jason Moreau, # 10 Exhibit 5-Depo Elizabeth Trenbeath, # 11 Exhibit 6-Depo Barry Clark, # 12 Exhibit 7-MHF resume, # 13 Exhibit 8-A+W resume, # 14 Exhibit 9-Sandusky Wellness v MedTox, # 15 Exhibit 10-Temporary Svcs v American Intern, # 16 Exhibit 11-Hazels Cup v Around the Globe, # 17 Exhibit 12-Brodsky v Humana, # 18 Exhibit 13-Chapman v Wagener, # 19 Exhibit 14-St Louis Heart v Vein Ctr, # 20 Exhibit 15-Khoday v Symantec part 1 of 2, # 21 Exhibit 15-Khoday v Symantec part 2 of 2, # 22 Exhibit 16-Critchfield v Taranto, # 23 Exhibit 17-Fax table)No proposed order.(Felder, John) (Entered: 05/12/2017) |
| 05/16/2017 | 69 | MOTION for Summary Judgment by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 5/30/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit Order from Amsterdam, # 3 Exhibit |

| | | |
|---|---|---|
| | | Plaintiff's Responses to RFA, # 4 Exhibit Amsterdam 1111 CONFIDENTIAL, # 5 Exhibit Taylor Ans to Int, # 6 Exhibit Moreau Declaration, # 7 Exhibit Amsterdam Ans to Int, # 8 Exhibit Plaintiff's Ans to Int, # 9 Exhibit Moreau Dep Excerpts, # 10 Exhibit Trenbeath Dep Excerpts, # 11 Exhibit Wachowiak Dep Excerpts, # 12 Exhibit Unpub Op. Catalina Mktg. v. Coolsavings.com, # 13 Exhibit Unpub Op. Cellco P'ship v. Plaza Resorts, # 14 Exhibit Unpub Op. Cent. W. Va. Energy v. Mt. State Carbon, # 15 Exhibit Unpub Op. Freidman v. Massage Envy, # 16 Exhibit Unpub Op. Ganesh v. Days Inn, # 17 Exhibit Unpub Op. Guzman v. Mem'l Hermann Hosp. Sys., # 18 Exhibit Unpub Op. Horizon Plastics v. Constance, # 19 Exhibit UnPub Op. Monitronics)No proposed order.(Nickles, W) See 70 Additional Attachments. Modified on 5/17/2017 to edit text (mbro, ). (Entered: 05/16/2017) |
| 05/16/2017 | 70 | Additional Attachments to Main Document 69 MOTION for Summary Judgment . First attachment description: Unpub Op. Salley v. Heartland-Charleston of Hanahan, SC . (Attachments: # 1 Exhibit Unpub Op. Schwan v. CNH Am., # 2 Exhibit Unpub Op. Shostack v. Diller, # 3 Exhibit Unpub Op. Smith v. Aitima Med. Equip., # 4 Exhibit Unpub Op. Spinozzi v. ITT Sheraton Corp., # 5 Exhibit Unpub Op. Stoops v. Wells Fargo, # 6 Exhibit Unpub Op. Supply JPro Sorbents v. RingCentral, # 7 Exhibit Unpub Op. Tap Pharms. v. US HHS, # 8 Exhibit Unpub Op. Urban Elevator Serv. v. Stryker Lubricant Dist., # 9 Exhibit Unpub Op. U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr., # 10 Exhibit Unpub Op. Witt v. Corelogic Saferent, # 11 Exhibit Unpub Op. Worsham v. Travel Options, # 12 Exhibit Unpub Op. Yaakov of Spring Valley v. FCC and USA)(Nickles, W) (Entered: 05/16/2017) |
| 05/22/2017 | 71 | Consent MOTION for Extension of Time to File Response/Reply as to 69 MOTION for Summary Judgment by Career Counseling, Inc.. Response to Motion due by 6/5/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Felder, John) (Entered: 05/22/2017) |
| 05/22/2017 | 72 | **TEXT ORDER granting 71 Motion for Extension of Time to File Response/Reply re 69 MOTION for Summary Judgment, Response to Motion due by 6/16/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Honorable J Michelle Childs on 5/22/2017. (asni, )** (Entered: 05/22/2017) |
| 05/22/2017 | 73 | Consent MOTION for Extension of Time to File Response/Reply as to 68 MOTION to Certify Class by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 6/5/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Nickles, W) (Entered: 05/22/2017) |
| 05/22/2017 | 74 | **TEXT ORDER granting 73 Motion for Extension of Time to File Response/Reply re 68 MOTION to Certify Class, Response to Motion due by 6/9/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Replies due by 6/30/2017. Signed by Honorable J Michelle Childs on 5/22/2017.(asni, )** (Entered: 05/22/2017) |
| 06/08/2017 | 75 | RESPONSE in Opposition re 68 MOTION to Certify Class Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation.Reply to Response to Motion due by 6/15/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit email communications, # 2 Exhibit Application for Review, # 3 Exhibit Moreau deposition excerpts, # 4 Exhibit Trenbeath deposition excerpts, # 5 Exhibit Unpublished Op. Cuming v. S.C. Lottery Comm'n, # 6 Exhibit Unpublished Op. Fricko v. Novi, # 7 Exhibit Unpublished Op. Levitt v. Fax, # 8 Exhibit Unpublished Op. Paulino v. Dollar General, # 9 Exhibit Unpublished Op. Simon |

| | | |
|---|---|---|
| | | v. Healthways, # 10 Exhibit Unpublished Op. Williams v. Telespectrum)(Nickles, W) (Entered: 06/08/2017) |
| 06/08/2017 | 76 | MOTION for Extension of Time to File Response/Reply as to 69 MOTION for Summary Judgment by Career Counseling, Inc.. Response to Motion due by 6/22/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Felder, John) (Entered: 06/08/2017) |
| 06/09/2017 | 77 | **TEXT ORDER granting 76 Motion for Extension of Time to File Response/Reply re 69 MOTION for Summary Judgment Response to Motion due by 6/23/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Honorable J Michelle Childs on 6/9/2017.(asni, )** (Entered: 06/09/2017) |
| 06/14/2017 | 78 | NOTICE of Request for Protection from Court Appearance by Jonathan Matthew Harvey for June 28-July 8, 2017 (Harvey, Jonathan) (Entered: 06/14/2017) |
| 06/23/2017 | 81 | RESPONSE in Opposition re 69 MOTION for Summary Judgment Response filed by Career Counseling, Inc..Reply to Response to Motion due by 6/30/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 1-Rule 30b6 deposition Amsterdam, # 2 Exhibit 2-deposition of Jason Moreau, # 3 Exhibit 3-deposition of Elizabeth Trenbeath, # 4 Exhibit 4-appendix of unreported cases)(Felder, John) (Entered: 06/23/2017) |
| 06/30/2017 | 84 | REPLY to Response to Motion re 68 MOTION to Certify Class Response filed by Career Counseling, Inc.. (Attachments: # 1 Exhibit 18--Trenbeath Deposition, # 2 Exhibit 19--Unreported Cases)(Felder, John) (Entered: 06/30/2017) |
| 06/30/2017 | 85 | REPLY to Response to Motion re 69 MOTION for Summary Judgment, Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation. refiled by clerk to correct event type.(asni, ) (Additional attachment(s) added on 6/30/2017: # 1 Exhibit A, # 2 Exhibit B) (asni, ). (Entered: 06/30/2017) |
| 08/08/2017 | 86 | Joint MOTION to Amend/Correct 39 Scheduling Order,, by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 8/22/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel. (Nickles, W) (Entered: 08/08/2017) |
| 08/08/2017 | 87 | **MEDIATION ORDER granting 86 Joint MOTION to Amend/Correct 39 Scheduling Order. Mediation shall be completed no later than (45) days following a final ruling on the pending motions for summary judgment and class certification. Signed by Honorable J Michelle Childs on 8/8/2017. (asni, )** (Entered: 08/08/2017) |
| 08/22/2017 | 88 | Consent MOTION for Leave to File Supplemental Response/Reply as to 68 MOTION to Certify Class 69 MOTION for Summary Judgment by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 9/5/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents)No proposed order.(Nickles, W) Modified to correct event and link correct event to associated events on 8/23/2017 (asni, ). (Entered: 08/22/2017) |
| 08/23/2017 | 89 | **TEXT ORDER granting 88 Motion for Leave to File Supplemental Response/Reply. Signed by Honorable J Michelle Childs on 8/23/2017.(asni, )** (Entered: 08/23/2017) |
| 08/23/2017 | 91 | SUPPLEMENTAL RESPONSE in Opposition re 68 MOTION to Certify Class Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation.Reply to Response to |

| | | |
|---|---|---|
| | | Motion due by 8/30/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Nickles, W) (Entered: 08/23/2017) |
| 08/23/2017 | 92 | SUPPLEMENTAL REPLY to Response to Motion re 69 MOTION for Summary Judgment Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation. Refiled by the clerk to correct event type. (asni, ) (Entered: 08/23/2017) |
| 08/30/2017 | 93 | SUPPLEMENTAL REPLY to Response to Motion re 68 MOTION to Certify Class Response filed by Career Counseling, Inc.. (Attachments: # 1 Exhibit A-Orrington v Scion, # 2 Exhibit B-Gorss v Sysco)(Felder, John) (Entered: 08/30/2017) |
| 08/30/2017 | 94 | SUPPLEMENTAL RESPONSE in Opposition re 69 MOTION for Summary Judgment Response filed by Career Counseling, Inc.. (Attachments: # 1 Exhibit A-Orrington v Scion, # 2 Exhibit B-Gorss v Sysco)(asni, ) (Entered: 08/30/2017) |
| 11/02/2017 | 96 | NOTICE of Hearing on Motion 68 MOTION to Certify Class , 69 MOTION for Summary Judgment : Motion Hearing set for 12/1/2017 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 11/02/2017) |
| 11/09/2017 | 97 | MOTION to Appear Pro Hac Vice by Wallace C. Solberg ( Filing fee $ 250 receipt number 0420-7454980) by Career Counseling, Inc.. Response to Motion due by 11/27/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1-Application and Certificate of Good Standing)No proposed order.(Felder, John) (Entered: 11/09/2017) |
| 11/09/2017 | 98 | **TEXT ORDER granting 97 Motion to Appear Pro Hac Vice. (asni, )** (Entered: 11/09/2017) |
| 11/16/2017 | 99 | Second MOTION for Leave to File *Supplemental Motion for Summary Judgment* by Amsterdam Printing & Litho, Inc., John Does 1-10, Taylor Corporation. Response to Motion due by 11/30/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents Supplemental Motion for Summary Judgment, # 2 Exhibit unpublished opinion Alpha Tech Pet v. Lagasse)No proposed order.(Nickles, W) (Additional attachment(s) added on 11/16/2017: # 3 Exhibit unpublished opinion Brodsky v. Humanadental Ins. Co.) (asni, ). (Entered: 11/16/2017) |
| 11/16/2017 | 100 | **TEXT ORDER granting 99 Second MOTION for Leave to File Supplemental Response/Reply as to 68 MOTION to Certify Class 69 MOTION for Summary Judgment(asni, )** (Entered: 11/16/2017) |
| 11/16/2017 | 102 | SECOND SUPPLEMENTAL RESPONSE in Opposition re 68 MOTION to Certify Class *Second Supplemental* Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation.Reply to Response to Motion due by 11/27/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit unpublished opinion Alpha Tech Pet v. Lagasse, # 2 Exhibit unpublished opinion Brodsky v Humanadental Ins. Co.)(Nickles, W) (Entered: 11/16/2017) |
| 11/16/2017 | 103 | SECOND SUPPLEMENTAL REPLY to Response to Motion re 69 MOTION for Summary Judgment Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation. (Attachments: # 1 Exhibit unpublished opinion Alpha Tech Pet v. Lagasse, # 2 Exhibit unpublished opinion Brodsky v Humanadental Ins. Co.)(asni, ) refiled by the clerk to correct event type (Entered: 11/20/2017) |
| 11/27/2017 | 104 | Consent MOTION for Leave to File *Response to Defendants Second Supplement to Defendants Motion for Summary Judgment and Opposition to Plaintiffs Motion for Class Certification* by Career Counseling, Inc.. Response to Motion due by 12/11/2017. Add an |

| | | |
|---|---|---|
| | | additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A-proposed Response)No proposed order. (Felder, John) (Entered: 11/27/2017) |
| 11/28/2017 | 105 | **TEXT ORDER granting 104 Motion for Leave to File. Signed by Honorable J Michelle Childs on 11/28/2017.(asni, )** (Entered: 11/28/2017) |
| 11/28/2017 | 106 | SECOND SUPPLEMENTAL RESPONSE in opposition re 69 MOTION for Summary Judgment Response filed by Career Counseling, Inc.. (Attachments: # 1 Exhibit 1-Brodsky v HumanaDental, # 2 Exhibit 2-Alpha Tech v Lagasse, # 3 Exhibit 3-Nov 2 Bureau Order, # 4 Exhibit 4-Brodsky 23f, # 5 Exhibit 5-Brodsky 23f, # 6 Exhibit 6-Holtzman v Turza, # 7 Exhibit 7-Pet for review, # 8 Exhibit 8-Alpha Tech Petition, # 9 Exhibit 9-Order)(Felder, John) (Entered: 11/28/2017) |
| 11/28/2017 | 107 | SECOND SUPPLEMENTAL REPLY re 68 MOTION to Certify Class Response filed by Career Counseling, Inc.. (Attachments: # 1 Exhibit 1-Brodsky v Humanadental, # 2 Exhibit 2-AlphaTech v Lagasse, # 3 Exhibit 3-Bureau Order, # 4 Exhibit 4-Brodsky 23f, # 5 Exhibit 5-Brodsky 23f, # 6 Exhibit 6-Holtzman v Turza, # 7 Exhibit 7-Pet for review, # 8 Exhibit 8-Alpha Tech Petition, # 9 Exhibit 9-Order)(Felder, John) (Entered: 11/28/2017) |
| 12/01/2017 | 109 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: taking under advisement 68 Motion to Certify Class; 69 Motion for Summary Judgment. Motion Hearing held on 12/1/2017. Written order forthcoming. Court Reporter Carly Horenkamp. (mbro, )** (Entered: 12/01/2017) |
| 03/27/2018 | 112 | Third MOTION for Leave to File *Supplemental Motion for Summary Judgment* by Amsterdam Printing & Litho, Inc., John Does 1-10, Taylor Corporation. Response to Motion due by 4/10/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents Supplemental Motion for Summary Judgment, # 2 Exhibit Unpublished opinion A Custom Heating & Air v. Kabbage, # 3 Exhibit Unpublished opinion Gorss Motels v. A.V.M. Enterprises, # 4 Exhibit Unpublished opinion Carlton & Harris Chiro. v. PDR Network)No proposed order.(Nickles, W) (Entered: 03/27/2018) |
| 03/27/2018 | 113 | **TEXT ORDER: Before the court is Defendants' Third Unopposed Motion for Leave to Supplement Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Motion for Class Certification (ECF No. 112). Defendants assert that they did not have an opportunity to address three cases that were decided after it filed its Motion for Summary Judgment (ECF No. 69), opposition to Plaintiff's Motion to Certify a Class (ECF No. 68), and supplemental responses. (ECF No. 112 at 2 8.) The court notes that the time for briefing on Plaintiff's Motion for Class Certification has expired pursuant to the scheduling order and extensions granted in this case. (ECF No. 39 at 2 7, ECF No. 66.) However, pursuant to Fed. R. Civ. P. 6(b)(1)(B), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time... on motion made after the time has expired if the party failed to act because of excusable neglect." The court finds good cause to allow supplemental and additional briefing as to Plaintiff's Motion to Certify a Class (ECF No. 68), and also Defendants' Motion for Summary Judgment (ECF No. 69). For this reason, the court GRANTS Defendants' Third Unopposed Motion for Leave to Supplement its Motion for Summary Judgment and Opposition to Plaintiff's Motion for Class Certification. 112 . Additionally, because of the complexity of each party's arguments and the fact that this is the third motion to supplement, the court in its discretion finds that its assessment of the issues would be enhanced if all relevant arguments were presented in one document. Therefore, the court DENIES WITHOUT PREJUDICE Plaintiff's Motion to Certify a Class 68** |

|  |  |  |
|---|---|---|
|  |  | **and Defendants' Motion for Summary Judgment 69 . The Court DIRECTS the parties to refile their respective motions and memorandums of law within fourteen (14) days of the filing of this Order. Each party will then have an opportunity to respond to the other party's motion in accordance with the Local Rules of the court. Additionally, each party's memorandum of law shall not exceed forty (40) pages and shall include all relevant arguments to the issues raised in each party's original motions and subsequent supplements. Lastly, the court will deny any future motions to supplement the party's motions once they are refiled. Signed by Honorable J Michelle Childs on 3/27/2018.(asni, )** (Entered: 03/27/2018) |
| 04/10/2018 | 116 | Second MOTION for Summary Judgment by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 4/24/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit Deposition excerpts of David Wachowiak, # 3 Exhibit Declaration of David Wachowiak, # 4 Exhibit Unpub Op A Custom Heating & Air v. Kabbage, # 5 Exhibit Unpub Op Alpha Tech Pet v. Lagasse, # 6 Exhibit Unpub Op Bais Yaakov of Spring Valley v. FCC, # 7 Exhibit Unpub Op Betz v. First Credit Servs., # 8 Exhibit Unpub Op Broadsky v. Humanadental Insurance Co, # 9 Exhibit Unpub Op Cabiness v. Educ. Sols., # 10 Exhibit Unpub Op Carlton & Harris Chiro. v. PDR Network, # 11 Exhibit Unpub Op. Catalina Mktg. v. Coolsavings.com, # 12 Exhibit Unpub Op Cellco P'ship v. Plaza Resorts, # 13 Exhibit Unpu Op Cent. W. Va. Energy Co. v. Mt. State Carbon, # 14 Exhibit Unpub Op Friedman v. Massage Envy, # 15 Exhibit Unpub Op Gorss Motels, Inc. v. A.V.M. Enters., # 16 Exhibit Unpub Op Guzman v. Mem'l Mermann Hosp. Sys., # 17 Exhibit Unpub Op. Horizon Plastics v. Constance, # 18 Exhibit Unpub Op. In re: Monitronics Int'l., Inc., # 19 Exhibit Unpub Op. Mojica v. Securus Techs., Inc., # 20 Exhibit Unpub Op. Oliver v. TTC-Ameridial, et al, # 21 Exhibit Unpub Op. Orrington v. Scion Dental, Inc., # 22 Exhibit Unpub Op. Physicians Healthsource v. Allscripts Health Sols., # 23 Exhibit Unpub Op. Salley v. Heartland-Charleston of Hanahan, SC, # 24 Exhibit Unpub Op. Sandusky Wellness Ctr v. ASD Specialty Healthcare, # 25 Exhibit Unpub Op. Schwan v. CNH Am., # 26 Exhibit Unpub Op. Shostack v. Diller, # 27 Exhibit Unpub Op. Shree Ganesh, Inc. v. Days Inns of Am., Inc., # 28 Exhibit Unpub Op. Spinozzi v. ITT Sheraton Corp., # 29 Exhibit Unpub Op. US ex rel. Hefner v. Hackensack Univ. Med. Ctr, # 30 Exhibit Unpub Op. Urban Elevator Serv. v. Stryker Lubricant Distribs., # 31 Exhibit Unpub Op. Worsham v. Travel Options, Inc.)No proposed order.(Nickles, W) (Entered: 04/10/2018) |
| 04/10/2018 | 117 | MOTION to Amend/Correct 68 MOTION to Certify Class , MOTION to Certify Class ( Response to Motion due by 4/24/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) by Career Counseling, Inc.. (Attachments: # 1 Memo in Support, # 2 Appendix of Exhibits, # 3 Exhibit 1-Group Ex 1-1 to 2-21, # 4 Exhibit 2-Group Ex 2-1 to 2-21, # 5 Exhibit 3-depo Wachowiak 1 of 4, # 6 Exhibit 3-depo Wachowiak 2 of 4, # 7 Exhibit 3-depo Wachowiak 3 of 4, # 8 Exhibit 3-depo Wachowiak 4 of 4, # 9 Exhibit 4-depo Moreau, # 10 Exhibit 5-depo Trenbeath, # 11 Exhibit 6-depo Clark, # 12 Exhibit 7-MHF resume, # 13 Exhibit 8-A+W resume, # 14 Exhibit 9-fax table, # 15 Exhibit 10-fax table II, # 16 Exhibit 11- part 1 of 3, # 17 Exhibit 11-part 2 of 3, # 18 Exhibit 11-part 3 of 3)No proposed order.(Felder, John) (Entered: 04/10/2018) |
| 04/24/2018 | 119 | RESPONSE in Opposition re 117 MOTION to Amend/Correct 68 MOTION to Certify Class Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation.Reply to Response to Motion due by 5/1/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Unpub, Op. A Custom Heating & Air v. Kabbage, Inc., # 2 Exhibit Unpub. Op. Alpha Tech Pet, Inc. v. Lagasse, LLC, # 3 Exhibit Unpub. Op. Brodsky v. Humanadental Ins. Co., # 4 Exhibit Unpub. Op. Carlton & Harris Chiropractic v. Meditab Software, Inc., # 5 Exhibit Unpub. |

| | | Op. Cuming v. S.C. Lottery Commission, # 6 Exhibit Op. Di Biase v. SPX Corp., # 7 Exhibit Unpub. Op. Fricko,Inc. v. Novi BRS Enter. Inc., # 8 Exhibit Unpub. Op. Ginwright v. Exeter Fin. Corp., # 9 Exhibit Unpub. Op. Gorss Motels, Inc. v. Safemark Syst., L.P., # 10 Exhibit Unpub. Op. In re: TD Bank, N.A. Debit Card Overdraft Fee Litigation, # 11 Exhibit Unpub. Op. Levitt v. Fax.com, # 12 Exhibit Unpub. Op. Paulino v. Dollar Gen. Corp., # 13 Exhibit Unpub. Op. RJF Chiropractic Ctr., Inc. v. BSn Med., Inc., # 14 Exhibit Unpub. Op. Seaman v. Duke University, # 15 Exhibit Unpub. Op. Simon v. Healthways, Inc., # 16 Exhibit Unpub. Op. Williams v. Telespectrum, Inc., # 17 Exhibit Unpub. Op. Witt v. CoreLogic Saferent, LLC)(Nickles, W) (Entered: 04/24/2018) |
|---|---|---|
| 04/24/2018 | 120 | RESPONSE in Opposition re 116 Second MOTION for Summary Judgment Response filed by Career Counseling, Inc..Reply to Response to Motion due by 5/1/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Appendix, # 2 Exhibit 1-depo of Moreau, # 3 Exhibit 2-Taylor Corp website (our companies), # 4 Exhibit 3-Taylor Corp website (Solution sets), # 5 Exhibit 4-Alpha table unreported opinions)(Felder, John) (Entered: 04/24/2018) |
| 06/19/2018 | 123 | **ORDER AND OPINION denying 116 Motion for Summary Judgment. Signed by Honorable J Michelle Childs on 6/19/2018.(asni, )** (Entered: 06/19/2018) |
| 06/20/2018 | 124 | **TEXT ORDER: The parties are directed to file joint proposed trial dates for the months of January and February 2019 by July 5, 2018. Please include the anticipated length of the trial with your dates (Specific Document due by 7/5/2018). Signed by Honorable J Michelle Childs on 6/20/2018. (asni, )** (Entered: 06/20/2018) |
| 07/03/2018 | 125 | **ORDER denying without prejudice 117 Motion to Certify Class Signed by Honorable J Michelle Childs on July 3, 2018.(mibr, )** (Entered: 07/03/2018) |
| 07/05/2018 | 126 | REPLY by Career Counseling, Inc. to 124 Order,, Set Deadlines, . (Felder, John) (Entered: 07/05/2018) |
| 07/06/2018 | 127 | NOTICE of Request for Protection from Court Appearance by Jonathan Matthew Harvey for September 18, 2018 through October 3, 2018 Associated Cases: 3:15-cv-05061-JMC, 3:16-cv-03013-JMC(Harvey, Jonathan) (Entered: 07/06/2018) |
| 07/13/2018 | 130 | NOTICE of Hearing: Bench Trial set for 2/4/2019 - 2/7/2019 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 07/13/2018) |
| 07/17/2018 | 131 | MOTION for Reconsideration re 125 Order on Motion to Certify Class by Career Counseling, Inc.. Response to Motion due by 7/31/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit A-7.3.18 Order and Opinion, # 3 Exhibit B-unreported cases part 1 of 2, # 4 Exhibit B-unreported cases part 2 of 2)No proposed order.(Felder, John) (Entered: 07/17/2018) |
| 07/31/2018 | 132 | RESPONSE in Opposition re 131 MOTION for Reconsideration re 125 Order on Motion to Certify Class Response filed by Amsterdam Printing & Litho, Inc., Taylor Corporation.Reply to Response to Motion due by 8/7/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit unpub op. Alpha Tech Pet, Inc. v. Lagasse, LLC, # 2 Exhibit unpub op. Cuming v. S.C. Lottery Comm'n, # 3 Exhibit unpub op. Krakauer v. Dish Network, LLc, # 4 Exhibit unpub op. Kubiak v. S.W. Cowboy, # 5 Exhibit unpub op. Licari Family Chiropractic v. eClinical Works, LLC, # 6 Exhibit unpub op. Menachem Raitport v. Harbour Capital Corp., # 7 Exhibit unpub op. Nationalwide Mut. Fire Ins. Co. v. Superior Solution, LLC, # 8 Exhibit unpub op. True Health Chiropractic, Inc. v. McKesson Corp)(Nickles, W) (Entered: 07/31/2018) |

| 08/07/2018 | 133 | REPLY to Response to Motion re 131 MOTION for Reconsideration re 125 Order on Motion to Certify Class Response filed by Career Counseling, Inc.. (Felder, John) (Entered: 08/07/2018) |
| 09/07/2018 | 136 | MOTION to Amend/Correct 39 Scheduling Order by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 9/21/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Defendants' Proposed Amended Scheduling Order, # 2 Exhibit Plaintiff's Proposed Amended Scheduling Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Nickles, W) (Entered: 09/07/2018) |
| 09/07/2018 | 137 | **AMENDED SCHEDULING ORDER ( Records Custodian Affidavit due by 1/4/2019, Motions due by 1/14/2019, Rule 26(a)(3) Disclosures due by 1/4/2019, Pretrial Briefs due by 1/28/2019, Bench Trial Deadline 2/4/2019, Mediation Due by 10/19/2018, and all other deadlines as set out) granting 136 MOTION to Amend/Correct Scheduling Order. Signed by Honorable J Michelle Childs on 9/7/2018. (asni, ) (Entered: 09/07/2018)** |
| 09/13/2018 | 138 | **TEXT ORDER: This matter is before the court pursuant to Plaintiff's Motion to Reconsider pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. (ECF No. 131.) Specifically, Plaintiff seeks reconsideration of the court's July 3, 2018 Order (ECF No. 125) denying without prejudice Plaintiff's Amended Motion for Class Certification (ECF No. 117). In its Motion, Plaintiff asserts that because the court had previously denied Plaintiff's Motion to Compel (ECF No. 50) seeking production of fax target lists and exception reports, the court either erred or created a manifest injustice by denying its Motion for Class Certification on the basis that the class was not ascertainable because "Plaintiff has not provided evidence of the unique set of fax numbers to which Amsterdam successfully sent faxes." (ECF No. 131-1 at 2 (quoting ECF No. 125 at 14).) In other words, "Plaintiff sought to compel the very evidence that the [c]ourt held was lacking, and that motion was denied...." (Id. at 3.) Defendants oppose Plaintiff's Motion asserting that the court "overlooked nothing that would warrant reconsideration of its Order, and several other independent deficiencies preclude the certification of a class in this case." (ECF No. 132 at 2.) Under Rule 54(b), the "district court retains the power to reconsider and modify its interlocutory judgments... at any time prior to final judgment when such is warranted." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003). Reconsideration under Rule 54(b) is appropriate on the following grounds: (1) to follow an intervening change in controlling law; (2) on account of new evidence; or (3) to correct a clear error of law or prevent manifest injustice. Beyond Sys., Inc. v. Kraft Foods, Inc., C/A No. PJM-08-409, 2010 WL 3059344, at \*2 (D. Md. Aug. 4, 2010) ("This three-part test shares the same three elements as the Fourth Circuit's test for amending an earlier judgment under Rule 59(e), but the elements are not applied with the same force when analyzing an[] interlocutory order.") (citing Am. Canoe Ass'n, 326 F.3d at 514). Upon consideration of the parties' arguments, the court is persuaded that a manifest injustice did occur affecting Plaintiff, but not in the context of the express denial of Plaintiff's Motion for Class Certification. E.g., Campero USA Corp. v. ADS Foodservice, LLC, 916 F. Supp. 2d 1284, 129293 (S.D. Fla. 2012) (Manifest injustice occurs where the court "has made an error not of reasoning but of apprehension....") (citations omitted). In this regard, the court finds that a manifest injustice occurred when the court used its consideration of the proportionality requirements of Amended Rule 26 to deny Plaintiff's Motion to Compel production of documentation that could have demonstrated the ascertainability of the proposed class. (See ECF No. 61.) Therefore, the court GRANTS IN PART Plaintiff's Motion to Reconsider 131 and ORDERS Defendants to produce copies of the previously requested fax target lists** |

| | | |
|---|---|---|
| | | **and exception reports on or before October 3, 2018. Once Defendants produce the requested documentation, the parties should proceed in accordance with the recently filed Amended Scheduling Order (ECF No. 137.) Signed by Honorable J Michelle Childs on 9/13/2018.**(asni, ) (Entered: 09/13/2018) |
| 09/25/2018 | 139 | Joint MOTION for Confidentiality Order by Amsterdam Printing & Litho, Inc., Taylor Corporation. Response to Motion due by 10/9/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Nickles, W) (Entered: 09/25/2018) |
| 09/25/2018 | 140 | **CONSENT CONFIDENTIALITY ORDER granting 139 Motion for Confidentiality Order. Signed by Honorable J Michelle Childs on 9/25/2018.**(asni, ) (Entered: 09/25/2018) |
| 10/23/2018 | 141 | STIPULATION of Dismissal Without Prejudice by Career Counseling, Inc. refiled by the clerk to correct event type. (asni, ) (Entered: 10/23/2018) |
| 10/23/2018 | 142 | NOTICE of Cancellation of Hearing: Bench Trial set for 2/4/2019 - 2/7/2019 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs (asni, ) (Entered: 10/23/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/11/2021 14:09:39 | | |
| **PACER Login:** | kdwgrandcentral:2579381:5699876 | **Client Code:** | 090008.0088.07568 |
| **Description:** | Docket Report | **Search Criteria:** | 3:15-cv-05061-JMC |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

# EXHIBIT L

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into on the date of execution between Career Counseling, Inc. ("Plaintiff"), on behalf of itself and a class of similarly-situated persons (identified and defined below as the "Settlement Class") and Amsterdam Printing & Litho, Inc. and Taylor Corporation, including their present, former, or future agents, representatives, employees, directors, officers, shareholders, attorneys, parents, subsidiaries and affiliates (collectively "Defendants"). The parties to this Agreement are collectively referred to as the "Parties."

**WHEREAS**, on behalf of itself and a putative class of similarly-situated persons, Plaintiff filed a civil action against Defendants that is now pending in Circuit Court of St. Louis City, Missouri and entitled *Career Counseling, Inc. v. Amsterdam Printing & Litho, Inc. and Taylor Corporation,* Case No. 1822-CC11500, Division 20 ("Litigation"); and

**WHEREAS**, Plaintiff's Class Action Petition alleges that Defendants violated the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227(b)(1)(C), the FCC regulations, and invaded the recipient's privacy, prevented the use of outgoing faxes, caused wear and tear of the recipients' fax machines causing property damage and loss of use of the fax machines, among other claims, by faxing advertisements without the recipients' prior express invitation or permission; and

**WHEREAS**, without admitting or conceding fault or liability or the validity of Plaintiff's claims, point of law or point of fact, or that Plaintiff or any proposed Class Member is entitled to any relief as a result of Defendants' conduct, Defendants have agreed to settle all disputes regarding Defendants' advertising faxes to the Settlement Class; and

**WHEREAS**, Plaintiff has determined that the Settlement Class includes owners of

1

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

24,591 unique fax numbers that were successfully sent in excess of 252,000 advertising faxes by Defendants between June 21, 2015 and December 24, 2015; and

**WHEREAS**, Defendants have agreed to make available up to $9,999,999.00 to fund this settlement (the "Settlement Fund"); and

**WHEREAS**, Class Counsel (identified below) have concluded that the terms and conditions of the Agreement provided herein are fair, reasonable, and adequate, and in the best interests of the Settlement Class as a means of resolving all disputes between and among the Parties; and

**WHEREFORE**, the Parties stipulate and agree that the claims of the Settlement Class should be and are hereby compromised and settled, subject to the Court's approval, upon the following terms and conditions:

1. <u>Recitals</u>. The above-described recitals are incorporated herein and made a part hereof.

2. <u>For Settlement Purposes Only</u>. This Agreement is entered into for purposes of resolving all disputes between Defendants and the owners of 24,591 unique fax numbers. Assertions, statements, and representations herein are for settlement purposes only. If the Court does not finally approve this Agreement, then the Parties expressly agree that this Agreement is null and void and may not be used by either party for any reason.

3. <u>Certification of the Settlement Class</u>. The Parties hereby stipulate to a "Settlement Class" defined as: "All persons or entities who were successfully sent one or more faxes on or about the dates set forth stating: (1) "Time to Reorder and Save Big!!," sent June 22, 2015; (2) "The Independence Day Sale,"

2

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

sent on June 29, 2015; (3) "Is it Reorder Time," sent July 6, 2015; (4) "Just a Reminder," sent July 13, 2015; (5) "Great news, you have reached Star Status," sent July 20, 2015; (6) "Running Low,"  sent July 27, 2015; (7) "Time to Reorder and Save Big," sent August 3, 2015; (8) "Are Your Supplies Running Low," sent August 10, 2015; (9) "Just A Reminder," sent August 24, 2015; (10) "Running Low," sent September 8, 2015; (11) "Time to Reorder and Save Big!!," sent September 14, 2015; (12) "Are Your Supplies Running Low," sent September 21, 2015; (13) Time to Reorder and Save Big!!," sent October 19, 2015; (14) "Is it Reorder Time," sent November 9, 2015; (15) "Just A Reminder," sent November 16, 2015; (16) "Enjoy a Cornucopia of Savings this Thanksgiving," sent November 23, 2015; (17) "A Jump Start to the Holidays," sent November 30, 2015; (18) "Happy Holidays, You receive 20% off your entire order!," sent December 7, 2015; (19) "Happy Holidays, It's Time to Reorder and Save 20% off your next order!," sent December 14, 2015; (20) "Wall Calendar Blow Out," sent December 17, 2015; and (21) "Time is Running Out! Over Stock Wall Calendars," sent December 23, 2015."   Excluded from the Settlement Class are Defendants, any parent, subsidiary, affiliate or controlled person of Defendants, as well as the officers, directors, agents, servants or employees of Defendants and the immediate family members of such persons, and the members of the judiciary.

4. <u>Representation of the Settlement Class</u>. The Parties agree that Plaintiff will be appointed as the "Class Representative" and attorney Max G. Margulis of Margulis Law Group and Brian J. Wanca of Anderson + Wanca will be appointed

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

as "Class Counsel."

5. <u>Preliminary Approval</u>. Plaintiff will move the Court for the entry of an order preliminarily approving this settlement. A proposed "Order Preliminarily Approving Class Action Settlement And Approving Class Notice" (the "Preliminary Approval Order"), attached as <u>Exhibit 1</u>

6. <u>The Settlement Fund</u>. The Defendants have agreed to make the Settlement Fund up to $9,999,999.00 available to settle this case. The Defendants are not required to place all or any portion of the Settlement Fund into a separate bank account. The Defendants will not relinquish control of any money until payments are due. The Defendants shall retain any portion of the Settlement Fund that is not paid for approved claims of class members, to the Class Representative, or to Class Counsel. The Defendants shall not be responsible for any payment or obligation other than those specified in this Agreement.

7. <u>Notice</u>. Within 21 days after preliminary approval of the settlement by the Court, notice of the settlement will be issued to the Settlement Class members identified in the fax logs supplied to the class administrator. The Parties will request that the Court approve a "Notice of Class Action and Proposed Settlement with Attached Claim Form" in the form attached hereto as <u>Exhibit 2</u>, and request approval to send it by facsimile, and if the facsimile is not successfully received after three attempts, by postcard via U.S. mail. The Claims Administrator will undertake reasonable efforts in an effort to locate class members to deliver the class notice. Class members will have 60 days after the notice is first sent to exclude themselves or object to the settlement if they so choose.

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

8. <u>Claim Forms</u>. Class members must submit a claim form to receive a share of the Settlement Fund. After the payments to Class Counsel and to the Class Representative, each member of the Settlement Class who submits a timely and valid Claim Form shall be paid a total of $500.00 per unique fax number to which the above referenced faxes were successfully sent as determined by the Report of Robert Biggerstaff as represented in the fax logs supplied during discovery. If the total value of the class members' claims exceeds the amount available in the Settlement Fund after other payments required under the Agreement, then the amount paid per claim shall be reduced pro rata to ensure that the total amount paid does not exceed the Settlement Fund. Claim Forms will be due within 60 days after the Notice is sent. Any member of the Settlement Class who does not submit a Claim Form within the 60-day time limit, as evidenced by postmark or other identifiable date of transmission, shall receive no monetary payment from the Settlement Fund. The Parties have the right to challenge a submitted claim by a prospective Settlement Class Member. Upon request, the class administrator will provide copies of all claim forms to counsel for the Parties. If there is a discrepancy with a submitted claim, either party may request the class administrator to request additional documentation.

9. <u>Incentive Award and Attorneys' Fees</u>. Class Counsel will apply to the Court for Plaintiff to be awarded $15,000.00 from the Settlement Fund for representing the Settlement Class. Defendants shall not oppose this request or appeal the award. Class Counsel will request an award for attorney's fees in an amount equal to thirty-three and one-third (33 1/3%) of the Settlement Fund ($3,333,333.00), plus

5

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

reasonable out-of-pocket litigation expenses, notice costs and administrative fees, all of which the Defendants agree to pay from the Settlement Fund. Defendants will not oppose these requests or appeal the awards, because they are agreed. The awards will be set forth in the Final Approval Order and Judgment and paid exclusively from the Settlement Fund.

10. <u>Final Approval</u>. The preliminary approval order will request a date for a final fairness hearing, at which Plaintiff and Defendants will request that the Court enter a "Final Approval Order and Judgment" in the form attached hereto as <u>Exhibit 3</u>. The fact that the Court may require non-substantive changes in the Final Approval Order and Judgment will not invalidate this Agreement or the settlement.

11. <u>Effective Date</u>. The "Effective Date" of this Agreement shall be the calendar date five days after the later of (a) the date on which the Court enters a Final Approval Order and Judgment dismissing with prejudice the claims of all Settlement Class members (including Plaintiff) who do not properly exclude themselves as provided in the Notice or (b) if any Settlement Class member objected to the settlement, the date on which the date for filing an appeal has expired or, if there are appeals, the date on which the settlement and judgment has been affirmed in all material respects by the appellate court of last resort to which such appeals have been taken and such affirmances are no longer subject to further appeal or review.

12. <u>Claims Administrator</u>. Class Counsel shall hire and pay the cost of a third party claims administrator (agreed upon by the Parties to be Class-Settlement.com),

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

who will cause the Notice to be issued to the Class Members by facsimile, and if unsuccessful after three attempts, then by postcard via U.S. mail, receive the claim forms, assist class members in completing and submitting forms, and provide a list of accepted and rejected claims to counsel for the Parties. The decision of the Claims Administrator shall be binding on the Parties. Upon request, the Claims Administrator will provide copies of all claim forms, requests to opt-out and/or objections to counsel for the Parties. The cost and expenses of the third party claims administrator is deemed an out-of-pocket expense pursuant to paragraph 9 above.

13. <u>Payments</u>. Within seven (7) days after the Effective Date, the Defendants shall pay monies sufficient to pay the approved claims and the fees, expenses, and incentive award approved by the Court in the Final Approval Order and Judgment, by certified check or wire transfer to the Claims Administrator. Checks issued to the Settlement Class members will be void 181 days after issuance and shall state that fact on their face, after which any remaining funds will be returned to the Defendants.

14. <u>Option to Receive Attorney's Fees Payments in the Future</u>. The Parties acknowledge and agree to preserve the option of each of Class Counsel to receive his law firm's share of the attorney's fees in the future in the form of periodic payments in lieu of a lump sum payment. This is solely for convenience and does not provide Class Counsel with any ownership interest in any portion of the settlement other than the right to receive the fee payments in the future as specified in relevant assignment documents to be completed prior to receipt of

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

fees by Class Counsel. All attorneys fees will be paid to the Claims Administrator for the benefit of Class Counsel.

15. <u>Releases</u>. Subject to and effective upon entry of the Final Approval Order and Judgment and payment of all monies due hereunder, all Settlement Class members who do not opt out of the proposed Settlement Class as required in the Notice, for and in consideration of the terms and undertakings herein, the sufficiency and fairness of which are acknowledged, release and forever discharge Defendants from any and all claims, demands, debts, liabilities, actions, causes of action of every kind and nature, obligations, damages, losses, and costs, whether known or unknown, actual or potential, suspected or unsuspected, direct or indirect, contingent or fixed, that have been, could have been, or in the future might be asserted that arise out of or relate to advertisements faxed by or on behalf of Defendants between June 21, 2015 and December 24, 2015 (the "Released Claims"). The release does not release claims of the Settlement Class for unsolicited faxes sent outside the Class Period.

16. <u>Class Enjoined</u>. On the Effective Date, all members of the Settlement Class who did not exclude themselves as required by the Notice (and any person or entity claiming by or through him, her, or it, as heir, administrator, devisee, predecessor, successor, attorney, representative of any kind, shareholder, partner, director or owner of any kind, affiliate, subrogee, assignee, or insurers) will be forever barred and permanently enjoined from directly, indirectly, representatively or in any other capacity, filing, commencing, prosecuting, continuing, litigating, intervening in, participating in as class members or otherwise, or receiving any

8

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

benefits or other relief from any other lawsuit, any other arbitration, or any other administrative, regulatory, or other proceeding against Defendants about the Released Claims; and all persons and entities shall be forever barred and permanently enjoined from filing, commencing, or prosecuting any other lawsuit as a class action against Defendants (including by seeking to amend a pending complaint to include class allegations or by seeking class certification in a pending action in any jurisdiction) on behalf of Settlement Class members who have not timely excluded themselves from the Settlement Class if such other lawsuit is based on or arises from the Released Claims.

17. <u>Cooperation</u>. Plaintiff and Defendants agree to cooperate fully with one another to effect the consummation of this Agreement and to achieve the settlement provided for herein.

18. <u>Right to Set Aside Agreement</u>.  Any party shall have the right, but not the obligation, to void or rescind the Agreement if any of the following events occur: (a) the Court does not preliminarily approve the settlement without material modifications to the Agreement; (b) there are material modifications made to the Agreement by the Court, by any other court, or by any tribunal, agency, entity, or person that are not accepted by any Party or Signatory to this term sheet; (c) any objection to the settlement is sustained by the Court, regardless of any right to appeal; or (d) should 2% or more of the Settlement Class opt out of the proposed settlement. The right to void or rescind under subparagraphs (a) or (d) must be exercised, if at all, no later than 14 days before the date identified in the Class Notice as the date of the Final Approval hearing, or else the Parties agree that any

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

attempted rescission shall be without effect. Rescission or setting aside is effective only if and when notice of same is served on counsel of record. In the event that a Party chooses to exercise its right to rescind, the Settlement shall be deemed void ab initio and the Parties shall be deemed to be in the same position as existed prior to the execution of the Agreement with the exception that the rescinding party shall pay expenses incurred for the administration of the settlement.

19. Agreement Contingent Upon Entry of Final Approval. This Agreement is contingent upon the Court's entry of an order containing a judgment giving final approval to the terms of this Agreement. If the Court refuses to grant final approval of the terms of the settlement set forth herein, or if the Court's Final Approval Order and Judgment is reversed or substantially modified on appeal, then this Agreement shall be null and void, and no stipulation, representation, or assertion of fact made in this Agreement may be used against any Party. No party to this Agreement, absent any substantive change by the Court, shall appeal the approval of this Settlement Agreement by the Court.

20. Notices. Requests for exclusion, objections to the Agreement or settlement, and notices to Plaintiff and the Settlement Class shall be sent to:

Brian J. Wanca
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008

Requests for exclusion and objections to the Agreement or settlement shall be copied to, and notices to Defendants shall be sent to its counsel addressed as follows:

10

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

William Raney
COPILEVITZ & CANTER, LLC
310 W. 20th Street, Suite 300
Kansas City, MO 64108

21. <u>Court Submission</u>. Class Counsel and Defendants' counsel will submit this Agreement and the exhibits hereto, along with such other supporting papers as may be appropriate, to the Court for preliminary approval. If the Court declines to grant preliminary approval of the settlement and to order notice of hearing with respect to the proposed Settlement Class, or if the Court declines to grant final approval to the foregoing after such notice and hearing, this Agreement will terminate as soon as the Court enters an order unconditionally and finally adjudicating that this Agreement and settlement will not be approved.

22. <u>Integration Clause</u>. This Agreement contains the full, complete, and integrated statement of each and every term and provision agreed to by and among the Parties and supersedes any prior writings or agreements (written or oral) between or among the Parties, which prior agreements may no longer be relied upon for any purpose. This Agreement shall not be orally modified in any respect and can be modified only by the written agreement of the Parties supported by adequate consideration as confirmed in writing.

23. <u>Headings</u>. Headings contained in this Agreement are for convenience of reference only and are not intended to alter or vary the construction and meaning of this Agreement.

24. <u>Binding and Benefiting Others</u>. This Agreement and the settlement shall be binding upon and inure to the benefit of the Parties, and to their respective

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

present, former, or future agents, insurers, representatives, employees, directors, officers, shareholders, attorneys, parents, subsidiaries, and affiliates.

25. <u>Warranties</u>. The Parties each further represent, warrant, and agree that, in executing this Agreement, they do so with full knowledge of any and all rights they may have with respect to the claims released in this Agreement, and that they have received independent legal counsel from their attorneys with regard to the facts involved and the controversy herein compromised and with regard to their rights arising out of such facts. Each of the individuals executing this Agreement warrants that he or she has the authority to enter into this Agreement and to legally bind the party(ies) for which he or she is signing.

26. <u>Governing Law</u>. The contractual terms of this Agreement shall be interpreted and enforced in accordance with the substantive law of the State of Missouri, without regard to its conflict of laws or choice of laws provisions.

27. <u>Mutual Interpretation</u>. The Parties agree and stipulate that the settlement was negotiated on an "arm's-length" basis between parties of equal bargaining power. Class Counsel, and Defendants' counsel, have drafted the Agreement jointly. Accordingly, this Agreement is not one of adhesion, is mutually created, and no ambiguity shall be construed in favor of or against any of the Parties. The Settlement Class acknowledges, but does not concede to or agree with, statements by Defendants regarding the merits of the claims or class certification and Defendants acknowledge, but do not concede to or agree with, the Settlement Class's statements regarding the merits of the claims or class certification.

28. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

shall be deemed to be an original, and such counterparts together shall constitute one and the same instrument. Facsimile signatures are acceptable for the execution of this Agreement.

29. <u>Severability</u>. In the event any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions if the Parties and their counsel mutually elect by written stipulation to be filed with the Court within 20 days to proceed as if such invalid, illegal, or unenforceable provisions had never been included in this Agreement.

30. <u>Continuing Jurisdiction</u>. Without affecting the finality of the final judgment, the Court shall retain continuing jurisdiction over the Litigation and the Parties, including all members of the Settlement Class, the administration and enforcement of this Agreement and the settlement, and the benefits to the Settlement Class hereunder, including for such purposes as supervising the implementation, enforcement, construction, and interpretation of this Agreement, the order preliminarily approving the settlement, and the Final Approval Order and Judgment, and hearing and determining an application by Class Counsel for an award of fees and expenses. Any dispute or controversies arising with respect to the interpretation, enforcement, or implementation of the Agreement shall be presented by motion to the Court.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed on the date set forth underneath their respective signatures.

Dated: 11/2/18

**CAREER COUNSELING, INC.**
**on behalf of itself and the Settlement Class**

By: _____

Its: _____

By: _____
Brian J. Wanca

By: _____
Max G. Margulis

*Attorneys for Plaintiff*

Dated: _____

**AMSTERDAM PRINTING & LITHO, INC.**

By: _____

Their: _____

Dated: _____

**TAYLOR CORPORATION**

By: _____

Their: _____

14

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed on the date set forth underneath their respective signatures.

Dated: _____

**CAREER COUNSELING, INC.**
**on behalf of itself and the Settlement Class**

By: _____

Its: _____


By: _____
Brian J. Wanca


By: _____
Max G. Margulis

*Attorneys for Plaintiff*


Dated:  11/8/2018

**AMSTERDAM PRINTING & LITHO, INC.**

By: _____

Their: _____


Dated:  11/8/2018

**TAYLOR CORPORATION**

By: _____

Their: _____

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

# EXHIBIT 1

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES, individually and on behalf of all others similarly-situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 1822-CC11500 |
| | ) | |
| v. | ) | Division 20 |
| | ) | |
| AMSTERDAM PRINTING & LITHO, INC. and TAYLOR CORPORATION, | ) ) | |
| | ) | |
| Defendants. | ) | |

**ORDER PRELIMINARILY APPROVING CLASS**
**ACTION SETTLEMENT AND APPROVING CLASS NOTICE**

This matter coming before the Court on the "Motion for Preliminary Approval of Class Action Settlement and Notice to the Settlement Class" (the "Motion"), after review and consideration of the Parties' Settlement Agreement and having been fully advised in the premises, IT IS HEREBY ORDERED and adjudged as follows:

1.    By stipulation of the Parties, and pursuant to Missouri Supreme Court Rule 52.08, the Court preliminarily certifies the following Settlement Class:

> All persons or entities who were successfully sent one or more faxes on or about the dates set forth stating: (1) "Time to Reorder and Save Big!!," sent June 22, 2015; (2) "The Independence Day Sale," sent on June 29, 2015; (3) "Is it Reorder Time," sent July 6, 2015; (4) "Just a Reminder," sent July 13, 2015; (5) "Great news, you have reached Star Status," sent July 20, 2015; (6) "Running Low," sent July 27, 2015; (7) "Time to Reorder and Save Big," sent August 3, 2015; (8) "Are Your Supplies Running Low," sent August 10, 2015; (9) "Just A Reminder," sent August 24, 2015; (10) "Running Low," sent September 8, 2015; (11) "Time to Reorder and Save Big!!," sent September 14, 2015; (12) "Are Your Supplies Running Low," sent September 21, 2015; (13) Time to Reorder and Save Big!!," sent October 19, 2015; (14) "Is it Reorder Time," sent November 9, 2015; (15) "Just A Reminder," sent November 16, 2015; (16) "Enjoy a Cornucopia of Savings this Thanksgiving," sent November 23, 2015; (17) "A Jump Start to the Holidays," sent November 30, 2015; (18) "Happy Holidays, You receive 20% off your entire order!," sent December 7, 2015; (19)

1

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

"Happy Holidays, It's Time to Reorder and Save 20% off your next order!," sent December 14, 2015; (20) "Wall Calendar Blow Out," sent December 17, 2015; and (21) "Time is Running Out! Over Stock Wall Calendars," sent December 23, 2015.

Excluded from the Class are Defendants, any parent, subsidiary, affiliate or controlled persons of Defendants, as well as the officers, directors, agents, servants or employees of Defendants and the immediate family members of such persons, and members of the Missouri judiciary.

The Parties expressly agreed to this Settlement Class definition for settlement purposes.

2.      The Court finds that class certification is appropriate for settlement purposes because (a) the Settlement Class is so numerous that joinder of all members is impractical, (b) there are common questions of law and fact that predominate over any questions affecting only individual class members, (c) Plaintiff is typical and will fairly and adequately protect the interests of the Settlement Class, and (d) a class action is an appropriate method for the fair and efficient adjudication of this controversy.

3.      The Court appoints plaintiff, Career Counseling, Inc. ("Plaintiff"), as the "Class Representative" and appoints Max G. Margulis of Margulis Law Group and Brian J. Wanca of Anderson + Wanca as "Class Counsel."

4.      Pursuant to Missouri Supreme Court Rule 52.08(e), the settlement of this action, as embodied in the terms of the Settlement Agreement, is preliminarily approved.

5.      The Settlement Agreement is incorporated by reference into this Order (with capitalized terms as set forth in the Settlement Agreement) and is hereby preliminarily adopted as an Order of this Court.

6.      The Settlement Agreement proposes notice of the settlement to the Settlement Class by sending the Notice via facsimile, and if the facsimile is not successfully received after three (3) attempts, then by postcard via U.S. mail. The Court finds that such notice satisfies the requirements of due process and Missouri Supreme Court Rule 52.08(c)(2). The plan is approved

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

and adopted. The Court orders that the Parties provide the notice to the Settlement Class as proposed in the Settlement Agreement. The Court approves the form of the Notice as contained in Exhibit 2 to the Settlement Agreement. The Court also approves Class-Settlements.com as the Settlement Administrator and fax notice provider.

7.      The Court hereby sets deadlines and dates for the acts and events set forth in the Settlement Agreement and directs the Parties to incorporate the deadlines and dates in the Class Notice:

(a)      The Notice shall be sent by the Settlement Administrator on or before _____, 2018;

(b)      Requests by any Settlement Class member to opt out of the settlement must be submitted to Class Counsel (with a copy to Defendants' Counsel) on or before _____, 201_, or be forever barred; and

(c)      Objections and motions to intervene, including supporting memoranda, shall be filed in this Court and postmarked and served on Class Counsel and Defendants' counsel, on or before _____, 201_, or be forever barred.

(d)      Completed and signed Claim Forms shall be postmarked or submitted to the Settlement Administrator on or before _____, 2019.

8.      The final approval hearing, set forth in the Class Notice, is hereby scheduled for _____, 2019, at _____ a.m./p.m., in Division _____ of the Circuit Court of the City of St. Louis, 10 N. Tucker Blvd., St. Louis, MO 63101.

ENTER:

_____

The Honorable Judge Joan L. Moriarty

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

# EXHIBIT 2

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

**THIS IS A NOTICE OF A LAWSUIT SETTLEMENT.**
**You may benefit from this. Please read it carefully. You are not being sued.**
**You must return a completed Proof of Claim (attached) if you want to receive a payment.**

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**

| | |
|---|---|
| CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES, individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiff, ) | Cause No. 1822-CC11500 |
| v. ) | |
| ) | Division 20 |
| AMSTERDAM PRINTING & LITHO, INC. and TAYLOR CORPORATION, ) ) | |
| ) | |
| Defendants. ) | |

**NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT**
**WITH ATTACHED CLAIM FORM**

**TO: All persons or entities who were successfully sent one or more faxes on or about the dates set forth stating: (1) "Time to Reorder and Save Big!!," sent June 22, 2015; (2) "The Independence Day Sale," sent on June 29, 2015; (3) "Is it Reorder Time," sent July 6, 2015; (4) "Just a Reminder," sent July 13, 2015; (5) "Great news, you have reached Star Status," sent July 20, 2015; (6) "Running Low," sent July 27, 2015; (7) "Time to Reorder and Save Big," sent August 3, 2015; (8) "Are Your Supplies Running Low," sent August 10, 2015; (9) "Just A Reminder," sent August 24, 2015; (10) "Running Low," sent September 8, 2015; (11) "Time to Reorder and Save Big!!," sent September 14, 2015; (12) "Are Your Supplies Running Low," sent September 21, 2015; (13) Time to Reorder and Save Big!!," sent October 19, 2015; (14) "Is it Reorder Time," sent November 9, 2015; (15) "Just A Reminder," sent November 16, 2015; (16) "Enjoy a Cornucopia of Savings this Thanksgiving," sent November 23, 2015; (17) "A Jump Start to the Holidays," sent November 30, 2015; (18) "Happy Holidays, You receive 20% off your entire order!," sent December 7, 2015; (19) "Happy Holidays, It's Time to Reorder and Save 20% off your next order!," sent December 14, 2015; (20) "Wall Calendar Blow Out," sent December 17, 2015; and (21) "Time is Running Out! Over Stock Wall Calendars," sent December 23, 2015.**

**Excluded from the Class are Defendants, any parent, subsidiary, affiliate or controlled persons of Defendants, as well as the officers, directors, agents, servants or employees of Defendants and the immediate family members of such persons, and members of the Missouri judiciary. (the "Settlement Class").**

**A.    WHY HAVE YOU RECEIVED THIS NOTICE?** The Court ordered us to send this

1

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

Notice. The Notice explains the nature of the lawsuit and the settlement terms and informs you of your legal rights and obligations.

**B.    WHAT IS THIS LAWSUIT ABOUT?** This lawsuit is about fax advertisements sent by or on behalf of the defendants, Amsterdam Printing & Litho, Inc. and Taylor Corporation ("Defendants"), between June 21, 2015 and December 24, 2015. Plaintiff, Career Counseling, Inc., filed this class action lawsuit in the Circuit Court of St. Louis City, Missouri alleging that Defendants violated the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by sending advertisements to the Class by fax. Defendants denied Plaintiff's allegations and raised defenses. The parties have reached a proposed settlement.  The Court has not found that Defendants violated the TCPA.

**C.    WHAT IS THE PROPOSED SETTLEMENT?** Without admitting any fault or liability, and in exchange for a release of all claims against Defendants, Defendants have agreed to make up to $9,999,999.00 (the "Settlement Fund") available to pay those Settlement Class members who submit a claim form (attached), to pay an incentive award to plaintiff, Career Counseling, Inc., for serving as the class representative, and to pay attorneys' fees and litigation expenses to Plaintiff's attorneys. Each Settlement Class member who submits an approved claim will be mailed a check for their pro rata share of the Settlement Fund, up to $500.00 per unique fax number according to the records in the litigation. The Court has preliminarily approved this settlement, subject to a fairness hearing that will occur on _____, 2019, at _____ a.m./p.m., in Division 20 of the Circuit Court of the City of St. Louis, Missouri, 10 N. Tucker Blvd, St. Louis, MO 63101.

**D.    WHAT CAN YOU DO NOW? YOU HAVE FOUR OPTIONS.**
Members of the Settlement Class have the following four options:

    **1.    Return a completed Claim Form:** To receive a share of the settlement funds, you must complete and return a signed Claim Form postmarked or submitted on or before _____, 2019. The Claim Form is attached as the last page of this Notice. If approved, you will be mailed a check for your share of the settlement funds.

    **2.    Do nothing.** If you do nothing, you will stay in the Settlement Class, be bound by any judgment entered by the Court, and you will release your claims against Defendants about Defendants' fax advertisements, but you will receive no payment.

    **3.    Exclude yourself from the Class and the settlement.** You are not required to participate in the settlement. You have the right to exclude yourself from the Settlement Class and the settlement by sending a written request for exclusion. But your completed, signed statement advising of your election to opt out must be postmarked no later than _____, 201_. If your request is not postmarked by that date, your right to opt out will be deemed waived and you will be bound by all orders and judgments entered in connection with the settlement. Your request must list your name, street address, fax number, and the name and number of this case, and it must indicate your request for exclusion (for example, "Exclude me from the Career Counseling v. Amsterdam settlement"). You must send your request to the following attorneys, and they will inform

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

the Court of your request.

| Class Counsel: | Defendants' Attorney: |
|---|---|
| Brian J. Wanca | William Raney |
| ANDERSON + WANCA | COPILEVITZ & CANTER, LLC |
| 3701 Algonquin Rd., Suite 500 | 310 W. 20th Street, Suite 300 |
| Rolling Meadows, IL 60008 | Kansas City, MO 64108 |

**4.** **Object to the settlement in writing.** If you object to the settlement, and wish to file an objection rather than simply excluding yourself from the class action, you must submit your objection in writing to the Clerk of the Circuit Court of the City of St. Louis, Missouri, 10 N. Tucker Blvd, St. Louis, MO 63101. Your objection must be postmarked by _____, 201_. You must also serve copies of your objection and any supporting memoranda or materials on the attorney for the Settlement Class and for Defendants listed above, postmarked by the same date. Any objection must include your name, fax number(s), and street address, the name and number of this case, and a statement of the reasons why you believe that the Court should find that the proposed settlement is not fair, reasonable, and in the best interests of the Class. Please note that it is not sufficient to simply state that you object. You must state the reasons why you believe the settlement should not be approved.

**E.** **WHEN WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?** The Court will hold a hearing to decide whether the proposed settlement is fair and reasonable and should be approved. At that fairness hearing, the Court will hear any objections and arguments about the proposed settlement, including the amount of the award of costs and attorney's fees to Class Counsel. The fairness hearing will take place on _____, 201_, at _____ a.m./p.m., Division 20 of the Circuit Court of the City of St. Louis, Missouri, 10 N. Tucker Blvd, St. Louis, MO 63101. **You do not need to attend this hearing.** The fairness hearing may be continued to a future date without further notice. If the Court does not approve the settlement, the case will proceed as if no settlement has been attempted. If the settlement is not approved, there is no assurance that the Class will recover more than is provided in the settlement, or recover anything at all.

**F.** **WHO REPRESENTS THE SETTLEMENT CLASS?** The Court appointed Plaintiff, Career Counseling, Inc., to be the "Class Representatives" and appointed the following attorneys to be "Class Counsel":

| Max G. Margulis | Brian J. Wanca |
|---|---|
| Margulis Law Group | ANDERSON + WANCA |
| 28 Old Belle Monte Rd. | 3701 Algonquin Road, Suite 500 |
| Chesterfield, MO 63017 | Rolling Meadows, IL 60008 |

At the fairness hearing, Class Counsel will request that the Court approve the payment of an incentive award of $15,000.00 from the Settlement Fund to Plaintiff for its services on behalf of the Class. Additionally, Class Counsel will request that the Court award them attorneys' fees

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

equal to one third (33 1/3%) of the Settlement Fund ($3,333,333.00), plus reasonable out-of-pocket litigation expenses, notice costs and administrative fees. Defendants have agreed not to object to these amounts.

### G.      HOW DO I OBTAIN MORE INFORMATION ABOUT THE LAWSUIT OR THE SETTLEMENT? This description of the case is general and does not cover all of the issues and proceedings in the case. To see the complete file, including a copy of the settlement agreement, you may visit the office of the Clerk of the Circuit Court of the City of St. Louis, Missouri, 10 N. Tucker Blvd, St. Louis, MO 63101. The Clerk will make the files relating to the lawsuit available to you for inspection and copying at your own expense.

If you have specific questions, write to Class Counsel Brian J. Wanca at the address above. Include the case number, your name, your fax number, and your telephone number. Or, you may call Brian J. Wanca's office at 855-827-2329

Please do not contact the Clerk of the Court, the Judge, or the Judge's staff, because they cannot answer your questions or give you advice about this settlement.

**BY ORDER OF THE COURT**
**HONORABLE**

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

**PROOF OF CLAIM**
**Career Counseling, Inc. v. Amsterdam Printing & Litho, Inc., et al.,**
**Case No. 1822-CC11500        Div. 20**

*You Must Complete All **THREE** Steps to Claim a Share of the Settlement Fund:*

1.   **You Must Provide Your Contact Information.**

   Name: _____

   Company: _____

   Address: _____

   City/State/Zip Code: _____

   Fax Number(s): _____
                    [List all numbers.  You may attach a separate sheet]

   Contact Telephone: _____

   Email Address: _____


2.   **You Must Verify Ownership of the Fax Number(s) Listed in #1 above:**

   a.   "The fax number(s) identified above or attached to this Proof of Claim was/were mine or my company's from June 22, 2015 through December 23, 2015."


                    _____
                         (Sign your name here)

   **_OR_**

   b.   "The fax number(s) identified above or attached to this Proof of Claim was **not**/were **not** mine or my company's from June 22, 2015 through December 23, 2015." Explain when you obtained the fax number(s) identified in No. 1 above or attached to this Proof of Claim:

                    _____
                    _____


                    _____
                         (Sign your name here)


3.   **You Must Return this Claim Form by _____, 2019:**
   a.   Fax this Claim Form to:  <u><fax number for claims ></u>

        **_OR_**

   b.   Mail this Claim Form to:  [CLAIMS ADMINISTRATOR]

        **_OR_**

   c.   Email to Claims Administrator at: AmsterdamClaims@Class-Settlement.com

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

# EXHIBIT 3

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

| | | |
|---|---|---|
| CAREER COUNSELING, INC. d/b/a SNELLING STAFFING SERVICES, individually and on behalf of all others similarly-situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 1822-CC11500 |
| | ) | |
| v. | ) | Division 20 |
| | ) | |
| AMSTERDAM PRINTING & LITHO, INC. and TAYLOR CORPORATION, | ) ) | |
| | ) | |
| Defendants. | ) | |

## FINAL APPROVAL ORDER AND JUDGMENT

The matter coming before the Court on the Parties' joint request for final approval of the class action settlement, due notice having been given, the Parties appearing through counsel, and the Court fully advised in the premises, IT IS HEREBY ORDERED:

1.      This Court has jurisdiction over plaintiff, Career Counseling, Inc. ("Plaintiff"), and defendants, Amsterdam Printing & Litho, Inc. and Taylor Corporation ("Defendants"), each of their counsel, the members of the Settlement Class, and the claims asserted in this lawsuit.

2.      Pursuant to Missouri Supreme Court Rule 52.08(e), the Court hereby finally approves the settlement of this action, as embodied in the terms of the Settlement Agreement, as a fair, reasonable, and adequate settlement in the best interests of the Settlement Class (defined below), in light of the factual, legal, practical, and procedural considerations raised by this case. No timely objections were filed.  Accordingly, this Final Approval Order and Judgment binds all members of the Class who did not opt out.

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

3.      In its Order Preliminarily Approving Settlement, Certifying Settlement Class, and

Authorizing Notice to the Settlement Class (the "Preliminary Approval Order"), the Court

certified the following Settlement Class:

> All persons or entities who were successfully sent one or more faxes on or about
> the dates set forth stating: (1) "Time to Reorder and Save Big!!," sent June 22,
> 2015; (2) "The Independence Day Sale," sent on June 29, 2015; (3) "Is it
> Reorder Time," sent July 6, 2015; (4) "Just a Reminder," sent July 13, 2015; (5)
> "Great news, you have reached Star Status," sent July 20, 2015; (6) "Running
> Low," sent July 27, 2015; (7) "Time to Reorder and Save Big," sent August 3,
> 2015; (8) "Are Your Supplies Running Low," sent August 10, 2015; (9) "Just A
> Reminder," sent August 24, 2015; (10) "Running Low," sent September 8, 2015;
> (11) "Time to Reorder and Save Big!!," sent September 14, 2015; (12) "Are
> Your Supplies Running Low," sent September 21, 2015; (13) Time to Reorder
> and Save Big!!," sent October 19, 2015; (14) "Is it Reorder Time," sent
> November 9, 2015; (15) "Just A Reminder," sent November 16, 2015; (16)
> "Enjoy a Cornucopia of Savings this Thanksgiving," sent November 23, 2015;
> (17) "A Jump Start to the Holidays," sent November 30, 2015; (18) "Happy
> Holidays, You receive 20% off your entire order!," sent December 7, 2015; (19)
> "Happy Holidays, It's Time to Reorder and Save 20% off your next order!," sent
> December 14, 2015; (20) "Wall Calendar Blow Out," sent December 17, 2015;
> and (21) "Time is Running Out! Over Stock Wall Calendars," sent December 23,
> 2015.
>
> Excluded from the Class are Defendants, any parent, subsidiary, affiliate or
> controlled persons of Defendants, as well as the officers, directors, agents,
> servants or employees of Defendants and the immediate family members of such
> persons, and members of the Missouri judiciary.

As per the class definition the Court hereby excludes from the Settlement Class

Defendants, any parent, subsidiary, affiliate or controlled persons of Defendants, as well as the

officers, directors, agents, servants or employees of Defendants and the immediate family

members of such persons, and members of the Missouri judiciary, since the Parties expressly

agreed to this Settlement Class definition for settlement purposes.

In the Preliminary Approval Order, the Court appointed Plaintiff as the "Class

Representative," and appointed Plaintiff's attorneys Max G. Margulis of Margulis Law Group

and Brian J. Wanca of Anderson + Wanca as "Class Counsel."

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

4.      The Court finds that the Settlement Agreement has been entered into in good faith following arm's-length negotiations.

5.      The Court finds that the notice given to Class Members in this action was the best notice practicable under the circumstances and satisfies the requirements of due process and Missouri Supreme Court Rule 52.08(c)(2).

6.      Because they submitted a timely request to be excluded from the Settlement Class and this action, the following persons are so excluded: _____.

7.      _____ objections were received and _____ persons appeared in Court at the fairness hearing to object to the settlement. All objections are overruled.

8.      The Court finds that the settlement is fair, adequate, and reasonable, after due consideration of (a) the uncertainty of the class's success on the merits of the claims; the range of their possible recovery, (b) the complexity, expense and duration of the litigation, (c) the lack of opposition to the settlement, (d) the state of proceedings at which the settlement was achieve, (e) the written submissions, affidavits, and arguments of counsel, and (f) after notice and hearing. This Court also finds that the financial settlement terms fall within the range of settlement terms that are fair, adequate and reasonable. Accordingly, this Settlement Agreement should be and is approved and shall govern all issues regarding the settlement and all rights of the Parties, including the members of the Settlement Class. Each member (including any person or entity claiming by or through him, her, or it, but except for those who excluded themselves from the Class) by timely filing a valid notice with the Clerk of the Court indicating that they are opting out (such persons having been identified above) shall be bound by the Settlement Agreement, including being subject to the release set forth in said Settlement Agreement.

9.      Defendants have created a settlement fund (the "Settlement Fund") of up to $9,999,999.00 to pay all claims by Settlement Class members, to pay Class Counsel's fees,

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

litigation expenses, settlement administration expenses and to pay the Class Representative's incentive award. Unclaimed monies in the Settlement Fund shall revert back to the Defendants.

10.     As the Parties agreed in the Settlement Agreement, each owner of each unique fax number of the Settlement Class who submits a timely and valid Claim Form shall be paid a total of $500.00 per unique fax number. The Claims Administrator shall cause those checks to be mailed after receiving the funds from Defendants. Checks issued to the claiming Settlement Class members will be void 181 days after issuance and the total amount from voided checks shall revert back to Defendants.

11.     Pursuant to the Parties' agreement, the Court approves Class Counsel's attorneys' fees in an amount equal to one third (33 1/3%) of the Settlement Fund ($3,333,333.00), plus reasonable out-of-pocket litigation expenses, notice costs and administrative fees from the Settlement Fund. Accordingly, the Court awards Class Counsel fees in the amount of $3,333,333.00 and expenses, including costs of claims administration in the amount of $_____; that judgment is final and the fees are ordered paid to Class Counsel. Some of the law firms have expressed an interest in receiving their share of the fee award in periodic payments, rather than in a lump sum. Class-settlement.com, the Claims Administrator, is permitted to enter into any and all agreements with the attorneys and third parties to provide for such periodic payment of fee awards as requested by the attorneys. In accordance with the Settlement Agreement, Defendants will pay those amounts from the Settlement Fund when this Final Approval Order becomes final as those terms are defined in the Settlement Agreement.

12.     Pursuant to the Parties' agreement, the Court approves a $15,000.00 incentive award to Career Counseling, Inc. for serving as the Class Representative. In accordance with the Settlement Agreement, Defendants will pay that amount from the Settlement Fund when the Final Judgment and Order become final as those terms are defined in the Settlement Agreement.

4

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

13.    The Court adopts and incorporates all of the terms of the Settlement Agreement by reference here. The Parties to the Settlement Agreement shall carry out their respective obligations as agreed upon in the Settlement Agreement.

14.    This action, including all claims against Defendants asserted in this lawsuit, or which could have been asserted in this lawsuit, by or on behalf of Plaintiff and all Settlement Class members against Defendants, is hereby dismissed with prejudice and without taxable costs to any Party.

15.    All claims or causes of action of any kind by any Settlement Class member or anyone claiming by or through him, her, or it brought in this Court or any other forum (other than persons who have properly opted out of the Settlement) are barred pursuant to the releases set forth in the Settlement Agreement. All persons and entities are enjoined from instituting, either directly or indirectly, any action against Defendants in this Court or in any other court or forum, asserting any claim that is being settled or released herein.

16.    If (a) the Settlement Agreement is terminated pursuant to its terms, or (b) the Settlement Agreement or Final Approval Order and Judgment do not for any reason become effective, or (c) the Settlement Agreement or Final Approval Order and Judgment are reversed, vacated, or modified in any material or substantive respect, then any and all orders entered pursuant to the Settlement Agreement shall be deemed vacated. If the settlement does not become final in accordance with the terms of the Settlement Agreement, this Final Approval Order and Judgment shall be void and shall be deemed vacated.

17.    The Court retains continuing jurisdiction over this action, Plaintiff and all members of the Settlement Class, and Defendants to determine all matters relating in any way to this Final Judgment and Order, the Preliminary Approval Order, or the Settlement Agreement, including, but not limited to, their administration, implementation, interpretation, or

Electronically Filed - City of St. Louis - March 25, 2019 - 08:38 PM

enforcement. The Court further retains jurisdiction to enforce this Order.

      18.    The Court finds that there is no just reason to delay the enforcement of or appeal from this Final Approval Order and Judgment.

                            BY ORDER OF THE COURT

Dated: _____          _____

                            Honorable Joan L. Moriarty